IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. _____

FRAUNHOFER-GESELLSCHAFT ZUR
FÖRDERUNG DER ANGEWANDTEN
FORSCHUNG E.V.,

                Plaintiff,

v.

LENOVO (UNITED STATES), INC.,
LENOVO (SHANGHAI) ELECTRONICS
TECHNOLOGY CO. LTD., LENOVO
(BEIJING), LTD., LENOVO GROUP, LTD.,
MOTOROLA (WUHAN) MOBILITY
TECHNOLOGIES COMMUNICATION CO.,
LTD., AND MOTOROLA MOBILITY, LLC,

                Defendants.

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V. (the "Plaintiff" or "Fraunhofer") files this Complaint for patent infringement against Defendants Lenovo (United States), Inc., Lenovo (Shanghai) Electronics Technology Co. Ltd., Lenovo (Beijing), Ltd., Lenovo Group, Ltd., Motorola (Wuhan) Mobility Technologies Communication Co., Ltd., and Motorola Mobility, LLC (collectively, "Lenovo" or "Defendants") and states as follows:

## THE PARTIES

1.     Fraunhofer is a non-profit corporation duly organized and existing under the laws of Germany with its principal place of business at Hansastraße 27c, 80686 Munich, Germany.

2.     On information and belief, Defendant Lenovo Group, Ltd. ("Lenovo Group") is a Chinese company. In *IPVenture Inc. v. Lenovo Group Ltd. et al.*, 11-cv-00588 (D. Del.), D.I. 131, Lenovo Group stated that it has a principal place of business at 23/F, Lincoln House, Taikoo Place, 979 King's Road, Quarry Bay, Hong Kong. Lenovo Group also lists the following address as a "Key Operations Center" on its website: 8001 Development Drive, Morrisville, NC 27560, United States.[1] Defendant Lenovo Group, either itself or through the activities of its subsidiaries, makes, uses, sells, offers for sale, and/or imports throughout the United States, including this District, products, such as mobile devices, that infringe the Asserted Patents.

3.     On information and belief, Defendant Lenovo (United States), Inc. ("Lenovo US") is a subsidiary of Defendant Lenovo Group. Defendant Lenovo US is a Delaware corporation with its principal place of business at 8001 Development Drive, Morrisville, North Carolina 27560. Defendant Lenovo US, either itself or through the activities of its affiliates and/or subsidiaries, makes, uses, sells, offers for sale, and/or imports throughout the United States, including this District, products, such as mobile devices, that infringe the Asserted Patents.

---

[1] https://investor.lenovo.com//en/about/corpinfo.php (last visited October 16, 2025).

2

4. On information and belief, Defendant Lenovo (Shanghai) Electronics Technology Co. Ltd. ("Lenovo Shanghai") is a subsidiary of Defendant Lenovo Group. Defendant Lenovo Shanghai is a Chinese company with its principal place of business at Section 304-305, Building No.4, #222, Meiyue Road, China (Shanghai) Pilot Free Trade Zone, Shanghai, China, 200131. Defendant Lenovo Shanghai, either itself or through the activities of its affiliates and/or subsidiaries, makes, uses, sells, offers for sale, and/or imports throughout the United States, including this District, products, such as mobile devices, that infringe the Asserted Patents (defined below).

5. On information and belief, Defendant Lenovo (Beijing), Ltd. ("Lenovo Beijing") is a subsidiary of Defendant Lenovo Group. Defendant Lenovo Beijing is a Chinese company with its principal place of business at Lenovo Building, 6 Chuangye Rd, Shangdi Haidian District, Beijing, China 100085. Defendant Lenovo Beijing, either itself or through the activities of its affiliates and/or subsidiaries, makes, uses, sells, offers for sale, and/or imports throughout the United States, including this District, products, such as mobile devices, that infringe the Asserted Patents.

6. On information and belief, Defendant Motorola (Wuhan) Mobility Technologies Communication Co., Ltd. ("Motorola Wuhan") is a subsidiary of Defendant Lenovo Group. Defendant Motorola Wuhan is a Chinese company with its principal place of business at No. 19, Gaoxin 4th Road, Wuhan East Lake High-tech Zone, Wuhan, Wuhan Hubei 430000, China. Defendant Motorola Wuhan, either itself or through the activities of its affiliates and/or subsidiaries, makes, uses, sells, offers for sale, and/or imports throughout the United States, including this District, products, such as mobile devices, that infringe the Asserted Patents.

7.     On information and belief, Defendant Motorola Mobility LLC ("Motorola Mobility") is a subsidiary of Motorola Mobility Holdings LLC, which is a subsidiary of Defendant Lenovo Group. Defendant Motorola Mobility is a Delaware corporation with its principal place of business at 222 W. Merchandise Mart Plaza, Chicago, IL 60654. Defendant Motorola Mobility, either itself or through the activities of its affiliates and/or subsidiaries, makes, uses, sells, offers for sale, and/or imports throughout the United States, including this District, products, such as mobile devices, that infringe the Asserted Patents.

## NATURE OF THE ACTION

8.     This is a civil action for infringement of U.S. Patent Nos. 11,521,631 ("the '631 Patent"), 9,595,263 ("the '263 Patent"), 10,643,624 ("the '624 Patent"), 10,089,993 ("the '993 Patent"), 10,475,455 ("the '455 Patent"), and 10,249,317 ("the '317 Patent") (collectively, the "Asserted Patents") arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

9.     Lenovo directly infringes the Asserted Patents by making, using, offering to sell, selling, and/or importing into the United States mobile devices and other devices that practice the inventions claimed in the Asserted Patents. This includes mobile devices and other devices that comply with and/or are capable of complying with the Enhanced Voice Services ("EVS") Standard.  These devices include all Lenovo 5G and 4G products with EVS capability, including but not limited to, the Motorola Moto G Power, the devices listed in Appendix A, and all equivalents thereto (collectively, "Lenovo's EVS Products").

10.     Lenovo indirectly infringes the Asserted Patents by inducing its consumer end-users to directly infringe the Asserted Patents. Lenovo induces infringement by providing mobile devices that, when used by consumers for voice calls or conferencing using EVS technology, as

4

directed and intended by Lenovo, cause those users to make, use, and practice the inventions claimed in the Asserted Patents.

11. Plaintiff seeks damages and other relief for Lenovo's infringement of the Asserted Patents.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq.*

13. Venue is proper in this judicial district under 28 U.S.C. §§1391(b)-(c) and 1400(b). Lenovo US and Motorola Mobility have offices in North Carolina and this District. Lenovo US and Motorola Mobility also have employees in North Carolina, including Motorola Mobility's Chief Global Marketing & Strategy Officer.[2] Additionally, Lenovo US and Motorola Mobility have previously asserted that venue is proper in this District in prior patent infringement cases.[3] Moreover, defendants Lenovo Group, Lenovo Shanghai, Lenovo Beijing, and Motorola Wuhan are not a resident in the United States and therefore, in accordance with 28 U.S.C. §§1391(c)(3), may be sued in any judicial district, and the joinder of such a defendant is disregarded in determining where the action may be brought with respect to other defendants.

---

[2] *See* https://www.linkedin.com/in/francois-laflamme-2b52318/ (last visited October 16, 2025); https://www.motorola.com/us/en/about/motorola-executive-team (last visited October 16, 2025).

[3] *See MyMail, Ltd. v. Motorola Mobility, LLC*, No. 1:18-cv-00048-LY, Dkt. No. 22 at 1, 10 (W.D. Tex.) ("If, however, this Court chooses, in lieu of dismissal, to transfer this case, Lenovo and Motorola respectfully submit that the Eastern District of North Carolina (EDNC), and specifically the Raleigh Division, is both a proper forum for this dispute and the most convenient forum. . . . Under the patent venue statute, the Eastern District of North Carolina is a proper venue for both Lenovo and Motorola.")

14.     This Court has general personal jurisdiction over Lenovo US, which has its principal place of business in North Carolina. The Court also has specific personal jurisdiction over all Defendants. Defendants have continuous and systematic business contacts with the State of North Carolina that subject them to the personal jurisdiction of the Court. Defendants, directly or through subsidiaries or intermediaries (including distributors, retailers, and others), have committed and continue to commit acts of patent infringement throughout the State of North Carolina and the Eastern District of North Carolina, by, among other things, making, using, testing, selling, licensing, importing and/or offering for sale/license products and services that infringe the Asserted Patents. Defendants purposefully and voluntarily placed Lenovo's EVS Products into this District and into the stream of commerce with the intention and expectation that they will be purchased and used by consumers in this District. Lenovo's EVS Products have been and continue to be purchased and used by consumers in this District.

15.     Defendants committed acts of patent infringement within North Carolina and, more particularly, within the Eastern District of North Carolina.  Jurisdiction over Lenovo US and Motorola Mobility is also proper because they have voluntarily submitted themselves to the jurisdiction of the courts by commencing litigations within the State of North Carolina, by registering with the North Carolina Secretary of State's Office to do business in the State of North Carolina, and/or by appointing a registered agent.

16.     Defendants are part of the same corporate structure and distribution chain for making, importing, offering to sell, selling, and/or using Lenovo's EVS Products, including in the State of North Carolina generally and this District in particular. Defendants share the same management, common ownership, advertising platforms, facilities, distribution chains and

6

platforms, and accused product lines and products involving related technologies. Thus, they operate as a unitary business venture.

17. Alternatively, the Court has personal jurisdiction over Defendants Lenovo Group, Lenovo Shanghai, Lenovo Beijing, and Motorola Wuhan under Federal Rule of Civil Procedure 4(k)(2). This case arises under federal law, Defendants Lenovo Group, Lenovo Shanghai, Lenovo Beijing, and Motorola Wuhan are not subject to general jurisdiction of any one state, and the exercise of jurisdiction is consistent with the United States Constitution.

## INTRODUCTION & BACKGROUND

18. The technology at issue in this case relates to audio and speech codecs used in wireless communications, including, but not limited to 4G, 5G, and Wi-Fi capable user devices.

19. Fraunhofer is one of the world's leading organizations for applied research, operating 76 institutes and research facilities throughout Germany. Founded in 1949, it has an annual research budget of €2.9 billion (approximately $3.4 billion), and employs over 30,000 employees, comprised primarily of scientists and engineers. Fraunhofer has over 4,700 issued U.S. Patents.

20. The Fraunhofer Institute for Integrated Circuits IIS ("Fraunhofer IIS") is one of the 76 institutes within Fraunhofer. Based in Erlangen, Germany it was founded in 1985. Fraunhofer IIS is the largest institute within Fraunhofer and is primarily focused on microelectronics and information technology system research.

21. For over 30 years, Fraunhofer IIS, through its Audio and Media Technologies division, has been at the forefront of developing and standardizing technologies relating to audio/speech coding and moving image production worldwide. Fraunhofer IIS' innovations have significantly improved both the creation and transmission of audio content, drastically improving

7

the quality of broadcast, streaming and real-time communication. Fraunhofer IIS' technology has been widely adopted in cell phones, computers, and other consumer electronic devices, all used daily by billions of people around the world.

22.     Fraunhofer has been highly successful in developing audio codecs. In the past, it was involved in the development of mp3 (officially called "MPEG Layer 3," standardized in 1992), followed by the co-development of MPEG Advanced Audio Coding (AAC, standardized in 1997) and High Efficiency-AAC (HE-AAC). The mp3 and AAC codecs were both successful and widely adopted.

23.     Over the past two decades Fraunhofer continued its research, developing significant technologies in the areas of real-time communication, voice compression, and seamless integration of audio and voice compression methods in a unified codec. This included the extended High-Efficiency AAC codec (xHE-AAC, standardized in 2011), and ultimately the EVS codec. The EVS codec is the most advanced 3GPP codec for mobile communication networks.

24.     The 3rd Generation Partnership Project (3GPP) is a global telecommunications standards body which started in 1998 with participation from "major telecommunication companies [including] operators, vendors and service providers."[4] The 3GPP "unites seven telecommunications standard development organizations (ARIB, ATIS, CCSA, ETSI, TSDSI, TTA, TTC), known as 'Organizational Partners' providing their members with a stable

---

[4]                    https://www.3gpp.org/ftp/Information/presentations/Newcomers_quick-start/Newcomers_slides.pdf (last visited October 16, 2025).

environment to produce the Reports and Specifications that define 3GPP technologies."[5] Over 857 organizations worldwide have joined the 3GPP via one of its seven Organizational Partners.[6]

25.    Generally, the "3GPP specifications cover cellular telecommunication technologies."[7] The 3GPP technologies "are constantly evolving through Generations of commercial cellular / mobile systems."[8] With its work relating to LTE and 5G networks, "3GPP has become the focal point for the vast majority of mobile systems beyond 3G."[9]

26.    The 3GPP adopted the EVS Standard in 2014. Among other things, the EVS Standard addressed certain limitations of the prior Adaptive Multirate Wideband ("AMR-WB") codec. Fraunhofer has been recognized as a leading contributor to the EVS codec and the 3GPP EVS Standard, which were developed and standardized through a collaboration of industry leaders, including manufacturers (chipset, handset, infrastructure), operators, and technology providers.

27.    The EVS Standard is set forth in the 3GPP standards documents known as technical specifications ("TS"). The 26 series of the 3GPP technical specifications covers various aspects of the EVS Standard, including at least TS 26.441, 26.442, 26.443, 26.444, 26.445, 26.446, 26.447, 26.448, 26.449, 26.450, 26.451, 26.114 and 26.952 (collectively the "EVS Standard").

28.    The EVS codec is operable in conjunction with different networks including, for example, the Voice over Long Term Evolution ("VoLTE") services in 4G networks. The 3GPP

---

[5] https://www.3gpp.org/about-us/introducing-3gpp (last visited October 16, 2025).

[6] https://www.3gpp.org/ftp/Information/presentations/Newcomers_quick-start/Newcomers_slides.pdf (last visited October 16, 2025).

[7] https://www.3gpp.org/about-us/introducing-3gpp (last visited October 16, 2025).

[8] *Id.*

[9] *Id.*

9

"anticipated that enhanced voice services based on the new EVS codec will become the dominant voice service in 3GPP LTE networks."[10]

29.     In addition to use in 4G networks, the EVS codec is also implemented by 5G-capable devices[11] and devices operating over Wi-Fi networks.

30.     The EVS codec has clear advantages over prior codecs. For instance, the EVS codec offers improved voice and music transmission quality while improving data compression efficiency and allows coding of audio signals with different frequency bandwidths. Moreover, the EVS codec offers an adaptable bit rate over a wide bit rate range which improves network capacity and transmission quality. The EVS codec also increases reliability by using various methods to compensate for the effects of packet losses during transmission.

31.     In addition to the above, the EVS codec incorporates many other improvements. For instance, the EVS codec allows for greater flexibility with respect to the type of signals to be encoded, providing high compression for all signal types (speech, background, music, and general audio). Previously, codecs for mobile communication focused on prediction-based time-domain speech coders which are optimized for speech-like signals and thus have difficulties with non-speech content.

32.     To achieve optimum coding regardless of the signal type the EVS codec combines prediction-based time-domain coding – an Algebraic Code Excited Linear Prediction ("ACELP") coder which is optimized for speech-like signals - with transform-based coding strategies - a Modified Discrete Cosine Transform ("MDCT") coder, in particular an MDCT-based Transform Coded Excitation ("TCX") coder - which can code any type of signal. Sophisticated algorithms

---

[10] 3GPP TR 26.952 V16.1.0 (2019-06) at p. 9.

[11] https://www.ericsson.com/en/5g-voice (last visited June 4, 2025).

are used to determine which coding strategy provides the highest quality at a particular moment in time, and special care is taken to ensure seamless transitions when switching between the coding strategies.

33.     According to independent studies, the EVS codec outperforms the prior AMR-WB codec at all operational points and provides much higher sound quality using fewer bits. Through these and other technical advantages the EVS codec facilitates better call quality and improves network usage efficiency.

34.     GSMA (Groupe Spécial Mobile Association) considered EVS "a new full HD VoLTE codec … with [a] voice definition similar to that of a full HD film."[12] GSMA also recognized that "EVS has higher anti-jitter and anti-packet-loss capabilities, ensuring good voice quality at cell edge and during high-speed movement."[13] In addition, GSMA recognized that "under the same quality conditions, the capacity of a network utilizing EVS is twice or is even higher than that using a common voice codec."[14]

35.     In 2016, T-Mobile upgraded its network in the United States to support EVS. T-Mobile touted EVS as "a true next-gen voice technology that delivers some incredibly cool benefits to our customers," including "improv[ing] voice call reliability in areas of weaker signal" and "even higher-fidelity calls."[15] On information and belief, T-Mobile's US spokesperson stated

---

[12] Network Experience Evolution to 5G, available at https://www.gsma.com/solutions-and-impact/technologies/networks/wp-content/uploads/2020/02/Network-Experience-Evolution-to-5G_GSMA.pdf (last visited October 16, 2025).

[13] *Id.*

[14] *Id.*

[15] Neville Ray, *Patent-Pending: T-Mobile's Next Network Upgrade with Enhanced Voice Services*, T-Mobile (Apr. 5, 2016), https://www.t-mobile.com/news/volteenhanced- voice-services.

that "the EVS codec (the way the audio is stored and transferred) captures a much broader audio frequency range that translates into a richer, more realistic-sounding voice audio."[16] Similarly, T-Mobile U.S. CTO Neville Ray stated that "EVS improves voice call reliability in areas of weaker signals resulting in fewer dropped calls, and provides 'higher fidelity' calls than the carrier's already launched HD Voice product with a 'broader audio frequency range' providing more 'realistic sounding' audio." *Id.*

36.     On information and belief, carrier Verizon Wireless also upgraded its network in the United States to support the EVS codec.[17] According to Verizon, as of February 11, 2025, "more than 280 million people have access to Verizon's 5G Ultra Wideband network."[18]

37.     On information and belief, the AT&T network in the United States supports the EVS codec.

38.     As of May 2019, the EVS codec was supported by more than 160 EVS enabled devices offered by 16 vendors.[19] By June 2022, "the EVS codec [was] widely deployed in devices

---

[16] Dan Meyer, *T-Mobile EVS Builds on VoLTE, Claimed Better Reliability, Clarity, Availability*, RCR Wireless News (Apr. 7, 2016), https://www.rcrwireless.com/20160407/carriers/t-mobile-evs-builds-volte-claimed-better-reliability-clarity-availability-tag2.

[17] *See, e.g.*, Sascha Segan, *How to Make Your Cell Phone Calls Sound Better*, PCMag (May 29, 2025), https://www.pcmag.com/article/360357/how-to-make-your-cell-phone-callssound-better.

[18] Karen Schulz, *Verizon has the best 5G network in America*, (June 3, 2025), https://www.verizon.com/about/news/verizon-has-best-5g-network-america.

[19] https://gsacom.com/paper/enhanced-voice-services-evs-market-update-2/ (last visited October 16, 2025).

and networks around the world."[20] In fact, "the default voice codec in 5G smartphones enables 'HD voice+', using [EVS]."[21]

39. The EVS Standard has been widely deployed in the United States.

40. The Asserted Patents cover fundamental audio coding technologies used by audio codecs that comply with the EVS Standard. These technologies are necessary for Lenovo's consumers to enjoy EVS (sometimes commercially referred to as "Enhanced HD Voice," "Ultra HD Voice," or "HD Voice+") which provides a high efficiency and versatile solution to audio and speech coding when using Lenovo's mobile devices. The Asserted Patents disclose technologies that enable many benefits to consumers including, but not limited to, better sound quality when compared to older technologies operating at the same bit rate.

## NOTICE AND COMPLIANCE WITH FRAND OBLIGATIONS

41. The Asserted Patents are essential to the EVS Standard.

42. The applications to which each Asserted Patent claims priority have been declared essential to the EVS Standard by way of Intellectual Property Rights ("IPR") Declarations to one or more of 3GPP's organizational partners including, for example, the European Telecommunications Standards Institute ("ETSI").

43. On information and belief, Lenovo is an active participant in 3GPP at least by participation of Lenovo Beijing, Lenovo Shanghai and related entities such as Lenovo Mobile Communication Technology Ltd., Motorola Mobility Germany GmbH, and Motorola Mobility

---

[20] https://www.nokia.com/blog/coding-for-connection-voice-codec-and-the-foundation-of-communication/ (last visited October 16, 2025).

[21] https://www.ericsson.com/en/5g-voice# (last visited October 16, 2025).

13

UK Ltd. through 3GPP organizational partners such as the China Communications Standards Association ("CCSA") and ETSI.

44. Through its participation in 3GPP, Defendant Lenovo has or should have knowledge of the Asserted Patents and the fact that the Asserted Patents have been declared essential to the EVS Standard.

45. On October 13, 2023, Plaintiff sent a FRAND package to Lenovo. This package included a list of patents, claim charts, a White Paper titled "Fraunhofer Institute for Integrated Circuits EVS Portfolio Royalty Program," an "EVS Patent License Agreement" template, and a template for a non-disclosure agreement ("NDA").

46. On February 2, 2024, Plaintiff received a draft NDA from Lenovo. Plaintiff then sent a draft NDA to Lenovo on March 19, 2024.

47. On March 22, 2024, Plaintiff and Lenovo had a telephone conference. During the call, Lenovo employee Mr. Fergal Clarke raised two questions regarding the NDA and said that he would inform Plaintiff whether he had more comments.

48. On April 4, 2024, Plaintiff sent an email to Lenovo inquiring about any further comments on the draft NDA.

49. As of the filing date of this complaint, Plaintiff has received no response from Lenovo to the email of April 4, 2024.

50. On April 11, 2024, Plaintiff sent an email to Lenovo answering the two questions regarding the NDA that Mr. Clarke raised on the call.

51. As of the filing date of this complaint, Plaintiff has received no response from Lenovo to the email of April 11, 2024.

52. On May 8, 2024, Plaintiff sent an email inquiring about the status of the NDA.

14

53. As of the filing date of this complaint, Plaintiff has received no response from Lenovo to the email of May 8, 2024.

54. In sum, beginning in October 2023, Plaintiff attempted to engage with Lenovo multiple times, but despite repeated attempts as of the filing date of this complaint, Plaintiff has received no communication from Lenovo since March 22, 2024.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 11,521,631

55. Plaintiff hereby incorporates by reference and re-alleges the foregoing paragraphs as if fully set forth herein.

56. On December 6, 2022, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '631 Patent, titled "Apparatus and Method for Selecting One of a First Encoding Algorithm and a Second Encoding Algorithm."

57. Pursuant to 35 U.S.C. § 282, the '631 Patent is presumed valid.

58. The '631 Patent is generally directed toward an improvement in the coding of audio signals. Specifically, it deals with "switched audio coding." This involves selecting different coding algorithms for different parts of an audio signal to be coded in order to achieve a better result. For example, the ACELP algorithm offers better quality for speech signals, while the TCX algorithm offers better quality for music signals. *See* '631 Patent at 1:18–39.

59. To achieve the best possible result, it is important to select the most suitable coding algorithm for the part of the audio signal to be coded. In the state of the art, the decision between the available coding algorithms is essentially based on two different approaches: the "closed-loop" approach and the "open-loop" approach. *See* '631 Patent at 1:40–60.

15

60.     The '631 Patent provides a selection method which does not require prior encoding and decoding according to the "closed-loop" approach.  The selection method also offers higher reliability than previously known "open-loop" methods.

61.     The '631 Patent is not directed to conventional or well-known audio coding technology.  Rather, the '631 Patent improves existing audio codecs.  In this regard, the '631 Patent teaches:

> Embodiments of the invention are based on the recognition that an open-loop selection with improved performance can be implemented by estimating a quality measure for each of first and second encoding algorithms and selecting one of the encoding algorithms based on a comparison between the first and second quality measures. The quality measures are estimated, i.e. the audio signal is not actually encoded and decoded to obtain the quality measures. Thus, the quality measures can be obtained with reduced complexity. The mode selection may then be performed using the estimated quality measures comparable to a closed-loop mode selection.
>
> In embodiments of the invention, an open-loop mode selection where the segmental SNR of ACELP and TCX are first estimated with low complexity is implemented. And then the mode selection is performed using these estimated segmental SNR values, like in a closed-loop mode selection.
>
> Embodiments of the invention do not employ a classical features+classifier approach like it is done in the open-loop mode selection of AMR-WB+. But instead, embodiments of the invention try to estimate a quality measure of each mode and select the mode that gives the best quality.

'631 Patent at 4:16–37.

62.     The claims of the '631 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

63.     The prosecution history of the '631 Patent further indicates that it differs from conventional coding technology.  For example, the Applicant explained that its amended claims "define operations performed in estimating the first quality measure without actually encoding and

16

decoding the portion of the audio signal using the first decoding algorithm. In other words, the amended independent claims define operations performed in an open loop estimation of the first quality measure." July 7, 2022, Amendment at 13. The Examiner allowed the claims because "[t]he prior art of record fails to teach or fairly suggest the claimed combinations of features," and "[t]he applicant's arguments regarding amended limitations are persuasive." August 12, 2022, Notice of Allowance at 3.

64.    Plaintiff holds all rights, title, and interest in and to the '631 Patent, including the right to bring this suit and recover all past, present and future damages for infringement of the '631 Patent. Lenovo is not licensed to the '631 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '631 Patent whatsoever. As such, Lenovo's infringement described below has injured, and continues to injure, Plaintiff.

65.    On information and belief, Lenovo has directly infringed and continues to directly infringe the '631 Patent by, for example, making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services that practice one or more claims of the '631 Patent, including without limitation Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard. These Lenovo devices include Lenovo's EVS Products.

66.    The EVS codec is a speech audio codec defined by the EVS Standard.

67.    Each of Lenovo's EVS Products includes hardware and software that implements the EVS codec. For example, hardware and/or software components comprising Lenovo's EVS Products are publicly identified as supporting the EVS codec and/or Enhanced HD Voice, Ultra HD Voice, or HD Voice+ services.

68.    The '631 Patent is essential to the EVS Standard.

69. Because Lenovo's EVS Products include hardware and/or software components supporting the EVS codec compliant with the EVS Standard, Lenovo necessarily infringes the '631 Patent.

70. On information and belief, Lenovo tests, or directs or controls others to test, Lenovo's EVS Products to ensure they include hardware and software compliant with the EVS Standard.

71. For example, Lenovo's EVS Products practice and/or are capable of practicing claim 1 of the '631 Patent, which is directed to an apparatus for selecting an encoding algorithm. The following paragraphs provide details regarding one example of Lenovo's infringement, and only as to a single patent claim. Plaintiff reserves its right to provide greater detail and scope via its Disclosure of Asserted Claims and Preliminary Infringement Contentions at the time required under the Local Patent Rules of Practice and Procedure adopted by this Court and any applicable scheduling order.

72. Claim 1 of the '631 Patent states:

1. An apparatus for selecting one of a first encoding algorithm comprising a first characteristic and a second encoding algorithm comprising a second characteristic for encoding a portion of an audio signal to acquire an encoded version of the portion of the audio signal, comprising:

    a first estimator for estimating a first quality measure for the portion of the audio signal, which is associated with the first encoding algorithm, without actually encoding and decoding the portion of the audio signal using the first encoding algorithm;

    a second estimator for estimating a second quality measure for the portion of the audio signal, which is associated with the second encoding algorithm, without actually encoding and decoding the portion of the audio signal using the second encoding algorithm; and

a controller for selecting the first encoding algorithm or the second encoding algorithm based on a comparison between the first quality measure and the second quality measure,

wherein, in estimating the first quality measure, the first estimator is configured to receive an input signal, window the input signal, transform the windowed input signal using a MDCT (modified discrete cosine transform) to obtain a spectrum, shape the obtained spectrum with weighted LPC (linear prediction coding) coefficients, and estimate a global gain for the portion of the audio signal using the shaped spectrum.

'631 Patent at 13:49–14:8.

73.     Lenovo's EVS Products implement at least Claim 1 of the '631 Patent.

74.     On information and belief, Lenovo's EVS Products conform to and implement technical specifications of the EVS Standard, including the portions of the specifications referenced below.

75.     As shown below, Lenovo's EVS Products comprise an apparatus for selecting one of a first encoding algorithm comprising a first characteristic and a second encoding algorithm comprising a second characteristic for encoding a portion of an audio signal to acquire an encoded version of the portion of the audio signal:

### 5.1.14    Coder technology selection

Multiple coding technologies are employed within the EVS codec, based on one of the following two generic principles for speech and audio coding, the LP-based (analysis-by-synthesis) approach and the transform-domain (MDCT) approach. There is no clearly defined borderline between the two approaches in the context of this codec. The LP-based coder is essentially based on the CELP technology, optimized and tuned specifically for each bitrate. The transform-domain approach is adopted by the HQ MDCT technology. There are also two hybrid schemes in which both approaches are combined, the GSC technology and the TCX technology. The selection of the coder technology depends on the actual bitrate, the bandwidth, speech/music classification, the selected coding mode and other parameters. The following table shows the allocation of technologies based on bitrate, bandwidth and content.

3GPP TS 26.445 version 14.2.0 Release 14 at 120.[22]

> ### 5.1.14.1 ACELP/MDCT-based technology selection at 9.6kbps, 16.4 and 24.4 kbps
>
> At 9.6kbps, 16.4kbps and 24.4kbps the decision to choose either ACELP or an MDCT-based technology is not based on the decision of the speech/music classifier as it is done for other bitrates, but on a specific technology selector described below.
>
> The technology selector is based on two estimates of the segmental SNR, one estimate corresponding to the transform-based technology (described in subclause 5.1.14.1.1), another estimate corresponding to the ACELP technology (described in subclause 5.1.14.1.2). Based on these two estimates and on a hysteresis mechanism, a decision is taken (described in subclause 5.1.14.1.3).

3GPP TS 26.445 version 14.2.0 Release 14 at 121.

76.     As shown below, the apparatus comprises a first estimator for estimating a first quality measure for the portion of the audio signal, which is associated with the first encoding algorithm, without actually encoding and decoding the portion of the audio signal using the first encoding algorithm:

> ### 5.1.14 Coder technology selection
>
> Multiple coding technologies are employed within the EVS codec, based on one of the following two generic principles for speech and audio coding, the LP-based (analysis-by-synthesis) approach and the transform-domain (MDCT) approach. There is no clearly defined borderline between the two approaches in the context of this codec. The LP-based coder is essentially based on the CELP technology, optimized and tuned specifically for each bitrate. The transform-domain approach is adopted by the HQ MDCT technology. There are also two hybrid schemes in which both approaches are combined, the GSC technology and the TCX technology. The selection of the coder technology depends on the actual bitrate, the bandwidth, speech/music classification, the selected coding mode and other parameters. The following table shows the allocation of technologies based on bitrate, bandwidth and content.

3GPP TS 26.445 version 14.2.0 Release 14 at 120.

---

[22] With respect to each Asserted Patent, reference to a particular version/release of the EVS Standard is provided for illustrative purposes only. Other versions/releases of the EVS Standard infringe each Asserted Patent for at least the same reasons and in the same manner.

| bitrate | 7.2 | 8 | 9.6 | 13.2 | 16.4 | 24.4 | 32 | 48 | 64 |
|---|---|---|---|---|---|---|---|---|---|
| **Table 19: Allocation of coder technologies per bitrate, bandwidth and content** | | | | | | | | | |
| NB | | | | | | | | | |
| speech | ACELP | ACELP | ACELP | ACELP | ACELP | ACELP | | | |
| audio | HQ MDCT | HQ MDCT | TCX | TCX/HQ MDCT | TCX/HQ MDCT | TCX | | | |
| noise | GSC | GSC | TCX | GSC | TCX | TCX | | | |
| WB | | | | | | | | | |
| speech | ACELP | ACELP | ACELP | ACELP | ACELP | ACELP | ACELP | TCX | ACELP |
| audio | GSC | GSC | TCX | GSC/TCX/HQ MDCT | TCX/HQ MDCT | TCX | HQ MDCT | TCX | HQ MDCT |
| noise | GSC | GSC | TCX | GSC | TCX | TCX | ACELP | TCX | ACELP |
| SWB | | | | | | | | | |
| speech | | | | ACELP | ACELP | ACELP | ACELP | TCX | ACELP |
| audio | | | | GSC/TCX/HQ MDCT | TCX/HQ MDCT | TCX/HQ MDCT | TCX/HQ MDCT | TCX | HQ MDCT |
| noise | | | | GSC | TCX | TCX | ACELP | TCX | ACELP |
| FB | | | | | | | | | |
| speech | | | | | ACELP | ACELP | ACELP | TCX | ACELP |
| audio | | | | | TCX | TCX/HQ MDCT | TCX/HQ MDCT | TCX | HQ MDCT |
| noise | | | | | TCX | TCX | ACELP | TCX | ACELP |

3GPP TS 26.445 version 14.2.0 Release 14 at 121.

### 5.1.14.1     ACELP/MDCT-based technology selection at 9.6kbps, 16.4 and 24.4 kbps

At 9.6kbps, 16.4kbps and 24.4kbps the decision to choose either ACELP or an MDCT-based technology is not based on the decision of the speech/music classifier as it is done for other bitrates, but on a specific technology selector described below.

The technology selector is based on two estimates of the segmental SNR, one estimate corresponding to the transform-based technology (described in subclause 5.1.14.1.1), another estimate corresponding to the ACELP technology (described in subclause 5.1.14.1.2). Based on these two estimates and on a hysteresis mechanism, a decision is taken (described in subclause 5.1.14.1.3).

3GPP TS 26.445 version 14.2.0 Release 14 at 121.

### 5.1.14.1.1     Segmental SNR estimation of the MDCT-based technology

The segmental SNR estimation of the TCX technology is based on a simplified TCX encoder. The input audio signal is first filtered using a LTP filter, then windowed and transformed using a MDCT, the MDCT spectrum is then shaped using weighted LPC, a global gain is then estimated, and finally the segmental SNR is derived from the global gain. All these steps are described in detail in the following clauses.

3GPP TS 26.445 version 14.2.0 Release 14 at 121.

77.     As shown below, the apparatus comprises a second estimator for estimating a second quality measure for the portion of the audio signal, which is associated with the second

encoding algorithm, without actually encoding and decoding the portion of the audio signal using the second encoding algorithm:

## 5.1.14    Coder technology selection

Multiple coding technologies are employed within the EVS codec, based on one of the following two generic principles for speech and audio coding, the LP-based (analysis-by-synthesis) approach and the transform-domain (MDCT) approach. There is no clearly defined borderline between the two approaches in the context of this codec. The LP-based coder is essentially based on the CELP technology, optimized and tuned specifically for each bitrate. The transform-domain approach is adopted by the HQ MDCT technology. There are also two hybrid schemes in which both approaches are combined, the GSC technology and the TCX technology. The selection of the coder technology depends on the actual bitrate, the bandwidth, speech/music classification, the selected coding mode and other parameters. The following table shows the allocation of technologies based on bitrate, bandwidth and content.

3GPP TS 26.445 version 14.2.0 Release 14 at 120.

**Table 19: Allocation of coder technologies per bitrate, bandwidth and content**

| bitrate | 7.2 | 8 | 9.6 | 13.2 | 16.4 | 24.4 | 32 | 48 | 64 |
|---|---|---|---|---|---|---|---|---|---|
| NB | | | | | | | | | |
| speech | ACELP | ACELP | ACELP | ACELP | ACELP | ACELP | | | |
| audio | HQ MDCT | HQ MDCT | TCX | TCX/HQ MDCT | TCX/HQ MDCT | TCX | | | |
| noise | GSC | GSC | TCX | GSC | TCX | TCX | | | |
| WB | | | | | | | | | |
| speech | ACELP | ACELP | ACELP | ACELP | ACELP | ACELP | ACELP | TCX | ACELP |
| audio | GSC | GSC | TCX | GSC/TCX/HQ MDCT | TCX/HQ MDCT | TCX | HQ MDCT | TCX | HQ MDCT |
| noise | GSC | GSC | TCX | GSC | TCX | TCX | ACELP | TCX | ACELP |
| SWB | | | | | | | | | |
| speech | | | | ACELP | ACELP | ACELP | ACELP | TCX | ACELP |
| audio | | | | GSC/TCX/HQ MDCT | TCX/HQ MDCT | TCX/HQ MDCT | TCX/HQ MDCT | TCX | HQ MDCT |
| noise | | | | GSC | TCX | TCX | ACELP | TCX | ACELP |
| FB | | | | | | | | | |
| speech | | | | | ACELP | ACELP | ACELP | TCX | ACELP |
| audio | | | | | TCX | TCX/HQ MDCT | TCX/HQ MDCT | TCX | HQ MDCT |
| noise | | | | | TCX | TCX | ACELP | TCX | ACELP |

3GPP TS 26.445 version 14.2.0 Release 14 at 121.

## 5.1.14.1    ACELP/MDCT-based technology selection at 9.6kbps, 16.4 and 24.4 kbps

At 9.6kbps, 16.4kbps and 24.4kbps the decision to choose either ACELP or an MDCT-based technology is not based on the decision of the speech/music classifier as it is done for other bitrates, but on a specific technology selector described below.

The technology selector is based on two estimates of the segmental SNR, one estimate corresponding to the transform-based technology (described in subclause 5.1.14.1.1), another estimate corresponding to the ACELP technology (described in subclause 5.1.14.1.2). Based on these two estimates and on a hysteresis mechanism, a decision is taken (described in subclause 5.1.14.1.3).

Case 5:25-cv-00680-FL    Document 1    Filed 10/27/25    Page 22 of 118

3GPP TS 26.445 version 14.2.0 Release 14 at 121.

> **5.1.14.1.2 Segmental SNR estimation of the ACELP technology**
>
> The segmental SNR estimation of the ACELP technology is based on the estimated SNR of the adaptive-codebook and the estimated SNR of the innovative-codebook. This is described in detail in the following clauses.

3GPP TS 26.445 version 14.2.0 Release 14 at 127.

78.     As shown below, the apparatus comprises a controller for selecting the first encoding algorithm or the second encoding algorithm based on a comparison between the first quality measure and the second quality measure:

> **5.1.14.1 ACELP/MDCT-based technology selection at 9.6kbps, 16.4 and 24.4 kbps**
>
> At 9.6kbps, 16.4kbps and 24.4kbps the decision to choose either ACELP or an MDCT-based technology is not based on the decision of the speech/music classifier as it is done for other bitrates, but on a specific technology selector described below.
>
> The technology selector is based on two estimates of the segmental SNR, one estimate corresponding to the transform-based technology (described in subclause 5.1.14.1.1), another estimate corresponding to the ACELP technology (described in subclause 5.1.14.1.2). Based on these two estimates and on a hysteresis mechanism, a decision is taken (described in subclause 5.1.14.1.3).

3GPP TS 26.445 version 14.2.0 Release 14 at 121.

> **5.1.14.1.3 Hysteresis and final decision**
>
> The ACELP technology is selected if
>
> $$ssnr_{ace} + dssnr > ssnr_{TCX} \,. \qquad\qquad (431)$$
>
> otherwise the MDCT-based technology is selected.

3GPP TS 26.445 version 14.2.0 Release 14 at 128.

79.     As shown below, in estimating the first quality measure, the first estimator is configured to receive an input signal, window the input signal, transform the windowed input signal using a MDCT (modified discrete cosine transform) to obtain a spectrum, shape the obtained spectrum with weighted LPC (linear prediction coding) coefficients, and estimate a global gain for the portion of the audio signal using the shaped spectrum:

23

**5.1.14.1.1     Segmental SNR estimation of the MDCT-based technology**

The segmental SNR estimation of the TCX technology is based on a simplified TCX encoder. The input audio signal is first filtered using a LTP filter, then windowed and transformed using a MDCT, the MDCT spectrum is then shaped using weighted LPC, a global gain is then estimated, and finally the segmental SNR is derived from the global gain. All these steps are described in detail in the following clauses.

3GPP TS 26.445 version 14.2.0 Release 14 at 121.

**5.1.14.1.1.2     Windowing and MDCT**

The LTP filtered signal $s_{LTP}$ is windowed using a sine-based window whose shape depends on the previous mode. If the past frame was encoded with a MDCT-based coding mode, the window is defined as

$$w(n) = 0 \text{ , for } n = -\frac{N-L}{2},...,-1 \text{ .} \tag{417}$$

$$w(n) = \sin\left[\left(n+\frac{1}{2}\right)\frac{\pi}{2L}\right] \text{, for } n = 0,...,L-1 \text{ .} \tag{418}$$

$$w(n) = 1 \text{ , for } n = L,...,N-1 \text{ .} \tag{419}$$

3GPP TS 26.445 version 14.2.0 Release 14 at 125.

80.     Based on the above Lenovo directly infringes at least claim 1 of the '631 Patent.

81.     In addition to direct infringement by making, using, offering to sell,  selling, and/or importing Lenovo's EVS Products, Lenovo indirectly infringes the '631 Patent claims.

82.     Lenovo has indirectly infringed and continues to indirectly infringe the '631 Patent by inducing third parties to directly infringe that patent.

83.     Lenovo had actual knowledge of the '631 Patent at least as of its receipt of Plaintiff's FRAND package on October 13, 2023, and continues to import, make, use, sell, and/or offer for sale Lenovo's EVS Products. At the very latest, Lenovo had actual knowledge of the '631 Patent and of its infringement of that patent as of the date of this Complaint.  Where acts constituting direct infringement of the '631 Patent are not performed by Lenovo, such acts constituting direct infringement of the '631 Patent are performed by Lenovo's customers or end-users who act at the direction and/or control of Lenovo, with Lenovo's knowledge.

84. Lenovo knows that the use of Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, to make a voice call using the EVS codec, constitutes infringement of the '631 Patent.

85. Lenovo advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provide instructions on and/or encourage infringing use.

86. Lenovo encourages and facilitates its customers to infringe the '631 Patent by instructing customers that purchase Lenovo's EVS Products that such devices have voice calling capability, and providing various indicators within those devices of the same.

87. For instance, Lenovo provides its customers with a user guide for each of the accused EVS Products. The user guide includes instructions on how to make a phone call as shown in the example below:[23]

---

[23] https://en-us.support.motorola.com/app/answers/detail/a_id/184284/~/user-guide-%28html%29---moto-g-power---2025 (last visited October 16, 2025).

25



88.     Using an accused device to make a phone call on an EVS-supported wireless carrier network, e.g., Verizon, results in infringement of the '631 Patent.

89.     Plaintiff is informed and believes, and on that basis alleges, that Lenovo indirectly infringes at least claim 1 of the '631 Patent by active inducement in violation of 35 U.S.C. § 271(b), by at least manufacturing, importing, supplying, distributing, selling, and/or offering for sale Lenovo's EVS Products to its customers with the knowledge and intent that use of those products would constitute direct infringement of the '631 Patent.  Lenovo has induced, and continues to induce, direct infringement of the '631 Patent by customers, importers, sellers, resellers, and/or end users of Lenovo's EVS Products.

90.     End users of Lenovo's EVS Products, pursuant to Lenovo's instructions, indicators, and advertisements, thus each directly infringe the '631 Patent.

91.     Lenovo also indirectly infringes by contributing to the infringement of, and continuing to contribute to the infringement of, one or more claims of the '631 Patent under 35

26

U.S.C. § 271(c) and/or 271(f) by selling, offering for sale, and/or importing into the United States, Lenovo's EVS Products. Lenovo knew at least as of its receipt of Plaintiff's FRAND package on October 13, 2023, that the accused products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '631 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

92.     The acts of infringement by Lenovo have caused damage to Plaintiff, and Plaintiff is entitled to recover from Lenovo damages sustained by Plaintiff as a result of Lenovo's wrongful acts in an amount subject to proof at trial. The infringement of the '631 Patent by Lenovo has damaged and will continue to damage Plaintiff.

93.     Lenovo had actual knowledge of, or was willfully blind to, the existence of the '631 Patent and Lenovo's infringement of the '631 Patent before the filing of this Complaint and at least as early as October 13, 2023, when it received the FRAND package from Fraunhofer.

94.     Despite this knowledge, Lenovo continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious that it should have been known to Lenovo. Thus, Lenovo's infringement has been, and continues to be, willful and deliberate.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 9,595,263

95.     Plaintiff hereby incorporates by reference and re-alleges the foregoing paragraphs as if fully set forth herein.

96.     On March 14, 2017, the USPTO duly and legally issued the '263 Patent, titled "Encoding and Decoding of Pulse Positions of Tracks of an Audio Signal."

27

97.     Pursuant to 35 U.S.C. § 282, the '263 Patent is presumed valid.

98.     The '263 Patent is generally directed toward an improvement in the coding of audio signals. Specifically, it deals with the encoding and decoding of pulse information for an algebraic codebook. Through the use of a state number, fewer bits are needed for pulse information representation.

99.     The '263 Patent is not directed to conventional or well-known audio coding technology. Rather, the '263 Patent improves existing audio codecs. In this regard, the '263 Patent teaches:

> According to embodiments, it is assumed that one state number is available for an apparatus for decoding. It is furthermore assumed that a track positions number, indicating the total number of track positions of at least one of the tracks associated with the encoded audio signal, and a total pulses number, indicating the number of pulses of at least one of the tracks, is available for a decoding apparatus of the present invention. Advantageously, the track positions number and the total pulses number is available for each track associated with an encoded audio signal.
>
> For example, having 4 tracks with 5 pulses, each can attain roughly $6.6 \times 10^{21}$ states, which can, according to embodiments, be encoded by 73 bits, which is approximately 21% more efficient than the encoding of the above-described state-of-the-art encoder using 92 bits.
>
> At first, a concept is provided how to encode a plurality of pulse positions of a track of an audio signal in an efficient way. In the following, the concept is extended to allow to encode not only the position of the pulses of a track, but also whether the pulse is positive or negative. Furthermore, the concept is then extended to allow to encode pulse information for a plurality of tracks in an efficient manner. The concepts are correspondingly applicable on a decoder side.

'263 Patent at 4:22–44.

100.    The claims of the '263 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

101. The prosecution history of the '263 Patent further indicates that it differs from conventional coding technology. For example, the Applicant explained that a prior art reference failed to disclose or suggest that "the pulse information decoder is configured to decode the plurality of pulse positions by only using one track position number, one total pulse number and one state number, wherein the track position number indicates a total number of the track positions of at least one of the tracks, and wherein the total pulse number indicates a total number of the pulses of at least one of the tracks." October 11, 2016, Amendment at 16. The Examiner agreed and allowed the claims because "[r]egarding rejections to claims under 35 U.S.C. §103(a), the arguments . . . are persuasive." October 28, 2016, Notice of Allowance at 3.

102. Plaintiff holds all rights, title, and interest in and to the '263 Patent, including the right to bring this suit and recover all past, present and future damages for infringement of the '263 Patent. Lenovo is not licensed to the '263 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '263 Patent whatsoever. As such, Lenovo's infringement described below has injured, and continues to injure, Plaintiff.

103. On information and belief, Lenovo has directly infringed and continues to directly infringe the '263 Patent by, for example, making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services that practice one or more claims of the '263 Patent, including without limitation Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard. These Lenovo devices include Lenovo's EVS Products.

104. The EVS codec is a speech audio codec defined by the EVS Standard.

105. Each of Lenovo's EVS Products includes hardware and software that implements the EVS codec. For example, hardware and/or software components comprising Lenovo's EVS

Products are publicly identified as supporting the EVS codec and/or Enhanced HD Voice, Ultra HD Voice, or HD Voice+ services.

106. The '263 Patent is essential to the EVS Standard.

107. Because Lenovo's EVS Products include hardware and/or software components supporting the EVS codec compliant with the EVS Standard, Lenovo necessarily infringes the '263 Patent.

108. On information and belief, Lenovo tests, or directs or controls others to test, Lenovo's EVS Products to ensure they include hardware and software compliant with the EVS Standard.

109. For example, Lenovo's EVS Products practice and/or are capable of practicing claim 1 of the '263 Patent, which is directed to an apparatus for decoding an encoded audio signal. The following paragraphs provide details regarding one example of Lenovo's infringement, and only as to a single patent claim. Plaintiff reserves its right to provide greater detail and scope via its Disclosure of Asserted Claims and Preliminary Infringement Contentions at the time required under the Local Patent Rules of Practice and Procedure adopted by this Court and any applicable scheduling order.

110. Claim 1 of the '263 Patent states:

1. An apparatus for decoding an encoded audio signal, wherein one or more tracks are associated with the encoded audio signal, each one of the tracks comprising a plurality of track positions and a plurality of pulses, wherein the apparatus comprises:

a pulse information decoder for decoding a plurality of pulse positions, wherein each one of the pulse positions is one of the track positions, where one of the pulses is located, and wherein the pulse information decoder is configured to decode the plurality of pulse positions by only using one track

position number, one total pulse number and one state number, wherein the track position number indicates a total number of the track positions of at least one of the tracks, and wherein the total pulse number indicates a total number of the pulses of at least one of the tracks; and

a signal decoder for decoding the encoded audio signal by generating a synthesized audio signal using the plurality of pulse positions and a plurality of predictive filter coefficients being associated with the encoded audio signal,

wherein at least one of the pulse information decoder and the signal decoder comprises a hardware implementation,

wherein the pulse information decoder is furthermore adapted to decode a plurality of pulse signs by only using the track position number, the total pulse number and the state number, wherein each one of the pulse signs indicates a sign of one of the plurality of pulses, and

wherein the signal decoder is adapted to decode the encoded audio signal by generating a synthesized audio signal furthermore using the plurality of pulse signs.

'263 Patent at 17:42–18:7.

111. Lenovo's EVS Products implement at least Claim 1 of the '263 Patent.

112. On information and belief, Lenovo's EVS Products conform to and implement technical specifications of the EVS Standard, including the portions of the specifications referenced below.

113. As shown below, Lenovo's EVS Products comprise an apparatus for decoding an encoded audio signal, wherein one or more tracks are associated with the encoded audio signal, each one of the tracks comprising a plurality of track positions and a plurality of pulses:

31

### 6.1.1    General LP-based decoding

The LSF parameters are decoded from the received bitstream and converted to LSP coefficients and subsequently to LP coefficients. The interpolation principle, described in subclause 5.1.9.6, is used to obtain interpolated LSP vectors for all subframes, i.e. 4 subframes in case of 12.8 kHz internal sampling rate and 5 subframes in case of 16 kHz sampling rate. Then, the excitation signal is reconstructed and post-processed before performing LP synthesis (filtering with the LP synthesis filter) to obtain the reconstructed signal. The reconstructed signal is then de-emphasized (an inverse of the pre-emphasis applied at the encoder). Finally, a post-processing is applied for enhancing the format and harmonic structure of signal as well as the periodicity in the low frequency region of the signal. The signal is then up-sampled to the output sample rate. Finally, the high-band signal is generated and added to the up-sampled synthesized signal to obtain a full-band reconstructed signal (output signal).

3GPP TS 26.445 version 14.2.0 Release 14 at 452.

### 5.2.3.1.5.6        Pulse indexing of the algebraic codebook

The objective is to enumerate all possible constellations of pulses in a vector $c$ which corresponds to one track of length $L$ within a sub-frame. That is, vector $c$ has signed integer values such that its norm-1 is $|x|_1 = p$, whereby we say that $c$ contains $p$ pulses.

3GPP TS 26.445 version 14.2.0 Release 14 at 160.

114.    As shown below, the apparatus comprises a pulse information decoder for decoding a plurality of pulse positions, wherein each one of the pulse positions is one of the track positions, where one of the pulses is located:

### 5.2.3.1.5.6        Pulse indexing of the algebraic codebook

The objective is to enumerate all possible constellations of pulses in a vector $c$ which corresponds to one track of length $L$ within a sub-frame. That is, vector $c$ has signed integer values such that its norm-1 is $|x|_1 = p$, whereby we say that $c$ contains $p$ pulses.

We can then partition the vector $c$ into two parts, $c = [c_1, c_2]$ such that the partitions are of length $L_1$ and $L_2 = L - L_1$ and contain $p_1$ and $p_2 = p - p_1$ pulses respectively. The number of different constellations for the original vector $c$ can then be determined by the recursive formulae:

$$\begin{cases} f(p,L) = \sum_{p_1=0}^{p} f(p_1, L_1) f(p - p_1, L_2), & p > 0, L > 1 \\ f(p,1) = 2, & p > 1 \\ f(0,L) = 1 & L > 0. \end{cases} \qquad (509)$$

3GPP TS 26.445 version 14.2.0 Release 14 at 160.

32

For computational efficiency, the values of this function can be pre-calculated and placed in a table.

Above equation gives the number of possible states for given $p$ and $L$. We can then enumerate a specific state, where $c_1$ and $c_2$ have $\pi_1$ and $\pi_2 = p - \pi_1$ pulses respectively. The number of states that have less pulses than $\pi_1$ in partition $c_1$ is

$$s(c_1, c_2) = \sum_{p_1=0}^{\pi_1-1} f(p_1, L_1) f(p - p_1, L - L_1).\qquad(510)$$

We can then define that overall state has $s(c) \ge s(c_1, c_2)$, whereby the overall state can be encoded with the recursion

$$s(c) = s(c_1, c_2) + s(c_1) + f(p_1, L_1)s(c_2),\qquad(511)$$

where the boundary conditions are

$$s(c) = \begin{cases} 0, & L = 1, c(1) \ge 0 \\ 1, & L = 1, c(1) < 0. \end{cases}\qquad(512)$$

The state can be decoded by the algorithm

1. Set $p_1 := 1$ and choose partitioning length $L_1 \ge 1$ and $L_2 \ge 1$.
2. Calculate $s(c_1, c_2)$ with $p_1$.
3. If $s(c) < s(c_1, c_2)$ then $\pi_1 = p_1 - 1$. Otherwise, set $p_1 := p_1 + 1$ and go to 2.

The states of the partitions $s(c_2)$ and $s(c_1)$ can then be calculated from the integer and reminder parts of the fraction $\dfrac{s(c) - s(c_1, c_2)}{f(p_1, L_1)}$. We can then recursively determine the state of each position in the vector $c$ until a partition has $L_k = 1$, whereby

$$c_k(1) = \begin{cases} +\pi_k, & \text{for } s(c_k) = 0 \\ -\pi_k, & \text{for } s(c_k) = 1. \end{cases}\qquad(513)$$

Observe that both the number of states $f(p, L)$ as well as the state $s(c)$ are integer numbers which can become larger than 32 bits. We must therefore employ arithmetic operations which support long integers throughout the algorithm.

3GPP TS 26.445 version 14.2.0 Release 14 at 161.

6.1.1.2.1.4      Decoding the algebraic codebook vector

The received algebraic codebook index is used to extract the positions and amplitudes (signs) of the excitation pulses and to find the algebraic codevector $c(n)$. If the integer part of the pitch lag is less than the subframe size 64, the pitch sharpening procedure is applied, which translates into modifying $c(n)$ by filtering it through the adaptive pre-filter $F^{(0)}(z) = \left(1 - \beta_1 z^{-1}\right)/\left(1 - 0.85 z^{-T}\right)$ which further consists of two parts: a periodicity enhancement part $1/\left(1 - 0.85 z^{-T}\right)$, where $T$ is the integer part of the pitch lag representing the fine spectral structure of the speech signal, and a tilt part $\left(1 - \beta_1 z^{-1}\right)$, where $\beta_1$ is related to the voicing of the previous subframe and is bounded by [0.28, 0.56] at 16.4 and 24.4 kbps, and by [0.0; 0.5] otherwise.

3GPP TS 26.445 version 14.2.0 Release 14 at 459.

33

115.    As shown below, the pulse information decoder is configured to decode the plurality of pulse positions by only using one track position number, one total pulse number and one state number, wherein the track position number indicates a total number of the track positions of at least one of the tracks, and wherein the total pulse number indicates a total number of the pulses of at least one of the tracks:

---

**5.2.3.1.5.6    Pulse indexing of the algebraic codebook**

The objective is to enumerate all possible constellations of pulses in a vector $c$ which corresponds to one track of length $L$ within a sub-frame. That is, vector $c$ has signed integer values such that its norm-1 is $|x|_1 = p$, whereby we say that $c$ contains $p$ pulses.

We can then partition the vector $c$ into two parts, $c = [c_1, c_2]$ such that the partitions are of length $L_1$ and $L_2 = L - L_1$ and contain $p_1$ and $p_2 = p - p_1$ pulses respectively. The number of different constellations for the original vector $c$ can then be determined by the recursive formulae:

$$\begin{cases} f(p,L) = \sum_{p_1=0}^{p} f(p_1, L_1) f(p - p_1, L_2), & p > 0, L > 1 \\ \qquad\quad f(p,1) = 2, & p > 1 \\ \qquad\quad f(0,L) = 1 & L > 0. \end{cases} \qquad (509)$$

---

3GPP TS 26.445 version 14.2.0 Release 14 at 160.

34

For computational efficiency, the values of this function can be pre-calculated and placed in a table.

Above equation gives the number of possible states for given $p$ and $L$. We can then enumerate a specific state, where $c_1$ and $c_2$ have $\pi_1$ and $\pi_2 = p - \pi_1$ pulses respectively. The number of states that have less pulses than $\pi_1$ in partition $c_1$ is

$$s(c_1, c_2) = \sum_{p_1=0}^{\pi_1 - 1} f(p_1, L_1) f(p - p_1, L - L_1). \tag{510}$$

We can then define that overall state has $s(c) \geq s(c_1, c_2)$, whereby the overall state can be encoded with the recursion

$$s(c) = s(c_1, c_2) + s(c_1) + f(p_1, L_1) s(c_2), \tag{511}$$

where the boundary conditions are

$$s(c) = \begin{cases} 0, & L = 1, c(1) \geq 0 \\ 1, & L = 1, c(1) < 0. \end{cases} \tag{512}$$

The state can be decoded by the algorithm

1. Set $p_1 := 1$ and choose partitioning length $L_1 \geq 1$ and $L_2 \geq 1$.
2. Calculate $s(c_1, c_2)$ with $p_1$.
3. If $s(c) < s(c_1, c_2)$ then $\pi_1 = p_1 - 1$. Otherwise, set $p_1 := p_1 + 1$ and go to 2.

The states of the partitions $s(c_2)$ and $s(c_1)$ can then be calculated from the integer and reminder parts of the fraction $\dfrac{s(c) - s(c_1, c_2)}{f(p_1, L_1)}$. We can then recursively determine the state of each position in the vector $c$ until a partition has $L_k = 1$, whereby

$$c_k(1) = \begin{cases} +\pi_k, & \text{for } s(c_k) = 0 \\ -\pi_k, & \text{for } s(c_k) = 1. \end{cases} \tag{513}$$

Observe that both the number of states $f(p, L)$ as well as the state $s(c)$ are integer numbers which can become larger than 32 bits. We must therefore employ arithmetic operations which support long integers throughout the algorithm.

3GPP TS 26.445 version 14.2.0 Release 14 at 161.

6.1.1.2.1.4          Decoding the algebraic codebook vector

The received algebraic codebook index is used to extract the positions and amplitudes (signs) of the excitation pulses and to find the algebraic codevector $c(n)$. If the integer part of the pitch lag is less than the subframe size 64, the pitch sharpening procedure is applied, which translates into modifying $c(n)$ by filtering it through the adaptive pre-filter $F^{(0)}(z) = (1 - \beta_1 z^{-1}) / (1 - 0.85 z^{-T})$ which further consists of two parts: a periodicity enhancement part $1/(1 - 0.85 z^{-T})$, where $T$ is the integer part of the pitch lag representing the fine spectral structure of the speech signal, and a tilt part $(1 - \beta_1 z^{-1})$, where $\beta_1$ is related to the voicing of the previous subframe and is bounded by [0.28, 0.56] at 16.4 and 24.4 kbps, and by [0.0; 0.5] otherwise.

3GPP TS 26.445 version 14.2.0 Release 14 at 459.

116.    As shown below, the apparatus comprises a signal decoder for decoding the encoded audio signal by generating a synthesized audio signal using the plurality of pulse positions and a plurality of predictive filter coefficients being associated with the encoded audio signal:

---

### 6.1.1    General LP-based decoding

The LSF parameters are decoded from the received bitstream and converted to LSP coefficients and subsequently to LP coefficients. The interpolation principle, described in subclause 5.1.9.6, is used to obtain interpolated LSP vectors for all subframes, i.e. 4 subframes in case of 12.8 kHz internal sampling rate and 5 subframes in case of 16 kHz sampling rate. Then, the excitation signal is reconstructed and post-processed before performing LP synthesis (filtering with the LP synthesis filter) to obtain the reconstructed signal. The reconstructed signal is then de-emphasized (an inverse of the pre-emphasis applied at the encoder). Finally, a post-processing is applied for enhancing the format and harmonic structure of signal as well as the periodicity in the low frequency region of the signal. The signal is then up-sampled to the output sample rate. Finally, the high-band signal is generated and added to the up-sampled synthesized signal to obtain a full-band reconstructed signal (output signal).

---

3GPP TS 26.445 version 14.2.0 Release 14 at 452.

---

### 6.1.1.2.1.4    Decoding the algebraic codebook vector

The received algebraic codebook index is used to extract the positions and amplitudes (signs) of the excitation pulses and to find the algebraic codevector $c(n)$. If the integer part of the pitch lag is less than the subframe size 64, the pitch sharpening procedure is applied, which translates into modifying $c(n)$ by filtering it through the adaptive pre-filter $F^{(0)}(z) = \left(1 - \beta_1 z^{-1}\right)/\left(1 - 0.85 z^{-T}\right)$ which further consists of two parts: a periodicity enhancement part $1/\left(1 - 0.85 z^{-T}\right)$, where $T$ is the integer part of the pitch lag representing the fine spectral structure of the speech signal, and a tilt part $\left(1 - \beta_1 z^{-1}\right)$, where $\beta_1$ is related to the voicing of the previous subframe and is bounded by [0.28, 0.56] at 16.4 and 24.4 kbps, and by [0.0; 0.5] otherwise.

---

3GPP TS 26.445 version 14.2.0 Release 14 at 459.

---

### 6.1.1.2.1.8    Reconstructed excitation

The total excitation in each subframe constructed by

$$u'(n) = \hat{g}_p\, v(n) + \hat{g}_c\, c(n), \qquad for\ n = 0, \ldots, 63 \qquad (1457)$$

where $c(n)$ is the pre-filtered algebraic codevector.

---

3GPP TS 26.445 version 14.2.0 Release 14 at 464.

### 6.1.3 Synthesis

The LP synthesis is performed by filtering the post-processed excitation signal $u(n)$ through the LP synthesis filter..
The decoded and interpolated LP coefficients, $\hat{a}_i$, are used to construct the synthesis filter, $1/\hat{A}(z)$.

3GPP TS 26.445 version 14.2.0 Release 14 at 477.

117.    At least one of the pulse information decoder and the signal decoder comprises a hardware implementation.  For example, the EVS codec is implemented in hardware (e.g., a smartphone and/or a hardware component thereof such as a chip implementing the EVS codec).

118.    As shown below, the pulse information decoder is furthermore adapted to decode a plurality of pulse signs by only using the track position number, the total pulse number and the state number, wherein each one of the pulse signs indicates a sign of one of the plurality of pulses:

### 5.2.3.1.5.6 Pulse indexing of the algebraic codebook

The objective is to enumerate all possible constellations of pulses in a vector $c$ which corresponds to one track of length $L$ within a sub-frame. That is, vector $c$ has signed integer values such that its norm-1 is $|x|_1 = p$, whereby we say that $c$ contains $p$ pulses.

We can then partition the vector $c$ into two parts, $c = [c_1, c_2]$ such that the partitions are of length $L_1$ and $L_2 = L - L_1$ and contain $p_1$ and $p_2 = p - p_1$ pulses respectively. The number of different constellations for the original vector $c$ can then be determined by the recursive formulae:

$$\begin{cases} f(p,L) = \sum_{p_1=0}^{p} f(p_1,L_1)f(p-p_1,L_2), & p>0, L>1 \\ f(p,1) = 2, & p>1 \\ f(0,L) = 1 & L>0. \end{cases} \qquad (509)$$

3GPP TS 26.445 version 14.2.0 Release 14 at 160.

For computational efficiency, the values of this function can be pre-calculated and placed in a table.

Above equation gives the number of possible states for given $p$ and $L$. We can then enumerate a specific state, where $c_1$ and $c_2$ have $\pi_1$ and $\pi_2 = p - \pi_1$ pulses respectively. The number of states that have less pulses than $\pi_1$ in partition $c_1$ is

$$s(c_1, c_2) = \sum_{p_1=0}^{\pi_1 - 1} f(p_1, L_1) f(p - p_1, L - L_1).$$ (510)

We can then define that overall state has $s(c) \geq s(c_1, c_2)$, whereby the overall state can be encoded with the recursion

$$s(c) = s(c_1, c_2) + s(c_1) + f(p_1, L_1) s(c_2),$$ (511)

where the boundary conditions are

$$s(c) = \begin{cases} 0, & L = 1, c(1) \geq 0 \\ 1, & L = 1, c(1) < 0. \end{cases}$$ (512)

The state can be decoded by the algorithm

1. Set $p_1 := 1$ and choose partitioning length $L_1 \geq 1$ and $L_2 \geq 1$.
2. Calculate $s(c_1, c_2)$ with $p_1$.
3. If $s(c) < s(c_1, c_2)$ then $\pi_1 = p_1 - 1$. Otherwise, set $p_1 := p_1 + 1$ and go to 2.

The states of the partitions $s(c_2)$ and $s(c_1)$ can then be calculated from the integer and reminder parts of the fraction $\frac{s(c) - s(c_1, c_2)}{f(p_1, L_1)}$. We can then recursively determine the state of each position in the vector $c$ until a partition has $L_k = 1$, whereby

$$c_k(1) = \begin{cases} + \pi_k, & \text{for } s(c_k) = 0 \\ - \pi_k, & \text{for } s(c_k) = 1. \end{cases}$$ (513)

Observe that both the number of states $f(p, L)$ as well as the state $s(c)$ are integer numbers which can become larger than 32 bits. We must therefore employ arithmetic operations which support long integers throughout the algorithm.

3GPP TS 26.445 version 14.2.0 Release 14 at 161.

119. As shown below, the signal decoder is adapted to decode the encoded audio signal by generating a synthesized audio signal furthermore using the plurality of pulse signs:

### 6.1.1 General LP-based decoding

The LSF parameters are decoded from the received bitstream and converted to LSP coefficients and subsequently to LP coefficients. The interpolation principle, described in subclause 5.1.9.6, is used to obtain interpolated LSP vectors for all subframes, i.e. 4 subframes in case of 12.8 kHz internal sampling rate and 5 subframes in case of 16 kHz sampling rate. Then, the excitation signal is reconstructed and post-processed before performing LP synthesis (filtering with the LP synthesis filter) to obtain the reconstructed signal. The reconstructed signal is then de-emphasized (an inverse of the pre-emphasis applied at the encoder). Finally, a post-processing is applied for enhancing the format and harmonic structure of signal as well as the periodicity in the low frequency region of the signal. The signal is then up-sampled to the output sample rate. Finally, the high-band signal is generated and added to the up-sampled synthesized signal to obtain a full-band reconstructed signal (output signal).

3GPP TS 26.445 version 14.2.0 Release 14 at 452.

### 6.1.1.2.1.4 Decoding the algebraic codebook vector

The received algebraic codebook index is used to extract the positions and amplitudes (signs) of the excitation pulses and to find the algebraic codevector $c(n)$. If the integer part of the pitch lag is less than the subframe size 64, the pitch sharpening procedure is applied, which translates into modifying $c(n)$ by filtering it through the adaptive pre-filter $F^{(0)}(z) = \left(1 - \beta_1 z^{-1}\right)/\left(1 - 0.85 z^{-T}\right)$ which further consists of two parts: a periodicity enhancement part $1/\left(1 - 0.85 z^{-T}\right)$, where $T$ is the integer part of the pitch lag representing the fine spectral structure of the speech signal, and a tilt part $\left(1 - \beta_1 z^{-1}\right)$, where $\beta_1$ is related to the voicing of the previous subframe and is bounded by [0.28, 0.56] at 16.4 and 24.4 kbps, and by [0.0; 0.5] otherwise.

3GPP TS 26.445 version 14.2.0 Release 14 at 459.

### 6.1.1.2.1.8 Reconstructed excitation

The total excitation in each subframe is constructed by

$$u'(n) = \hat{g}_p \, v(n) + \hat{g}_c \, c(n), \qquad for \; n = 0,\ldots,63 \qquad (1457)$$

where $c(n)$ is the pre-filtered algebraic codevector.

3GPP TS 26.445 version 14.2.0 Release 14 at 464.

### 6.1.3 Synthesis

The LP synthesis is performed by filtering the post-processed excitation signal $u(n)$ through the LP synthesis filter..
The decoded and interpolated LP coefficients, $\hat{a}_i$, are used to construct the synthesis filter, $1/\hat{A}(z)$.

3GPP TS 26.445 version 14.2.0 Release 14 at 477.

120.    Based on the above Lenovo directly infringes at least claim 1 of the '263 Patent.

39

121. In addition to direct infringement by making, using, offering to sell, selling, and/or importing Lenovo's EVS Products, Lenovo indirectly infringes the '263 Patent claims.

122. Lenovo has indirectly infringed and continues to indirectly infringe the '263 Patent by inducing third parties to directly infringe that patent.

123. Lenovo had actual knowledge of the '263 Patent at least as of its receipt of Plaintiff's FRAND package on October 13, 2023, and continues to import, make, use, sell, and/or offer for sale Lenovo's EVS Products. At the very latest, Lenovo had actual knowledge of the '263 Patent and of its infringement of that patent as of the date of this Complaint. Where acts constituting direct infringement of the '263 Patent are not performed by Lenovo, such acts constituting direct infringement of the '263 Patent are performed by Lenovo's customers or end-users who act at the direction and/or control of Lenovo, with Lenovo's knowledge.

124. Lenovo knows that the use of Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, to make a voice call using the EVS codec, constitutes infringement of the '263 Patent.

125. Lenovo advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provide instructions on and/or encourage infringing use.

126. Lenovo encourages and facilitates its customers to infringe the '263 Patent by instructing customers that purchase Lenovo's EVS Products that such devices have voice calling capability, and providing various indicators within those devices of the same.

127.    For instance, Lenovo provides its customers with a user guide for each of the accused EVS Products. The user guide includes instructions on how to make a phone call as shown in the example below:[24]



128.    Using an accused device to make a phone call on an EVS-supported wireless carrier network, e.g., Verizon, results in infringement of the '263 Patent.

129.    Plaintiff is informed and believes, and on that basis alleges, that Lenovo indirectly infringes at least claim 1 of the '263 Patent by active inducement in violation of 35 U.S.C. § 271(b), by at least manufacturing, importing, supplying, distributing, selling, and/or offering for sale Lenovo's EVS Products to its customers with the knowledge and intent that use of those products would constitute direct infringement of the '263 Patent.  Lenovo has induced, and continues to

_____

[24] https://en-us.support.motorola.com/app/answers/detail/a_id/184284/~/user-guide-%28html%29---moto-g-power---2025 (last visited October 16, 2025).

41

induce, direct infringement of the '263 Patent by customers, importers, sellers, resellers, and/or end users of Lenovo's EVS Products.

130.    End users of Lenovo's EVS Products, pursuant to Lenovo's instructions, indicators, and advertisements, thus each directly infringe the '263 Patent.

131.    Lenovo also indirectly infringes by contributing to the infringement of, and continuing to contribute to the infringement of, one or more claims of the '263 Patent under 35 U.S.C. § 271(c) and/or 271(f) by selling, offering for sale, and/or importing into the United States, Lenovo's EVS Products. Lenovo knew at least as of its receipt of Plaintiff's FRAND package on October 13, 2023, that the accused products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '263 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

132.    The acts of infringement by Lenovo have caused damage to Plaintiff, and Plaintiff is entitled to recover from Lenovo damages sustained by Plaintiff as a result of Lenovo's wrongful acts in an amount subject to proof at trial. The infringement of the '263 Patent by Lenovo has damaged and will continue to damage Plaintiff.

133.    Lenovo had actual knowledge of, or was willfully blind to, the existence of the '263 Patent and Lenovo's infringement of the '263 Patent before the filing of this Complaint and at least as early as October 13, 2023, when it received the FRAND package from Fraunhofer.

134.    Despite this knowledge, Lenovo continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this

risk was either known or obvious that it should have been known to Lenovo. Thus, Lenovo's infringement has been, and continues to be, willful and deliberate.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 10,643,624

135. Plaintiff hereby incorporates by reference and re-alleges the foregoing paragraphs as if fully set forth herein.

136. On May 5, 2020, the USPTO duly and legally issued the '624 Patent, titled "Apparatus and Method for Improved Concealment of the Adaptive Codebook in ACELP-Like Concealment Employing Improved Pulse Resynchronization."

137. Pursuant to 35 U.S.C. § 282, the '624 Patent is presumed valid.

138. The '624 Patent is generally directed toward an improvement in the coding of audio signals. Specifically, it deals with a novel approach to reconstruct a lost audio frame which provides a better estimation and hence, better sound quality. The disclosed method uses a pitch cycle from preceding or succeeding frames and treats the partial pitch cycles at the beginning and at the end of the to be reconstructed frame in a particular way to reconstruct the lost frame (n). The difference between the number of samples in the available pitch cycle and the number of samples in the pitch cycle to be constructed is considered. This results in better concealment of the lost frame and hence, better sound quality.

139. The '624 Patent is not directed to conventional or well-known audio coding technology. Rather, the '624 Patent improves existing audio codecs. In this regard, the '624 Patent teaches:

> The present invention is based on the finding that conventional technology has significant drawbacks. Both G.718 (see G.718: Frame error robust narrow-band and wideband embedded variable bit-rate coding of speech and audio from 8-32 kbit/s, Recommendation ITU-T G.718, *Telecommunication Standardization Sector of ITU*, June 2008) and G.729.1 (see G.729.1: G.729-based embedded variable bit-rate coder: An 8-32 kbit/s scalable wideband coder bitstream

43

interoperable with g.729, Recommendation ITU-T G.729.1, *Telecommunication Standardization Sector of ITU*, May 2006) use pitch extrapolation in case of a frame loss. This is necessitated, because in case of a frame loss, also the pitch lags are lost. According to G.718 and G.729.1, the pitch is extrapolated by taking the pitch evolution during the last two frames into account. However, the pitch lag being reconstructed by G.718 and G.729.1 is not very accurate and, e.g., often results in a reconstructed pitch lag that differs significantly from the real pitch lag.

Embodiments of the present invention provide a more accurate pitch lag reconstruction. For this purpose, in contrast to G.718 and G.729.1, some embodiments take information on the reliability of the pitch information into account.

According to conventional technology, the pitch information on which the extrapolation is based comprises the last eight correctly received pitch lags, for which the coding mode was different from UNVOICED. However, in conventional technology, the voicing characteristic might be quite weak, indicated by a low pitch gain (which corresponds to a low prediction gain). In conventional technology, in case the extrapolation is based on pitch lags which have different pitch gains, the extrapolation will not be able to output reasonable results or even fail at all and will fall back to a simple pitch lag repetition approach.

Embodiments are based on the finding that the reason for these shortcomings of conventional technology are that on the encoder side, the pitch lag is chosen with respect to maximize the pitch gain in order to maximize the coding gain of the adaptive codebook, but that, in case the speech characteristic is weak, the pitch lag might not indicate the fundamental frequency precisely, since the noise in the speech signal causes the pitch lag estimation to become imprecise.

Therefore, during concealment, according to embodiments, the application of the pitch lag extrapolation is weighted depending on the reliability of the previously received lags used for this extrapolation.

*** 

According to embodiments, weighted pitch prediction concepts are provided. In contrast to conventional technology, the provided pitch prediction of embodiments of the present invention uses a reliability measure for each of the pitch lags it is based on, making the prediction result much more valid and stable. Particularly, the pitch gain can be used as an indicator for the reliability. Alternatively or additionally, according to some embodiments, the time that has been passed after the correct reception of the pitch lag may, for example, be used as an indicator.

Regarding pulse resynchronization, the present invention is based on the finding that one of the shortcomings of conventional technology regarding the glottal pulse resynchronization is, that the pitch extrapolation does not take into account, how many pulses (pitch cycles) should be constructed in the concealed frame.

44

According to conventional technology, the pitch extrapolation is conducted such that changes in the pitch are only expected at the borders of the subframes.

According to embodiments, when conducting glottal pulse resynchronization, pitch changes which are different from continuous pitch changes can be taken into account.

Embodiments of the present invention are based on the finding that G.718 and G.729.1 have the following drawbacks.

At first, in conventional technology, when calculating d, it is assumed that there is an integer number of pitch cycles within the frame. Since d defines the location of the last pulse in the concealed frame, the position of the last pulse will not be correct, when there is a non-integer number of the pitch cycles within the frame. This is depicted in FIG. 6 and FIG. 7. FIG. 6 illustrates a speech signal before a removal of samples. FIG. 7 illustrates the speech signal after the removal of samples. Furthermore, the algorithm employed by conventional technology for the calculation of d is inefficient.

Moreover, the calculation of conventional technology necessitates the number of pulses N in the constructed periodic part of the excitation. This adds not needed computational complexity.

Furthermore, in conventional technology, the calculation of the number of pulses N in the constructed periodic part of the excitation does not take the location of the first pulse into account.

*** 

Moreover, according to conventional technology, it is checked, if T [N−1], the location of the $N^{th}$ pulse in the constructed periodic part of the excitation is within the frame length, even though N is defined to include the first pulse in the following frame.

Furthermore, according to conventional technology, no samples are added or removed before the first and after the last pulse. Embodiments of the present invention are based on the finding that this leads to the drawback that there could be a sudden change in the length of the first full pitch cycle, and moreover, this furthermore leads to the drawback that the length of the pitch cycle after the last pulse could be greater than the length of the last full pitch cycle before the last pulse, even when the pitch lag is decreasing (see FIGS. 6 and 7).

Embodiments are based on the finding that the pulses T [k]=P−dif f and T [n]=P−d are not equal when:

45

$d > \lceil \frac{T_c}{2} \rceil$.

In this case dif $f = T_c - d$ and the number of removed samples will be dif f instead of d.

T [k] is in the future frame and it is moved to the current frame only after removing d samples.

T[n] is moved to the future frame after adding −d samples (d<0).

This will lead to wrong position of pulses in the concealed frame.

Moreover, embodiments are based on the finding that in conventional technology, the maximum value of d is limited to the minimum allowed value for the coded pitch lag. This is a constraint that limits the occurrences of other problems, but it also limits the possible change in the pitch and thus limits the pulse resynchronization.

Furthermore, embodiments are based on the finding that in conventional technology, the periodic part is constructed using integer pitch lag, and that this creates a frequency shift of the harmonics and significant degradation in concealment of tonal signals with a constant pitch. This degradation can be seen in FIG. 8, wherein FIG. 8 depicts a time-frequency representation of a speech signal being resynchronized when using a rounded pitch lag.

Embodiments are moreover based on the finding that most of the problems of conventional technology occur in situations as illustrated by the examples depicted in FIGS. 6 and 7, where d samples are removed.

***

Inter alia, according to embodiments, three techniques are provided.

According to a first technique provided by an embodiment, a search concept for the pulses is provided that, in contrast to G.718 and G.729.1, takes into account the location of the first pulse in the calculation of the number of pulses in the constructed periodic part, denoted as N.

According to a second technique provided by another embodiment, an algorithm for searching for pulses is provided that, in contrast to G.718 and G.729.1, does not need the number of pulses in the constructed periodic part, denoted as N, that takes the location of the first pulse into account, and that directly calculates the last pulse index in the concealed frame, denoted as k.

According to a third technique provided by a further embodiment, a pulse search is not needed. According to this third technique, a construction of the periodic part is combined with the removal or addition of the samples, thus achieving less complexity than previous techniques.

46

'624 Patent at 16:52-19:54.

140.     The claims of the '624 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

141.     Plaintiff holds all rights, title, and interest in and to the '624 Patent, including the right to bring this suit and recover all past, present and future damages for infringement of the '624 Patent.  Lenovo is not licensed to the '624 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '624 Patent whatsoever.   As such, Lenovo's infringement described below has injured, and continues to injure, Plaintiff.

142.     On information and belief, Lenovo has directly infringed and continues to directly infringe the '624 Patent by, for example, making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services that practice one or more claims of the '624 Patent, including without limitation Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard. These Lenovo devices include Lenovo's EVS Products.

143.     The EVS codec is a speech audio codec defined by the EVS Standard.

144.     Each of Lenovo's EVS Products includes hardware and software that implements the EVS codec. For example, hardware and/or software components comprising Lenovo's EVS Products are publicly identified as supporting the EVS codec and/or Enhanced HD Voice, Ultra HD Voice, or HD Voice+ services.

145.     The '624 Patent is essential to the EVS Standard.

146. Because Lenovo's EVS Products include hardware and/or software components supporting the EVS codec compliant with the EVS Standard, Lenovo necessarily infringes the '624 Patent.

147. On information and belief, Lenovo tests, or directs or controls others to test, Lenovo's EVS Products to ensure they include hardware and software compliant with the EVS Standard.

148. For example, Lenovo's EVS Products practice and/or are capable of practicing claim 1 of the '624 Patent, which is directed to an apparatus for reconstructing a frame. The following paragraphs provide details regarding one example of Lenovo's infringement, and only as to a single patent claim. Plaintiff reserves its right to provide greater detail and scope via its Disclosure of Asserted Claims and Preliminary Infringement Contentions at the time required under the Local Patent Rules of Practice and Procedure adopted by this Court and any applicable scheduling order.

149. Claim 1 of the '624 Patent states:

1. An apparatus for reconstructing a frame comprising a speech signal as a reconstructed frame, said reconstructed frame being associated with at least one available frame, said at least one available frame being at least one of preceding frames of the reconstructed frame and at least one succeeding frame of the reconstructed frame, wherein the at least one available frame comprises at least one pitch cycle as at least one available pitch cycle, wherein the apparatus comprises:

   a determination unit for determining a sample number difference indicating a difference between a number of samples of one of the at least one available pitch cycle and a number of samples of a first pitch cycle to be reconstructed, and

48

a frame reconstructor for reconstructing the reconstructed frame by reconstructing, depending on the sample number difference and depending on the samples of said one of the at least one available pitch cycle, the first pitch cycle to be reconstructed as a first reconstructed pitch cycle,

wherein the frame reconstructor is adapted to generate an intermediate frame depending on said one of the at least one available pitch cycle,

wherein the frame reconstructor is adapted to generate the intermediate frame so that the intermediate frame comprises a first partial intermediate pitch cycle, at least one further intermediate pitch cycle, and a second partial intermediate pitch cycle,

wherein the first partial intermediate pitch cycle depends on at least one of the samples of said one of the at least one available pitch cycle, wherein each of the at least one further intermediate pitch cycle depends on all of the samples of said one of the at least one available pitch cycle, and wherein the second partial intermediate pitch cycle depends on at least one of the samples of said one of the at least one available pitch cycle,

wherein the determination unit is configured to determine a start portion difference number indicating how many samples are to be removed or added from the first partial intermediate pitch cycle, and wherein the frame reconstructor is configured to remove at least one first sample from the first partial intermediate pitch cycle, or is configured to add at least one first sample to the first partial intermediate pitch cycle depending on the start portion difference number,

wherein the determination unit is configured to determine for each of the further intermediate pitch cycles a pitch cycle difference number indicating how many

49

samples are to be removed or added from said one of the further intermediate pitch cycles, and wherein the frame reconstructor is configured to remove at least one second sample from said one of the further intermediate pitch cycles, or is configured to add at least one second sample to said one of the further intermediate pitch cycles depending on said pitch cycle difference number, and

wherein the determination unit is configured to determine an end portion difference number indicating how many samples are to be removed or added from the second partial intermediate pitch cycle, and wherein the frame reconstructor is configured to remove at least one third sample from the second partial intermediate pitch cycle, or is configured to add at least one third sample to the second partial intermediate pitch cycle depending on the end portion difference number.

'624 Patent at 48:59–49:56.

150.    Lenovo's EVS Products implement at least Claim 1 of the '624 Patent.

151.    On information and belief, Lenovo's EVS Products conform to and implement technical specifications of the EVS Standard, including the portions of the specifications referenced below.

152.    As shown below, Lenovo's EVS Products comprise an apparatus for reconstructing a frame comprising a speech signal as a reconstructed frame, said reconstructed frame being associated with at least one available frame, said at least one available frame being at least one of preceding frames of the reconstructed frame and at least one succeeding frame of the reconstructed frame, wherein the at least one available frame comprises at least one pitch cycle as at least one available pitch cycle:

50

# 4 General

The purpose of the frame loss concealment procedure is to conceal the effect of any unavailable EVS frame (speech or audio or SID) for decoding. The concealment of erased frames covers both the reconstruction of missing frames and the techniques to ensure smooth and rapid recovery of normal synthesis after erased segments. The frame loss concealment procedure also covers proper strategies including muting or fading to background noise for the case of multiple frame losses in a row. The purpose of muting the output or fading to background noise in the case of several lost frames in a row is to indicate the breakdown of the channel to the user and to avoid generating possible annoying sounds as a result from the frame loss concealment procedure.

3GPP TS 26.447 version 16.1.0 Release 16 at 8.

## 5.3.1.2 Construction of the periodic part of the excitation

For a concealment of erased frames following a correctly received UNVOICED_CLAS frame, no periodic part of the excitation is generated. For a concealment of erased frames following a correctly received frame other than UNVOICED_CLAS, the periodic part of the excitation is constructed by repeating the low-pass filtered last pitch period of the previous frame. The low-pass filter used is a simple 3-tap linear phase FIR filter with the coefficients equal to 0.18, 0.64 and 0.18. The pitch period, Tc, used to select the last pitch pulse, and hence used during the concealment, is defined so that pitch multiples or submultiples can be avoided or reduced. The following logic is used in determining the pitch period, Tc

if ((T[−1] < 1.8Ts) AND (T[−1] > 0.6Ts)) OR (Tcnt >=5)

tmp_tc = T[−1]

else

tmp_tc = Ts

Tc = round(tmp_tc)

Here, $T[−1] = d_{fr}^{[−1]}$ is the pitch period of the last subframe of the last good received frame and Ts is the pitch period of the last subframe of the last good stable voiced frame with coherent pitch estimates. A stable voiced frame is defined here as a VOICED_CLAS frame, preceded by a frame of voiced type (VOICED TRANSITION, VOICED_CLAS, ONSET). The coherence of pitch is verified by examining whether the closed-loop pitch estimates are reasonably close; i.e. whether the ratio between the 4th subframe pitch, $d_{fr}^{[−1]}$ at 12.8 kHz core sampling frequency or $d_{fr}^{[−2]}$ at 16 kHz core sampling frequency, and the 2nd subframe pitch, $d_{fr}^{[−3]}$ at 12.8 kHz core sampling frequency or $d_{fr}^{[−4]}$ at 16 kHz core sampling frequency, is within the interval [0.7, 1.4], and whether the ratio between the 2nd subframe pitch ($d_{fr}^{[−3]}$ or $d_{fr}^{[−4]}$) and the last subframe pitch of the preceding frame, $d_{fr}^{[−y]}$, is also within that interval, where $y = 5$ when the core sampling frequency is 12.8 kHz and $y = 6$ otherwise. The pitch is also assumed cohererent if the coding type is transition.

3GPP TS 26.447 version 16.1.0 Release 16 at 18.

51

### 5.3.1.3    Glottal pulse resynchronization

The construction of the periodic part of the excitation, described in the subclause 5.3.1.2, may result in a drift of the glottal pulse position in the concealed frame during voiced segments, since the pitch period used to build the excitation can be different from the encoder pitch period. This will cause the adaptive codebook (or past CELP excitation) to be desynchronized from the actual CELP excitation. Thus, in case a good frame is received after an erased frame, the pitch excitation (or adaptive codebook excitation) will have an error which may persist for several frames and affect the performance of the correctly received frames.

To overcome this problem and improve the decoder convergence, a resynchronization method is used which adjusts the position of the glottal pulses in the concealed frame to be synchronized with the estimated true glottal pulses positions where the positions of the glottal pulses are estimated at the decoder based on the pitch extrapolation performed as in subclause 5.3.1.1. Therefore, this resynchronization procedure is performed based on the estimation of phase information and it aligns the maximum pulse in each pitch period of the concealed frame to the estimated position of the glottal pulse.

The starting point is the constructed periodic part of the excitation src_exc, constructed as described in subclause 5.3.1.2. If $P_{pred} < tmp\_tc$ then samples are removed from src_exc and if $P_{pred} > tmp\_tc$ then samples are added to src_exc. The samples are added or removed at the locations of the minimum energy, between the estimated locations of the glottal pulses as well as the locations of the minimum energy before the estimated location of the first and after the estimated location of the last glottal pulse. The periodic part of the excitation, modified in such way, is stored into dst_exc.

3GPP TS 26.447 version 16.1.0 Release 16 at 19.

153.    As shown below, the apparatus comprises a determination unit for determining a sample number difference indicating a difference between a number of samples of one of the at least one available pitch cycle and a number of samples of a first pitch cycle to be reconstructed:

### 5.3.1.3    Glottal pulse resynchronization

The construction of the periodic part of the excitation, described in the subclause 5.3.1.2, may result in a drift of the glottal pulse position in the concealed frame during voiced segments, since the pitch period used to build the excitation can be different from the encoder pitch period. This will cause the adaptive codebook (or past CELP excitation) to be desynchronized from the actual CELP excitation. Thus, in case a good frame is received after an erased frame, the pitch excitation (or adaptive codebook excitation) will have an error which may persist for several frames and affect the performance of the correctly received frames.

To overcome this problem and improve the decoder convergence, a resynchronization method is used which adjusts the position of the glottal pulses in the concealed frame to be synchronized with the estimated true glottal pulses positions where the positions of the glottal pulses are estimated at the decoder based on the pitch extrapolation performed as in subclause 5.3.1.1. Therefore, this resynchronization procedure is performed based on the estimation of phase information and it aligns the maximum pulse in each pitch period of the concealed frame to the estimated position of the glottal pulse.

The starting point is the constructed periodic part of the excitation src_exc, constructed as described in subclause 5.3.1.2. If $P_{pred} < tmp\_tc$ then samples are removed from src_exc and if $P_{pred} > tmp\_tc$ then samples are added to src_exc. The samples are added or removed at the locations of the minimum energy, between the estimated locations of the glottal pulses as well as the locations of the minimum energy before the estimated location of the first and after the estimated location of the last glottal pulse. The periodic part of the excitation, modified in such way, is stored into dst_exc.

3GPP TS 26.447 version 16.1.0 Release 16 at 19.

The delta of the samples to be added or removed between consecutive pitch cycles $a$ is calculated as:

$$a = \frac{\left|T_C - P_{pred}\right|(L-d) - |d|T_C}{(k+1)\left(T[0] + \frac{k}{2}T_C\right)} \tag{41}$$

The number of samples to be added or removed before the first pulse is calculated as:

$$\Delta_0^p = \left(\left|T_C - P_{pred}\right| - (k+1)a\right)\frac{T[0]}{T_C} \tag{42}$$

The number of samples to be added or removed before the first pulse is rounded down and the fractional part is kept in memory:

$$\Delta_0^{'} = \left\lfloor \Delta_0^p \right\rfloor$$
$$F = \Delta_0^p - \Delta_0^{'} \tag{43}$$

For each region between 2 pulses the number of samples to be added or removed is calculated as:

$$\Delta_i = \left|T_C - P_{pred}\right| - (k+1-i)a, \qquad 1 \le i \le k \tag{44}$$

3GPP TS 26.447 version 16.1.0 Release 16 at 20.

154.     As shown below, the apparatus comprises a frame reconstructor for reconstructing the reconstructed frame by reconstructing, depending on the sample number difference and depending on the samples of said one of the at least one available pitch cycle, the first pitch cycle to be reconstructed as a first reconstructed pitch cycle:

### 5.3.1.1     Extrapolation of future pitch

In case of a frame loss, an estimation of the end-of-frame pitch is done to help keeping the adaptive codebook in sync to the error free case as good as possible. If the error free end-of-frame pitch can be predicted precisely, the recovery after the loss will be a lot quicker. The pitch extrapolation assumes that the encoder uses a smooth pitch contour. The information on the estimated end-of-frame pitch is used by the glottal pulse resynchronization tool described in subclause 5.3.1.2.

3GPP TS 26.447 version 16.1.0 Release 16 at 16.

### 5.3.1.3    Glottal pulse resynchronization

The construction of the periodic part of the excitation, described in the subclause 5.3.1.2, may result in a drift of the glottal pulse position in the concealed frame during voiced segments, since the pitch period used to build the excitation can be different from the encoder pitch period. This will cause the adaptive codebook (or past CELP excitation) to be desynchronized from the actual CELP excitation. Thus, in case a good frame is received after an erased frame, the pitch excitation (or adaptive codebook excitation) will have an error which may persist for several frames and affect the performance of the correctly received frames.

To overcome this problem and improve the decoder convergence, a resynchronization method is used which adjusts the position of the glottal pulses in the concealed frame to be synchronized with the estimated true glottal pulses positions where the positions of the glottal pulses are estimated at the decoder based on the pitch extrapolation performed as in subclause 5.3.1.1. Therefore, this resynchronization procedure is performed based on the estimation of phase information and it aligns the maximum pulse in each pitch period of the concealed frame to the estimated position of the glottal pulse.

The starting point is the constructed periodic part of the excitation src_exc, constructed as described in subclause 5.3.1.2. If $P_{pred} < tmp\_tc$ then samples are removed from src_exc and if $P_{pred} > tmp\_tc$ then samples are added to src_exc. The samples are added or removed at the locations of the minimum energy, between the estimated locations of the glottal pulses as well as the locations of the minimum energy before the estimated location of the first and after the estimated location of the last glottal pulse. The periodic part of the excitation, modified in such way, is stored into dst_exc.

3GPP TS 26.447 version 16.1.0 Release 16 at 19.

For each region between 2 pulses the number of samples to be added or removed is calculated as:

$$\Delta_i = \left| T_C - P_{pred} \right| - (k+1-i)a, \qquad 1 \le i \le k \tag{44}$$

The number of samples to be added or removed between 2 pulses, taking into account the remaining fractional part from the previous rounding, is rounded down:

$$\Delta_i^{'} = \left\lfloor \Delta_i + F \right\rfloor$$
$$F = \Delta_i - \Delta_i^{'} \tag{45}$$

If, due to the added $F$, for some i it happens that $\Delta_i > \Delta_{i-1}$, then the values for $\Delta_i$ and $\Delta_{i-1}$ are swapped.

3GPP TS 26.447 version 16.1.0 Release 16 at 20.

The location of the minimum energy segment $P_{\min}[1]$ between the first two pulses in src_exc, that has $\Delta'_{\max}$ length, is then found by simple search for minimum in the moving average of length $\Delta'_{\max}$. For every consecutive minimum energy segment between two pulses, the position is calculated as:

$$P_{\min}[i] = P_{\min}[1] + (i-1)T_C, \quad 1 < i \le k \qquad (48)$$

If $P_{\min}[1] > T_C$ then the location of the minimum energy segment before the first pulse is calculated using $P_{\min}[0] = P_{\min}[1] - T_C$. Otherwise the location of the minimum energy segment $P_{\min}[0]$ before the first pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta'_0$.

If $P_{\min}[1] + kT_C < L - d$ then the location of the minimum energy segment after the last pulse is calculated using $P_{\min}[k+1] = P_{\min}[1] + kT_C$. Otherwise the location of the minimum energy segment $P_{\min}[k+1]$ after the last pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta'_{k+1}$.

If there is going to be just one pulse in dst_exc, that is if $k$ is equal to 0, the search for $P_{\min}[1]$ is limited to $L - d$. $P_{\min}[1]$ then points to the location of the minimum energy segment after the only pulse in dst_exc.

If $d > 0$ then $\Delta'_i$ samples are added at location $P_{\min}[i]$ for $0 \le i \le k+1$ to the signal src_exc and stored in dst_exc, otherwise if $d < 0$ then $\Delta'_i$ samples are removed at location $P_{\min}[i]$ for $0 \le i \le k+1$ from the signal src_exc and stored in dst_exc. There are $k+2$ regions where the samples are added or removed.

### 5.3.1.2 Construction of the periodic part of the excitation

For a concealment of erased frames following a correctly received UNVOICED_CLAS frame, no periodic part of the excitation is generated. For a concealment of erased frames following a correctly received frame other than UNVOICED_CLAS, the periodic part of the excitation is constructed by repeating the low-pass filtered last pitch period of the previous frame. The low-pass filter used is a simple 3-tap linear phase FIR filter with the coefficients equal to 0.18, 0.64 and 0.18. The pitch period, Tc, used to select the last pitch pulse, and hence used during the concealment, is defined so that pitch multiples or submultiples can be avoided or reduced. The following logic is used in determining the pitch period, Tc

### 5.3.1.3.2      Performing glottal pulse resynchronization

First the pitch change per sub-frame $\delta$ is calculated as:

$$\delta = \frac{P_{pred} - tmp\_tc}{n_{subfr}} \tag{38}$$

Then the number of samples to be added (to be removed if negative) $d$ is calculated as:

$$d = \delta \frac{L}{Tc} \frac{n_{subfr} + 1}{2} - L\left(1 - \frac{tmp\_tc}{Tc}\right) \tag{39}$$

3GPP TS 26.447 version 16.1.0 Release 16 at 19–20.

For each region between 2 pulses the number of samples to be added or removed is calculated as:

$$\Delta_i = \left|T_C - P_{pred}\right| - \left(k + 1 - i\right)a , \qquad 1 \le i \le k \tag{44}$$

The number of samples to be added or removed between 2 pulses, taking into account the remaining fractional part from the previous rounding, is rounded down:

$$\Delta_i^{'} = \left\lfloor \Delta_i + F \right\rfloor$$
$$F = \Delta_i - \Delta_i^{'} \tag{45}$$

If, due to the added $F$, for some i it happens that $\Delta_i > \Delta_{i-1}$, then the values for $\Delta_i$ and $\Delta_{i-1}$ are swapped.

3GPP TS 26.447 version 16.1.0 Release 16 at 20.

The location of the minimum energy segment $P_{\min}[1]$ between the first two pulses in src_exc, that has $\Delta'_{\max}$ length, is then found by simple search for minimum in the moving average of length $\Delta'_{\max}$. For every consecutive minimum energy segment between two pulses, the position is calculated as:

$$P_{\min}[i] = P_{\min}[1] + (i-1)T_C, \quad 1 < i \le k \qquad (48)$$

If $P_{\min}[1] > T_C$ then the location of the minimum energy segment before the first pulse is calculated using $P_{\min}[0] = P_{\min}[1] - T_C$. Otherwise the location of the minimum energy segment $P_{\min}[0]$ before the first pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta'_0$.

If $P_{\min}[1] + kT_C < L - d$ then the location of the minimum energy segment after the last pulse is calculated using $P_{\min}[k+1] = P_{\min}[1] + kT_C$. Otherwise the location of the minimum energy segment $P_{\min}[k+1]$ after the last pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta'_{k+1}$.

If there is going to be just one pulse in dst_exc, that is if $k$ is equal to 0, the search for $P_{\min}[1]$ is limited to $L - d$. $P_{\min}[1]$ then points to the location of the minimum energy segment after the only pulse in dst_exc.

If $d > 0$ then $\Delta'_i$ samples are added at location $P_{\min}[i]$ for $0 \le i \le k+1$ to the signal src_exc and stored in dst_exc, otherwise if $d < 0$ then $\Delta'_i$ samples are removed at location $P_{\min}[i]$ for $0 \le i \le k+1$ from the signal src_exc and stored in dst_exc. There are $k+2$ regions where the samples are added or removed.

3GPP TS 26.447 version 16.1.0 Release 16 at 21.

155.    As shown below, the frame reconstructor is adapted to generate an intermediate frame depending on said one of the at least one available pitch cycle, the frame reconstructor is adapted to generate an intermediate frame depending on said one of the at least one available pitch cycle, wherein the frame reconstructor is adapted to generate the intermediate frame so that the intermediate frame comprises a first partial intermediate pitch cycle, at least one further intermediate pitch cycle, and a second partial intermediate pitch cycle, wherein the first partial intermediate pitch cycle depends on at least one of the samples of said one of the at least one available pitch cycle, wherein each of the at least one further intermediate pitch cycle depends on all of the samples of said one of the at least one available pitch cycle, and wherein the second

57

partial intermediate pitch cycle depends on at least one of the samples of said one of the at least one available pitch cycle:

---

**5.3.1.2    Construction of the periodic part of the excitation**

For a concealment of erased frames following a correctly received UNVOICED_CLAS frame, no periodic part of the excitation is generated. For a concealment of erased frames following a correctly received frame other than UNVOICED_CLAS, the periodic part of the excitation is constructed by repeating the low-pass filtered last pitch period of the previous frame. The low-pass filter used is a simple 3-tap linear phase FIR filter with the coefficients equal to 0.18, 0.64 and 0.18. The pitch period, Tc, used to select the last pitch pulse, and hence used during the concealment, is defined so that pitch multiples or submultiples can be avoided or reduced. The following logic is used in determining the pitch period, Tc

---

3GPP TS 26.447 version 16.1.0 Release 16 at 18.

---

**5.3.1.3    Glottal pulse resynchronization**

The construction of the periodic part of the excitation, described in the subclause 5.3.1.2, may result in a drift of the glottal pulse position in the concealed frame during voiced segments, since the pitch period used to build the excitation can be different from the encoder pitch period. This will cause the adaptive codebook (or past CELP excitation) to be desynchronized from the actual CELP excitation. Thus, in case a good frame is received after an erased frame, the pitch excitation (or adaptive codebook excitation) will have an error which may persist for several frames and affect the performance of the correctly received frames.

To overcome this problem and improve the decoder convergence, a resynchronization method is used which adjusts the position of the glottal pulses in the concealed frame to be synchronized with the estimated true glottal pulses positions where the positions of the glottal pulses are estimated at the decoder based on the pitch extrapolation performed as in subclause 5.3.1.1. Therefore, this resynchronization procedure is performed based on the estimation of phase information and it aligns the maximum pulse in each pitch period of the concealed frame to the estimated position of the glottal pulse.

The starting point is the constructed periodic part of the excitation src_exc, constructed as described in subclause 5.3.1.2. If $P_{pred} < tmp\_tc$ then samples are removed from src_exc and if $P_{pred} > tmp\_tc$ then samples are added to src_exc. The samples are added or removed at the locations of the minimum energy, between the estimated locations of the glottal pulses as well as the locations of the minimum energy before the estimated location of the first and after the estimated location of the last glottal pulse. The periodic part of the excitation, modified in such way, is stored into dst_exc.

---

3GPP TS 26.447 version 16.1.0 Release 16 at 19.

58

The number of samples to be added or removed before the first pulse is calculated as:

$$\Delta_0^p = \left( \left| T_C - P_{pred} \right| - (k+1)a \right) \frac{T[0]}{T_C} \qquad (42)$$

The number of samples to be added or removed before the first pulse is rounded down and the fractional part is kept in memory:

$$\Delta_0^{'} = \left\lfloor \Delta_0^p \right\rfloor$$
$$F = \Delta_0^p - \Delta_0^{'} \qquad (43)$$

For each region between 2 pulses the number of samples to be added or removed is calculated as:

$$\Delta_i = \left| T_C - P_{pred} \right| - (k+1-i)a , \qquad 1 \leq i \leq k \qquad (44)$$

The number of samples to be added or removed between 2 pulses, taking into account the remaining fractional part from the previous rounding, is rounded down:

$$\Delta_i^{'} = \left\lfloor \Delta_i + F \right\rfloor$$
$$F = \Delta_i - \Delta_i^{'} \qquad (45)$$

If, due to the added $F$, for some i it happens that $\Delta_i > \Delta_{i-1}$, then the values for $\Delta_i$ and $\Delta_{i-1}$ are swapped.

The number of samples to be added or removed after the last pulse is calculated as:

$$\Delta_{k+1}^{'} = \left\lfloor d + 0.5 \right\rfloor - \sum_{i=0}^{k} \Delta_i^{'} \qquad (46)$$

3GPP TS 26.447 version 16.1.0 Release 16 at 20.

The location of the minimum energy segment $P_{\min}[1]$ between the first two pulses in src_exc, that has $\Delta'_{\max}$ length, is then found by simple search for minimum in the moving average of length $\Delta'_{\max}$. For every consecutive minimum energy segment between two pulses, the position is calculated as:

$$P_{\min}[i] = P_{\min}[1] + (i-1)T_C, \quad 1 < i \leq k \qquad (48)$$

If $P_{\min}[1] > T_C$ then the location of the minimum energy segment before the first pulse is calculated using $P_{\min}[0] = P_{\min}[1] - T_C$. Otherwise the location of the minimum energy segment $P_{\min}[0]$ before the first pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta'_0$.

If $P_{\min}[1] + kT_C < L - d$ then the location of the minimum energy segment after the last pulse is calculated using $P_{\min}[k+1] = P_{\min}[1] + kT_C$. Otherwise the location of the minimum energy segment $P_{\min}[k+1]$ after the last pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta'_{k+1}$.

If there is going to be just one pulse in dst_exc, that is if $k$ is equal to 0, the search for $P_{\min}[1]$ is limited to $L - d$. $P_{\min}[1]$ then points to the location of the minimum energy segment after the only pulse in dst_exc.

If $d > 0$ then $\Delta'_i$ samples are added at location $P_{\min}[i]$ for $0 \leq i \leq k+1$ to the signal src_exc and stored in dst_exc, otherwise if $d < 0$ then $\Delta'_i$ samples are removed at location $P_{\min}[i]$ for $0 \leq i \leq k+1$ from the signal src_exc and stored in dst_exc. There are $k+2$ regions where the samples are added or removed.

3GPP TS 26.447 version 16.1.0 Release 16 at 21.

156.    As shown below, the determination unit is configured to determine a start portion difference number indicating how many samples are to be removed or added from the first partial intermediate pitch cycle, and wherein the frame reconstructor is configured to remove at least one first sample from the first partial intermediate pitch cycle, or is configured to add at least one first sample to the first partial intermediate pitch cycle depending on the start portion difference number:

The number of samples to be added or removed before the first pulse is calculated as:

$$\Delta_0^p = \left( \left| T_C - P_{pred} \right| - (k+1)a \right) \frac{T[0]}{T_C} \qquad (42)$$

The number of samples to be added or removed before the first pulse is rounded down and the fractional part is kept in memory:

$$\Delta_0^{'} = \left\lfloor \Delta_0^p \right\rfloor$$
$$F = \Delta_0^p - \Delta_0^{'} \qquad (43)$$

For each region between 2 pulses the number of samples to be added or removed is calculated as:

$$\Delta_i = \left| T_C - P_{pred} \right| - (k+1-i)a , \qquad 1 \leq i \leq k \qquad (44)$$

The number of samples to be added or removed between 2 pulses, taking into account the remaining fractional part from the previous rounding, is rounded down:

$$\Delta_i^{'} = \left\lfloor \Delta_i + F \right\rfloor$$
$$F = \Delta_i - \Delta_i^{'} \qquad (45)$$

If, due to the added $F$, for some i it happens that $\Delta_i > \Delta_{i-1}$, then the values for $\Delta_i$ and $\Delta_{i-1}$ are swapped.

The number of samples to be added or removed after the last pulse is calculated as:

$$\Delta_{k+1}^{'} = \left\lfloor d + 0.5 \right\rfloor - \sum_{i=0}^{k} \Delta_i^{'} \qquad (46)$$

3GPP TS 26.447 version 16.1.0 Release 16 at 20.

Case 5:25-cv-00680-FL    Document 1    Filed 10/27/25    Page 61 of 118

The location of the minimum energy segment $P_{\min}[1]$ between the first two pulses in src_exc, that has $\Delta'_{\max}$ length, is then found by simple search for minimum in the moving average of length $\Delta'_{\max}$. For every consecutive minimum energy segment between two pulses, the position is calculated as:

$$P_{\min}[i] = P_{\min}[1] + (i-1)T_C, \quad 1 < i \leq k \qquad (48)$$

If $P_{\min}[1] > T_C$ then the location of the minimum energy segment before the first pulse is calculated using $P_{\min}[0] = P_{\min}[1] - T_C$. Otherwise the location of the minimum energy segment $P_{\min}[0]$ before the first pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta'_0$.

If $P_{\min}[1] + kT_C < L - d$ then the location of the minimum energy segment after the last pulse is calculated using $P_{\min}[k+1] = P_{\min}[1] + kT_C$. Otherwise the location of the minimum energy segment $P_{\min}[k+1]$ after the last pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta'_{k+1}$.

If there is going to be just one pulse in dst_exc, that is if $k$ is equal to 0, the search for $P_{\min}[1]$ is limited to $L - d$. $P_{\min}[1]$ then points to the location of the minimum energy segment after the only pulse in dst_exc.

If $d > 0$ then $\Delta'_i$ samples are added at location $P_{\min}[i]$ for $0 \leq i \leq k+1$ to the signal src_exc and stored in dst_exc, otherwise if $d < 0$ then $\Delta'_i$ samples are removed at location $P_{\min}[i]$ for $0 \leq i \leq k+1$ from the signal src_exc and stored in dst_exc. There are $k+2$ regions where the samples are added or removed.

3GPP TS 26.447 version 16.1.0 Release 16 at 21.

157.     As shown below, the determination unit is configured to determine for each of the further intermediate pitch cycles a pitch cycle difference number indicating how many samples are to be removed or added from said one of the further intermediate pitch cycles, and wherein the frame reconstructor is configured to remove at least one second sample from said one of the further intermediate pitch cycles, or is configured to add at least one second sample to said one of the further intermediate pitch cycles depending on said pitch cycle difference number:

62

The number of samples to be added or removed before the first pulse is calculated as:

$$\Delta_0^p = \left(\left|T_C - P_{pred}\right| - (k+1)a\right)\frac{T[0]}{T_C} \tag{42}$$

The number of samples to be added or removed before the first pulse is rounded down and the fractional part is kept in memory:

$$\Delta_0^{'} = \left\lfloor \Delta_0^p \right\rfloor$$
$$F = \Delta_0^p - \Delta_0^{'} \tag{43}$$

For each region between 2 pulses the number of samples to be added or removed is calculated as:

$$\Delta_i = \left|T_C - P_{pred}\right| - (k+1-i)a, \qquad 1 \le i \le k \tag{44}$$

The number of samples to be added or removed between 2 pulses, taking into account the remaining fractional part from the previous rounding, is rounded down:

$$\Delta_i^{'} = \left\lfloor \Delta_i + F \right\rfloor$$
$$F = \Delta_i - \Delta_i^{'} \tag{45}$$

If, due to the added $F$, for some i it happens that $\Delta_i > \Delta_{i-1}$, then the values for $\Delta_i$ and $\Delta_{i-1}$ are swapped.

The number of samples to be added or removed after the last pulse is calculated as:

$$\Delta_{k+1}^{'} = \left\lfloor d + 0.5 \right\rfloor - \sum_{i=0}^{k} \Delta_i^{'} \tag{46}$$

3GPP TS 26.447 version 16.1.0 Release 16 at 20.

The location of the minimum energy segment $P_{\min}[1]$ between the first two pulses in src_exc, that has $\Delta'_{\max}$ length, is then found by simple search for minimum in the moving average of length $\Delta'_{\max}$. For every consecutive minimum energy segment between two pulses, the position is calculated as:

$$P_{\min}[i] = P_{\min}[1] + (i-1)T_C, \quad 1 < i \le k \tag{48}$$

If $P_{\min}[1] > T_C$ then the location of the minimum energy segment before the first pulse is calculated using $P_{\min}[0] = P_{\min}[1] - T_C$. Otherwise the location of the minimum energy segment $P_{\min}[0]$ before the first pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta'_0$.

If $P_{\min}[1] + kT_C < L - d$ then the location of the minimum energy segment after the last pulse is calculated using $P_{\min}[k+1] = P_{\min}[1] + kT_C$. Otherwise the location of the minimum energy segment $P_{\min}[k+1]$ after the last pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta'_{k+1}$.

If there is going to be just one pulse in dst_exc, that is if $k$ is equal to 0, the search for $P_{\min}[1]$ is limited to $L - d$. $P_{\min}[1]$ then points to the location of the minimum energy segment after the only pulse in dst_exc.

If $d > 0$ then $\Delta'_i$ samples are added at location $P_{\min}[i]$ for $0 \le i \le k+1$ to the signal src_exc and stored in dst_exc, otherwise if $d < 0$ then $\Delta'_i$ samples are removed at location $P_{\min}[i]$ for $0 \le i \le k+1$ from the signal src_exc and stored in dst_exc. There are $k+2$ regions where the samples are added or removed.

3GPP TS 26.447 version 16.1.0 Release 16 at 21.

158.    As shown below, the determination unit is configured to determine an end portion difference number indicating how many samples are to be removed or added from the second partial intermediate pitch cycle, and wherein the frame reconstructor is configured to remove at least one third sample from the second partial intermediate pitch cycle, or is configured to add at least one third sample to the second partial intermediate pitch cycle depending on the end portion difference number:

The number of samples to be added or removed before the first pulse is calculated as:

$$\Delta_0^p = \left( \left| T_C - P_{pred} \right| - (k+1)a \right) \frac{T[0]}{T_C} \tag{42}$$

The number of samples to be added or removed before the first pulse is rounded down and the fractional part is kept in memory:

$$\Delta_0^{'} = \left\lfloor \Delta_0^p \right\rfloor$$
$$F = \Delta_0^p - \Delta_0^{'} \tag{43}$$

For each region between 2 pulses the number of samples to be added or removed is calculated as:

$$\Delta_i = \left| T_C - P_{pred} \right| - (k+1-i)a , \qquad 1 \le i \le k \tag{44}$$

The number of samples to be added or removed between 2 pulses, taking into account the remaining fractional part from the previous rounding, is rounded down:

$$\Delta_i^{'} = \left\lfloor \Delta_i + F \right\rfloor$$
$$F = \Delta_i - \Delta_i^{'} \tag{45}$$

If, due to the added $F$, for some i it happens that $\Delta_i > \Delta_{i-1}$, then the values for $\Delta_i$ and $\Delta_{i-1}$ are swapped.

The number of samples to be added or removed after the last pulse is calculated as:

$$\Delta_{k+1}^{'} = \left\lfloor d + 0.5 \right\rfloor - \sum_{i=0}^{k} \Delta_i^{'} \tag{46}$$

3GPP TS 26.447 version 16.1.0 Release 16 at 20.

The location of the minimum energy segment $P_{\min}[1]$ between the first two pulses in src_exc, that has $\Delta_{\max}^{'}$ length, is then found by simple search for minimum in the moving average of length $\Delta_{\max}^{'}$. For every consecutive minimum energy segment between two pulses, the position is calculated as:

$$P_{\min}[i] = P_{\min}[1] + (i-1)T_C, \quad 1 < i \leq k \qquad (48)$$

If $P_{\min}[1] > T_C$ then the location of the minimum energy segment before the first pulse is calculated using $P_{\min}[0] = P_{\min}[1] - T_C$. Otherwise the location of the minimum energy segment $P_{\min}[0]$ before the first pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta_{0}^{'}$.

If $P_{\min}[1] + kT_C < L - d$ then the location of the minimum energy segment after the last pulse is calculated using $P_{\min}[k+1] = P_{\min}[1] + kT_C$. Otherwise the location of the minimum energy segment $P_{\min}[k+1]$ after the last pulse in src_exc is found by simple search for minimum in the moving average of length $\Delta_{k+1}^{'}$.

If there is going to be just one pulse in dst_exc, that is if $k$ is equal to 0, the search for $P_{\min}[1]$ is limited to $L - d$. $P_{\min}[1]$ then points to the location of the minimum energy segment after the only pulse in dst_exc.

If $d > 0$ then $\Delta_{i}^{'}$ samples are added at location $P_{\min}[i]$ for $0 \leq i \leq k+1$ to the signal src_exc and stored in dst_exc, otherwise if $d < 0$ then $\Delta_{i}^{'}$ samples are removed at location $P_{\min}[i]$ for $0 \leq i \leq k+1$ from the signal src_exc and stored in dst_exc. There are $k+2$ regions where the samples are added or removed.

3GPP TS 26.447 version 16.1.0 Release 16 at 21.

159.    Based on the above Lenovo directly infringes at least claim 1 of the '624 Patent.

160.    In addition to direct infringement by making, using, offering to sell, selling, and/or importing Lenovo's EVS Products, Lenovo indirectly infringes the '624 Patent claims.

161.    Lenovo has indirectly infringed and continues to indirectly infringe the '624 Patent by inducing third parties to directly infringe that patent.

162.    Lenovo had actual knowledge of the '624 Patent at least as of its receipt of Plaintiff's FRAND package on October 13, 2023, and continues to import, make, use, sell, and/or offer for sale Lenovo's EVS Products. At the very latest, Lenovo had actual knowledge of the '624 Patent and of its infringement of that patent as of the date of this Complaint. Where acts constituting direct infringement of the '624 Patent are not performed by Lenovo, such acts

constituting direct infringement of the '624 Patent are performed by Lenovo's customers or end-users who act at the direction and/or control of Lenovo, with Lenovo's knowledge.

163.    Lenovo knows that the use of Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, to make a voice call using the EVS codec, constitutes infringement of the '624 Patent.

164.    Lenovo advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provide instructions on and/or encourage infringing use.

165.    Lenovo encourages and facilitates its customers to infringe the '624 Patent by instructing customers that purchase Lenovo's EVS Products that such devices have voice calling capability, and providing various indicators within those devices of the same.

166.    For instance, Lenovo provides its customers with a user guide for each of the accused EVS Products. The user guide includes instructions on how to make a phone call as shown in the example below:[25]

---

[25] https://en-us.support.motorola.com/app/answers/detail/a_id/184284/~/user-guide-%28html%29---moto-g-power---2025 (last visited October 16, 2025).



167.     Using an accused device to make a phone call on an EVS-supported wireless carrier network, e.g., Verizon, results in infringement of the '624 Patent.

168.     Plaintiff is informed and believes, and on that basis alleges, that Lenovo indirectly infringes at least claim 1 of the '624 Patent by active inducement in violation of 35 U.S.C. § 271(b), by at least manufacturing, importing, supplying, distributing, selling, and/or offering for sale Lenovo's EVS Products to its customers with the knowledge and intent that use of those products would constitute direct infringement of the '624 Patent.  Lenovo has induced, and continues to induce, direct infringement of the '624 Patent by customers, importers, sellers, resellers, and/or end users of Lenovo's EVS Products.

169.     End users of Lenovo's EVS Products, pursuant to Lenovo's instructions, indicators, and advertisements, thus each directly infringe the '624 Patent.

170.     Lenovo also indirectly infringes by contributing to the infringement of, and continuing to contribute to the infringement of, one or more claims of the '624 Patent under 35

68

U.S.C. § 271(c) and/or 271(f) by selling, offering for sale, and/or importing into the United States, Lenovo's EVS Products. Lenovo knew at least as of its receipt of Plaintiff's FRAND package on October 13, 2023, that the accused products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '624 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

171.    The acts of infringement by Lenovo have caused damage to Plaintiff, and Plaintiff is entitled to recover from Lenovo damages sustained by Plaintiff as a result of Lenovo's wrongful acts in an amount subject to proof at trial. The infringement of the '624 Patent by Lenovo has damaged and will continue to damage Plaintiff.

172.    Lenovo had actual knowledge of, or was willfully blind to, the existence of the '624 Patent and Lenovo's infringement of the '624 Patent before the filing of this Complaint and at least as early as October 13, 2023, when it received the FRAND package from Fraunhofer.

173.    Despite this knowledge, Lenovo continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious that it should have been known to Lenovo. Thus, Lenovo's infringement has been, and continues to be, willful and deliberate.

**COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 10,089,993**

174.    Plaintiff hereby incorporates by reference and re-alleges the foregoing paragraphs as if fully set forth herein.

175.    On October 2, 2018, the USPTO duly and legally issued the '993 Patent, titled "Apparatus and Method for Comfort Noise Generation Mode Selection."

69

176.    Pursuant to 35 U.S.C. § 282, the '993 Patent is presumed valid.

177.    The '993 Patent is generally directed toward an improvement in the coding of audio signals. Specifically, it deals with a method for Comfort Noise Generation ("CNG") where one of the two or more CNG methods (one of which is a Frequency domain method) are selected and used depending on the characteristics of the background noise. The encoder sends the "mode" information to the decoder, and the decoder uses the corresponding CNG method when decoding the signal. Instead of using a particular CNG mode (e.g., frequency domain comfort noise generation (FD_CNG) or linear-prediction based comfort noise generation (LP_CNG)), the patent discloses selecting a CNG mode from two or more CNG modes depending on the background noise characteristics of the input signal.

178.    The '993 Patent is not directed to conventional or well-known audio coding technology. Rather, the '993 Patent improves existing audio codecs. In this regard, the '993 Patent teaches:

> Inter alia, embodiments are based on the finding that FD-CNG gives better quality on high-tilt background noise signals like e.g. car noise, while LP-CNG gives better quality on more spectrally flat background noise signals like e.g. office noise.
>
> To get the best possible quality out of a DTX/CNG system, according to embodiments, both CNG approaches are used and one of them is selected depending on the background noise characteristics.
>
> Embodiments provide a selector that decides which CNG mode should be used, for example, either LP-CNG or FD-CNG.

'993 Patent at 3:48–59.

179.    The claims of the '993 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

70

180.    Plaintiff holds all rights, title, and interest in and to the '993 Patent, including the right to bring this suit and recover all past, present and future damages for infringement of the '993 Patent.  Lenovo is not licensed to the '993 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '993 Patent whatsoever.  As such, Lenovo's infringement described below has injured, and continues to injure, Plaintiff.

181.    On information and belief, Lenovo has directly infringed and continues to directly infringe the '993 Patent by, for example, making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services that practice one or more claims of the '993 Patent, including without limitation Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard. These Lenovo devices include Lenovo's EVS Products.

182.    The EVS codec is a speech audio codec defined by the EVS Standard.

183.    Each of Lenovo's EVS Products includes hardware and software that implements the EVS codec. For example, hardware and/or software components comprising Lenovo's EVS Products are publicly identified as supporting the EVS codec and/or Enhanced HD Voice, Ultra HD Voice, or HD Voice+ services.

184.    The '993 Patent is essential to the EVS Standard.

185.    Because Lenovo's EVS Products include hardware and/or software components supporting the EVS codec compliant with the EVS Standard, Lenovo necessarily infringes the '993 Patent.

186.    On information and belief, Lenovo tests, or directs or controls others to test, Lenovo's EVS Products to ensure they include hardware and software compliant with the EVS Standard.

71

187. For example, Lenovo's EVS Products practice and/or are capable of practicing claim 1 of the '993 Patent, which is directed to an apparatus for encoding audio information. The following paragraphs provide details regarding one example of Lenovo's infringement, and only as to a single patent claim. Plaintiff reserves its right to provide greater detail and scope via its Disclosure of Asserted Claims and Preliminary Infringement Contentions at the time required under the Local Patent Rules of Practice and Procedure adopted by this Court and any applicable scheduling order.

188. Claim 1 of the '993 Patent states:

1. An apparatus for encoding audio information, comprising:

> a selector for selecting a comfort noise generation mode from two or more comfort noise generation modes depending on a background noise characteristic of an audio input signal, and

> an encoding unit for encoding the audio information, wherein the audio information comprises mode information indicating the selected comfort noise generation mode,

> wherein a first one of the two or more comfort noise generation modes is a frequency-domain comfort noise generation mode, and wherein the frequency-domain comfort noise generation mode indicates that the comfort noise shall be generated in a frequency domain and that the comfort noise being generated in the frequency domain shall be frequency-to-time converted.

'993 Patent at 14:44–60.

189. Lenovo's EVS Products implement at least Claim 1 of the '993 Patent.

72

190.    On information and belief, Lenovo's EVS Products conform to and implement technical specifications of the EVS Standard, including the portions of the specifications referenced below.

191.    As shown below, Lenovo's EVS Products comprise an apparatus for encoding audio information:

## 4      General description of the coder

### 4.1    Introduction

The present document is a detailed description of the signal processing algorithms of the Enhanced Voice Services coder. The detailed mapping from 20ms input blocks of audio samples in 16 bit uniform PCM format to encoded blocks of bits and from encoded blocks of bits to output blocks of reconstructed audio samples is explained. Four sampling rates are supported; 8 000, 16 000, 32 000 and 48 000 samples/s and the bit rates for the encoded bit stream of may be 5.9, 7.2, 8.0, 9.6, 13.2, 16.4, 24.4, 32.0, 48.0, 64.0, 96.0 or 128.0 kbit/s. An AMR-WB Interoperable mode is also provided which operates at bit rates for the encoded bit stream of 6.6, 8.85, 12.65, 14.25, 15.85, 18.25, 19.85, 23.05 or 23.85 kbit/s.

3GPP TS 26.445 version 16.2.0 Release 16 at 20.

## 5      Functional description of the encoder

The description of the encoder is as follows. First, common pre-processing is described, and then the different elements of the encoder are described one by one. The discontinuous transmission (DTX) operation and the AMR-WB interoperable option are then given in separate subclauses, again referencing the same processing as in the default option.

3GPP TS 26.445 version 16.2.0 Release 16 at 26.

## 5.6　　DTX/CNG operation

### 5.6.1　　Overview

This subclause describes the discontinuous transmission (DTX) scheme and the comfort noise generation (CNG) algorithm. The DTX/CNG operation, which is activated on a command line, is used to reduce the transmission rate by simulating background noise during inactive signal periods. The regular DTX/CNG modes are supported for bit rates up to 24.4 kbps. For higher bit rates, the EVS codec supports a less aggressive DTX/CNG scheme that only switches to CNG for low input signal power.

The reduction of the transmission rate during inactive periods is achieved by coding the parameters referred to as comfort noise (CN) parameters. These parameters are used at the decoder to regenerate the background noise as well as possible, by respecting the spectral and temporal content of the background noise at the encoder. In the EVS Codec, the CNG algorithm reproduces high quality comfort noise by choosing between a linear prediction-domain based coding mode (LP-CNG) and a frequency-domain based coding mode (FD-CNG), according to the input characteristics. Each of the two coding modes utilizes a different set of CN parameters. In the LP-CNG mode, four CN parameters are analyzed and encoded: the low-band excitation energy, the low-band signal spectrum, the low-band excitation envelope and the high-band energy, where the high-band energy is only encoded for SWB/FB input. In the FD-CNG mode, the CN parameters consisting of global gain and spectral energies grouped in critical bands. Those parameters are encoded by a vector quantizer for transmission.

3GPP TS 26.445 version 16.2.0 Release 16 at 425.

192.　　As shown below, the apparatus comprises a selector for selecting a comfort noise generation mode from two or more comfort noise generation modes depending on a background noise characteristic of an audio input signal:

## 5.6　　DTX/CNG operation

### 5.6.1　　Overview

This subclause describes the discontinuous transmission (DTX) scheme and the comfort noise generation (CNG) algorithm. The DTX/CNG operation, which is activated on a command line, is used to reduce the transmission rate by simulating background noise during inactive signal periods. The regular DTX/CNG modes are supported for bit rates up to 24.4 kbps. For higher bit rates, the EVS codec supports a less aggressive DTX/CNG scheme that only switches to CNG for low input signal power.

The reduction of the transmission rate during inactive periods is achieved by coding the parameters referred to as comfort noise (CN) parameters. These parameters are used at the decoder to regenerate the background noise as well as possible, by respecting the spectral and temporal content of the background noise at the encoder. In the EVS Codec, the CNG algorithm reproduces high quality comfort noise by choosing between a linear prediction-domain based coding mode (LP-CNG) and a frequency-domain based coding mode (FD-CNG), according to the input characteristics. Each of the two coding modes utilizes a different set of CN parameters. In the LP-CNG mode, four CN parameters are analyzed and encoded: the low-band excitation energy, the low-band signal spectrum, the low-band excitation envelope and the high-band energy, where the high-band energy is only encoded for SWB/FB input. In the FD-CNG mode, the CN parameters consisting of global gain and spectral energies grouped in critical bands. Those parameters are encoded by a vector quantizer for transmission.

3GPP TS 26.445 version 16.2.0 Release 16 at 425.

### 5.6.1.3 CNG selector

The CNG selector chooses one of the two CNG modes (FD_CNG or LP_CNG) for generating comfort noise. In case AMR-WB IO mode is used, LP-CNG is always selected. Otherwise, the decision is based on the energy ratio between a high and a low frequency range of the background noise signal and the bandwidth of the signal.

Noise energy estimates for the low frequency range up to 1270 Hz and for the two highest critical bands are estimated

by
$$N_{\text{lp}} = \frac{\sum_{i=0}^{9} N_{CB}(i)}{10} ,$$
(1321)

$$N_{\text{hp}} = \frac{N_{CB}(18) + N_{CB}(19)}{2} ,$$
(1322)

except for narrowband signals, where the lowest band is ignored and the highest bands are lower:

$$N_{\text{lp}} = \frac{\sum_{i=1}^{9} N_{CB}(i)}{9} ,$$
(1323)

$$N_{\text{hp}} = \frac{N_{CB}(15) + N_{CB}(16)}{2} .$$
(1324)

$N_{CB}$ is the background noise energy per critical band as described in subclause 5.1.11.1. Both values $N_{lp}$ and $N_{hp}$ are used to calculate the spectral tilt of the background noise energies and update the memory for $N_{tilt}$ :

$$N_{\text{tilt}} = 0.9 \cdot N_{tilt} + 0.1 \cdot \frac{N_{lp}}{N_{hp}}$$
(1325)

Depending on the previous CNG mode, input signal bandwidth (`input_bwidth`) as detected by the bandwidth detection module (subclause 5.1.6) and $N_{tilt}$ the CNG mode is changed if the current frame is active and at least the past 20 frames were active and one of the following cases applies:

```
if (cng_mode == LP_CNG &&
(( input_bwidth == NB &&  N_tilt > 9.f) ||
    ( input_bwidth  > NB &&  N_tilt < 45.f)))
{
    cng_mode = FD_CNG;
}
else
    if ( cng_mode == FD_CNG &&
        (( input_bwidth == NB &&  N_tilt < 2.f) ||
    ( input_bwidth  > NB &&  N_tilt < 10.f)))
    {
cng_mode = LP_CNG;
    }
```

3GPP TS 26.445 version 16.2.0 Release 16 at 428.

193.    As shown below, the apparatus comprises an encoding unit for encoding the audio information:

75

### 4.4.1 Encoder overview

Figure 1 represents a high-level overview of the encoder. The signal resampling block corrects mismatches between the sampling frequency and the signal bandwidth command line parameter that is specified on the command line or through a file containing a bandwidth switching profile as explained in TS 26.442 and TS 26.443 and TS 26.452. For the case that the signal bandwidth is lower than half the input sampling frequency, the signal is decimated to a the lowest possible sampling rate out of the set of (8, 16, 32 kHz) that is larger than twice the signal bandwidth.



**Figure 1: Encoder overview**

The signal analysis determines which of three possible encoder strategies to employ: LP based coding (ACELP), frequency domain encoding and inactive coding (CNG). In some operational modes the signal analysis step includes a closed loop decision to determine which encoding method will result in the lowest distortion. Further parameters derived in the signal analysis aid the operation of these coding blocks and some of the analysis parameters, such as the coding strategy to be employed, are encoded into the bit-stream. In each of the coding blocks the signal analysis is further refined to obtain parameters relevant for the particular coding block.

3GPP TS 26.445 version 16.2.0 Release 16 at 21.

# 5 Functional description of the encoder

The description of the encoder is as follows. First, common pre-processing is described, and then the different elements of the encoder are described one by one. The discontinuous transmission (DTX) operation and the AMR-WB interoperable option are then given in separate subclauses, again referencing the same processing as in the default option.

3GPP TS 26.445 version 16.2.0 Release 16 at 26.

## 5.6 DTX/CNG operation

### 5.6.1 Overview

This subclause describes the discontinuous transmission (DTX) scheme and the comfort noise generation (CNG) algorithm. The DTX/CNG operation, which is activated on a command line, is used to reduce the transmission rate by simulating background noise during inactive signal periods. The regular DTX/CNG modes are supported for bit rates up to 24.4 kbps. For higher bit rates, the EVS codec supports a less aggressive DTX/CNG scheme that only switches to CNG for low input signal power.

The reduction of the transmission rate during inactive periods is achieved by coding the parameters referred to as comfort noise (CN) parameters. These parameters are used at the decoder to regenerate the background noise as well as possible, by respecting the spectral and temporal content of the background noise at the encoder. In the EVS Codec, the CNG algorithm reproduces high quality comfort noise by choosing between a linear prediction-domain based coding mode (LP-CNG) and a frequency-domain based coding mode (FD-CNG), according to the input characteristics. Each of the two coding modes utilizes a different set of CN parameters. In the LP-CNG mode, four CN parameters are analyzed and encoded: the low-band excitation energy, the low-band signal spectrum, the low-band excitation envelope and the high-band energy, where the high-band energy is only encoded for SWB/FB input. In the FD-CNG mode, the CN parameters consisting of global gain and spectral energies grouped in critical bands. Those parameters are encoded by a vector quantizer for transmission.

When the codec is operated with the DTX/CNG operation, the signal activity detector (SAD) is used to analyse the input signal to determine whether the signal comprises an active or inactive signal (see SAD decision in subclause 6.2). Based on its analysis, the SAD generates a SAD flag, $f_{SAD}$, whose state indicates whether the signal is active ($f_{SAD}$ = 1) or merely a background noise ($f_{SAD}$ = 0). When $f_{SAD}$ = 1, the regular encoding and decoding process is performed, as in the default option. When $f_{SAD}$ = 0, DTX functions are run at the encoder that transmit either a silence insertion descriptor (SID) frame or a NO_DATA frame. The SID frame contains the CN parameters, which are used to update the statistics of the background noise at the decoder, whereas the NO_DATA frame is empty. The SID frame is always encoded using 48 bits regardless the actual CNG mode operating.

3GPP TS 26.445 version 16.2.0 Release 16 at 425.

194. As shown below, the audio information comprises mode information indicating the selected comfort noise generation mode:

# 5 Functional description of the encoder

The description of the encoder is as follows. First, common pre-processing is described, and then the different elements of the encoder are described one by one. The discontinuous transmission (DTX) operation and the AMR-WB interoperable option are then given in separate subclauses, again referencing the same processing as in the default option.

3GPP TS 26.445 version 16.2.0 Release 16 at 26.

## 5.6 DTX/CNG operation

### 5.6.1 Overview

This subclause describes the discontinuous transmission (DTX) scheme and the comfort noise generation (CNG) algorithm. The DTX/CNG operation, which is activated on a command line, is used to reduce the transmission rate by simulating background noise during inactive signal periods. The regular DTX/CNG modes are supported for bit rates up to 24.4 kbps. For higher bit rates, the EVS codec supports a less aggressive DTX/CNG scheme that only switches to CNG for low input signal power.

The reduction of the transmission rate during inactive periods is achieved by coding the parameters referred to as comfort noise (CN) parameters. These parameters are used at the decoder to regenerate the background noise as well as possible, by respecting the spectral and temporal content of the background noise at the encoder. In the EVS Codec, the CNG algorithm reproduces high quality comfort noise by choosing between a linear prediction-domain based coding mode (LP-CNG) and a frequency-domain based coding mode (FD-CNG), according to the input characteristics. Each of the two coding modes utilizes a different set of CN parameters. In the LP-CNG mode, four CN parameters are analyzed and encoded: the low-band excitation energy, the low-band signal spectrum, the low-band excitation envelope and the high-band energy, where the high-band energy is only encoded for SWB/FB input. In the FD-CNG mode, the CN parameters consisting of global gain and spectral energies grouped in critical bands. Those parameters are encoded by a vector quantizer for transmission.

When the codec is operated with the DTX/CNG operation, the signal activity detector (SAD) is used to analyse the input signal to determine whether the signal comprises an active or inactive signal (see SAD decision in subclause 6.2). Based on its analysis, the SAD generates a SAD flag, $f_{SAD}$, whose state indicates whether the signal is active ($f_{SAD} = 1$) or merely a background noise ($f_{SAD} = 0$). When $f_{SAD} = 1$, the regular encoding and decoding process is performed, as in the default option. When $f_{SAD} = 0$, DTX functions are run at the encoder that transmit either a silence insertion descriptor (SID) frame or a NO_DATA frame. The SID frame contains the CN parameters, which are used to update the statistics of the background noise at the decoder, whereas the NO_DATA frame is empty. The SID frame is always encoded using 48 bits regardless the actual CNG mode operating.

3GPP TS 26.445 version 16.2.0 Release 16 at 425.

### 5.6.2 Encoding for LP-CNG

This section describes the operation in LP-CNG. Similar to the default operation, the LP-CNG also operates on the split-band basis. In WB/NB operation, only the LP parameters for low-band signal are analyzed and encoded. In SWB/FB operation, besides the LP analysis for the low-band signal, the high-band signal is analyzed and encoded separately as a kind of bandwidth extension. The LP parameters for low-band analysis include: the low-band excitation energy, the low-band signal spectrum and the low-band excitation envelope. The high-band analysis only involves one parameter which is the high-band energy. The 1 CNG type bit (see subclause 7.2) is set to "0" for LP-CNG and transmitted in each SID frame.

3GPP TS 26.445 version 16.2.0 Release 16 at 428–29.

### 5.6.3    Encoding for FD-CNG

To be able to produce an artificial noise resembling the actual input background noise in terms of spectro-temporal characteristics, the FD-CNG makes use of a noise estimation algorithm to track the energy of the background noise present at the encoder input. The noise estimates are then transmitted as parameters in the form of SID frames to update the amplitude of the random sequences generated in each frequency band at the decoder side during inactive phases. Note, however, that the noise estimation is carried out continuously on every frame, i.e., regardless of the speech activity. Therefore, it can deliver some meaningful information about the noise spectrum at any time, in particular at the very beginning of a speech pause.

3GPP TS 26.445 version 16.2.0 Release 16 at 436.

## 7.2    Bit allocation for SID frames in the DTX operation

The SID payload consists of 48 bits independent of the bandwidth, bit rate and mode. The EVS codec supports three types of SID frames, one for the FD-CNG and two for the LP-CNG scheme.

**Table 185: Bit allocation of FD-CNG SID frame**

| Description | FD-CNG |
|---|---|
| Number of bits per frame | 48 |
| CNG type flag | 1 |
| Bandwidth indicator | 2 |
| CELP sample rate | 1 |
| Global gain | 7 |
| Spectral band energy | 37 |

The CNG type flag determines the usage of FD-CNG or LP-CNG. The bandwidth indicator indicates NB, WB, SWB or FB. The CELP sample rate can be 12.8 kHz or 16 kHz. The remaining bits are used for the spectral envelope information.

3GPP TS 26.445 version 16.2.0 Release 16 at 640.

Case 5:25-cv-00680-FL     Document 1     Filed 10/27/25     Page 79 of 118

**Table 186: Bit allocation of LP-CNG SID frame**

| Description | WB SID | SWB SID |
|---|---|---|
| Number of bits per frame | 48 | 48 |
| CNG type flag | 1 | 1 |
| Bandwidth indicator | 1 | 1 |
| Core sampling rate indicator | 1 | 1 |
| Hangover frame counter | 3 | 3 |
| LSF bits | 29 | 29 |
| Low-band energy bits | 7 | 7 |
| Low-band excitation spectral envelope bits | 6 | N/A |
| High-band energy bits | N/A | 4 |
| Unused bits | N/A | 2 |

The CNG type flag determines if the SID belongs to FD-CNG or LP-CNG. The bandwidth indicator indicates whether the SID is a WB or a SWB SID. The core sampling rate indicator indicates whether the core is running at 12.8 kHz or 16 kHz sampling rate. The hangover frame counter indicates the number of hangover frames preceding the SID. The low-band excitation spectral envelope bits are only applicable to WB SID. The high-band energy bits are only applicable to SWB SID.

3GPP TS 26.445 version 16.2.0 Release 16 at 641.

195.    As shown below, a first one of the two or more comfort noise generation modes is

a frequency-domain comfort noise generation mode:

## 5.6 DTX/CNG operation

### 5.6.1 Overview

This subclause describes the discontinuous transmission (DTX) scheme and the comfort noise generation (CNG) algorithm. The DTX/CNG operation, which is activated on a command line, is used to reduce the transmission rate by simulating background noise during inactive signal periods. The regular DTX/CNG modes are supported for bit rates up to 24.4 kbps. For higher bit rates, the EVS codec supports a less aggressive DTX/CNG scheme that only switches to CNG for low input signal power.

The reduction of the transmission rate during inactive periods is achieved by coding the parameters referred to as comfort noise (CN) parameters. These parameters are used at the decoder to regenerate the background noise as well as possible, by respecting the spectral and temporal content of the background noise at the encoder. In the EVS Codec, the CNG algorithm reproduces high quality comfort noise by choosing between a linear prediction-domain based coding mode (LP-CNG) and a frequency-domain based coding mode (FD-CNG), according to the input characteristics. Each of the two coding modes utilizes a different set of CN parameters. In the LP-CNG mode, four CN parameters are analyzed and encoded: the low-band excitation energy, the low-band signal spectrum, the low-band excitation envelope and the high-band energy, where the high-band energy is only encoded for SWB/FB input. In the FD-CNG mode, the CN parameters consisting of global gain and spectral energies grouped in critical bands. Those parameters are encoded by a vector quantizer for transmission.

3GPP TS 26.445 version 16.2.0 Release 16 at 425.

### 5.6.1.3 CNG selector

The CNG selector chooses one of the two CNG modes (FD_CNG or LP_CNG) for generating comfort noise. In case AMR-WB IO mode is used, LP-CNG is always selected. Otherwise, the decision is based on the energy ratio between a high and a low frequency range of the background noise signal and the bandwidth of the signal.

Noise energy estimates for the low frequency range up to 1270 Hz and for the two highest critical bands are estimated by

$$N_{\text{lp}} = \frac{\sum_{i=0}^{9} N_{CB}(i)}{10} \,, \tag{1321}$$

$$N_{\text{hp}} = \frac{N_{CB}(18) + N_{CB}(19)}{2} \,, \tag{1322}$$

except for narrowband signals, where the lowest band is ignored and the highest bands are lower:

$$N_{\text{lp}} = \frac{\sum_{i=1}^{9} N_{CB}(i)}{9} \,, \tag{1323}$$

$$N_{\text{hp}} = \frac{N_{CB}(15) + N_{CB}(16)}{2} \,. \tag{1324}$$

$N_{CB}$ is the background noise energy per critical band as described in subclause 5.1.11.1. Both values $N_{lp}$ and $N_{hp}$ are used to calculate the spectral tilt of the background noise energies and update the memory for $N_{tilt}$:

$$N_{\text{tilt}} = 0.9 \cdot N_{tilt} + 0.1 \cdot \frac{N_{lp}}{N_{hp}} \tag{1325}$$

Depending on the previous CNG mode, input signal bandwidth (`input_bwidth`) as detected by the bandwidth detection module (subclause 5.1.6) and $N_{tilt}$ the CNG mode is changed if the current frame is active and at least the past 20 frames were active and one of the following cases applies:

```
if (cng_mode == LP_CNG &&
(( input_bwidth == NB && N_tilt > 9.f) ||
    ( input_bwidth  > NB && N_tilt > 45.f)))
{
    cng_mode = FD_CNG;
}
else
    if ( cng_mode == FD_CNG &&
        (( input_bwidth == NB && N_tilt < 2.f) ||
( input_bwidth  > NB && N_tilt < 10.f)))
    {
cng_mode = LP_CNG;
    }
```

3GPP TS 26.445 version 16.2.0 Release 16 at 428.

## 5.6.3    Encoding for FD-CNG

To be able to produce an artificial noise resembling the actual input background noise in terms of spectro-temporal characteristics, the FD-CNG makes use of a noise estimation algorithm to track the energy of the background noise present at the encoder input. The noise estimates are then transmitted as parameters in the form of SID frames to update the amplitude of the random sequences generated in each frequency band at the decoder side during inactive phases. Note, however, that the noise estimation is carried out continuously on every frame, i.e., regardless of the speech activity. Therefore, it can deliver some meaningful information about the noise spectrum at any time, in particular at the very beginning of a speech pause.

3GPP TS 26.445 version 16.2.0 Release 16 at 436.

196.    As shown below, the frequency-domain comfort noise generation mode indicates that the comfort noise shall be generated in a frequency domain and that the comfort noise being generated in the frequency domain shall be frequency-to-time converted:

## 5.6.3    Encoding for FD-CNG

To be able to produce an artificial noise resembling the actual input background noise in terms of spectro-temporal characteristics, the FD-CNG makes use of a noise estimation algorithm to track the energy of the background noise present at the encoder input. The noise estimates are then transmitted as parameters in the form of SID frames to update the amplitude of the random sequences generated in each frequency band at the decoder side during inactive phases. Note, however, that the noise estimation is carried out continuously on every frame, i.e., regardless of the speech activity. Therefore, it can deliver some meaningful information about the noise spectrum at any time, in particular at the very beginning of a speech pause.

3GPP TS 26.445 version 16.2.0 Release 16 at 436.

### 5.6.3.6.3        FD-CNG encoder comfort noise generation

A FD-CNG time-domain signal is generated similarly to the time-domain CNG signal generated at the decoder-side (see subclauses 6.7.3.3.2 and 6.7.3.3.3), except that the interpolated SID parameters $N_{\text{FD-CNG}}^{[\text{SID,FR}]}(j)$ are used to generate the noise in the frequency-domain (instead of the noise levels $N_{\text{FD-CNG}}^{[\text{CNG}]}(j)$ which are not available at the encoder side).

3GPP TS 26.445 version 16.2.0 Release 16 at 446.

83

**6.7.3.3.3    Comfort noise generation in the time domain**

The FFT coefficients obtained after comfort noise generation in the frequency domain are transformed by an inverse FFT, producing a CNG time-domain signal of length $L_{\text{FFT}}^{[\text{FD}-\text{CNG}]}$. This signal is then windowed using a sine-based window that can be defined as follow

$$w(n) = 0 \text{, for } n = 0,\dots,\frac{L_{\text{FFT}}^{[\text{FD}-\text{CNG}]}}{8} - 1 \text{.} \qquad (1988)$$

$$w(n) = \sin\left[\left(n - \frac{L_{\text{FFT}}^{[\text{FD}-\text{CNG}]}}{8} + \frac{1}{2}\right)\frac{2\pi}{L_{\text{FFT}}^{[\text{FD}-\text{CNG}]}}\right] \text{, for } n = \frac{L_{\text{FFT}}^{[\text{FD}-\text{CNG}]}}{8},\dots,\frac{3L_{\text{FFT}}^{[\text{FD}-\text{CNG}]}}{8} - 1 \text{.} \qquad (1989)$$

3GPP TS 26.445 version 16.2.0 Release 16 at 608.

197.    Based on the above Lenovo directly infringes at least claim 1 of the '993 Patent.

198.    In addition to direct infringement by making, using, offering to sell, selling, and/or importing Lenovo's EVS Products, Lenovo indirectly infringes the '993 Patent claims.

199.    Lenovo has indirectly infringed and continues to indirectly infringe the '993 Patent by inducing third parties to directly infringe that patent.

200.    Lenovo had actual knowledge of the '993 Patent at least as of its receipt of Plaintiff's FRAND package on October 13, 2023, and continues to import, make, use, sell, and/or offer for sale Lenovo's EVS Products. At the very latest, Lenovo had actual knowledge of the '993 Patent and of its infringement of that patent as of the date of this Complaint.  Where acts constituting direct infringement of the '993 Patent are not performed by Lenovo, such acts constituting direct infringement of the '993 Patent are performed by Lenovo's customers or end-users who act at the direction and/or control of Lenovo, with Lenovo's knowledge.

201.    Lenovo knows that the use of Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, to make a voice call using the EVS codec, constitutes infringement of the '993 Patent.

202.    Lenovo advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provide instructions on and/or encourage infringing use.

203.    Lenovo encourages and facilitates its customers to infringe the '993 Patent by instructing customers that purchase Lenovo's EVS Products that such devices have voice calling capability, and providing various indicators within those devices of the same.

204.    For instance, Lenovo provides its customers with a user guide for each of the accused EVS Products. The user guide includes instructions on how to make a phone call as shown in the example below:[26]



---

[26] https://en-us.support.motorola.com/app/answers/detail/a_id/184284/~/user-guide-%28html%29---moto-g-power---2025 (last visited October 16, 2025).

205. Using an accused device to make a phone call on an EVS-supported wireless carrier network, e.g., Verizon, results in infringement of the '993 Patent.

206. Plaintiff is informed and believes, and on that basis alleges, that Lenovo indirectly infringes at least claim 1 of the '993 Patent by active inducement in violation of 35 U.S.C. § 271(b), by at least manufacturing, importing, supplying, distributing, selling, and/or offering for sale Lenovo's EVS Products to its customers with the knowledge and intent that use of those products would constitute direct infringement of the '993 Patent. Lenovo has induced, and continues to induce, direct infringement of the '993 Patent by customers, importers, sellers, resellers, and/or end users of Lenovo's EVS Products.

207. End users of Lenovo's EVS Products, pursuant to Lenovo's instructions, indicators, and advertisements, thus each directly infringe the '993 Patent.

208. Lenovo also indirectly infringes by contributing to the infringement of, and continuing to contribute to the infringement of, one or more claims of the '993 Patent under 35 U.S.C. § 271(c) and/or 271(f) by selling, offering for sale, and/or importing into the United States, Lenovo's EVS Products. Lenovo knew at least as of its receipt of Plaintiff's FRAND package on October 13, 2023, that the accused products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '993 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

209. The acts of infringement by Lenovo have caused damage to Plaintiff, and Plaintiff is entitled to recover from Lenovo damages sustained by Plaintiff as a result of Lenovo's wrongful

86

acts in an amount subject to proof at trial. The infringement of the '993 Patent by Lenovo has damaged and will continue to damage Plaintiff.

210.    Lenovo had actual knowledge of, or was willfully blind to, the existence of the '993 Patent and Lenovo's infringement of the '993 Patent before the filing of this Complaint and at least as early as October 13, 2023, when it received the FRAND package from Fraunhofer.

211.    Despite this knowledge, Lenovo continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious that it should have been known to Lenovo. Thus, Lenovo's infringement has been, and continues to be, willful and deliberate.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 10,475,455

212.    Plaintiff hereby incorporates by reference and re-alleges the foregoing paragraphs as if fully set forth herein.

213.    On November 12, 2019, the USPTO duly and legally issued the '455 Patent, titled "Method and Apparatus for Obtaining Spectrum Coefficients for a Replacement Frame of an Audio Signal, Audio Decoder, Audio Receiver, and System for Transmitting Audio Signals."

214.    Pursuant to 35 U.S.C. § 282, the '455 Patent is presumed valid.

215.    CN105408956A is a Chinese published patent application claiming priority to the same application (EP2014063058) as the '455 Patent. CN105408956A was cited during prosecution of Lenovo Beijing's Chinese Patent No. CN106101925B in a supplementary search dated March 19, 2019. Therefore, Lenovo was aware of the existence of the '455 Patent family at least as early as March 19, 2019. On information and belief Lenovo was aware of the existence of the '455 Patent at least as early as November 12, 2019.

87

216.    The '455 Patent is generally directed toward an improvement in the coding of audio signals.  Specifically, it deals with frame-loss at an audio receiver.  The patent discloses a method for acquiring spectrum coefficients for a replacement frame of an audio signal.  The method detects a tonal component of a spectrum of an audio signal based on a peak that exists in the spectra of a last frame m−1 preceding a replacement frame m and a second to last frame m−2 preceding the replacement frame m.  Spectrum coefficients are predicted for the tonal component of the spectrum.

217.    The '455 Patent is not directed to conventional or well-known audio coding technology.  Rather, the '455 Patent improves existing audio codecs.  In this regard, the '455 Patent teaches:

> Embodiments of the systems, methods, and apparatuses are advantageous as they provide for a good frame-loss concealment of tonal signals with a good quality and without introducing any additional delay. Embodiments of a low delay codec are advantageous as they perform well on both speech and audio signals and benefits, for example in an error prone environment, from the good frame-loss concealment that is achieved especially for stationary tonal signals. A delay-less frame-loss-concealment of monophonic and polyphonic signals is disclosed, which delivers good results for tonal signals without degradation of the non-tonal signals.

> In many embodiments, an improved concealment of tonal components in the MDCT domain is provided. Embodiments relate to audio and speech coding that incorporate a frequency domain codec or a switched speech/frequency domain codec, in particular to a frame-loss concealment in the MDCT (Modified Discrete Cosine Transform) domain. In many embodiments, a delay-less method for constructing an MDCT spectrum for a lost frame based on the previously received frames is provided, where the last received frame is coded in the frequency domain using the MDCT.

> ***

> Embodiments of the inventive approach are advantageous, as they operate fully on the basis of information already available at the receiver side when determining that a frame has been lost or needs to be replaced and there is no need for additional side information that needs to be received so that there is also no source for additional delays which occur in conventional-technology approaches given the

88

requirement to either receive the additional side information or to derive the additional side information from the existing information at hand.

Embodiments of the inventive approach are advantageous when compared to the above described conventional-technology approaches as the subsequently outlined drawbacks of such approaches, which were recognized by the inventors are avoided when applying the inventive approach.

The methods for the frame-loss-concealment described in the Lauber reference are not robust enough and don't produce good enough results for tonal signals.

*** 

In the '009 Publication, an additional delay is introduced and significant side information may be used. The tonal component selection is very simple and will choose many peaks among non-tonal components.

The method described in the Ryu 2006/Paris reference may use a look-ahead on the decoder side and hence introduces an additional delay of one frame. Using the smoothed pseudo power spectrum for the peak detection reduces the precision of the location of the peaks. It also reduces the reliability of the detection since it will detect peaks from noise that appear in just one frame.

The method described in the Ryu 2007 reference may use a look-ahead on the decoder side and hence introduces an additional delay of two frames. The tonal component selection doesn't check for tonal components in two frames separately, but relies on an averaged spectrum, and thus it will have either too many false positives or false negatives making it impossible to tune the peak detection thresholds. The location of the peaks will not be precise because the pseudo power spectrum is used. The limited spectral range for peak search looks like a workaround for the described problems that arises because pseudo power spectrum is used.

The method described in the Ryu 2006/California reference is based on the method described in the Ryu 2007 reference; hence, it has the same drawbacks; it just overcomes the additional delay.

In the '288 Patent, there is no detailed description of the decision whether a spectral coefficient belongs to the tonal part of the signal. However, the synergy between the tonal spectral coefficients detection and the concealment is important and thus a good detection of tonal components is important. Further, it has not been recognized to use filters dependent on both $C_m$ and $C_{m-1}$ (that is $C_m$, $C_{m-1}$, and $S_{m-1}$, as $S_{m-1}$ can be calculated when $C_m$, and $C_{m-1}$ is available) to calculate $C'_m$ and $S'_m$. Also, it was not recognized to use the possibility to calculate a complex spectrum that is not aligned to the coded signal framing, which is given with low overlap

89

windows. In addition, it was not recognized to use the possibility to calculate the phase difference between frames only based on the second last complex spectrum.

In the '659 Publication, at least three previous frames are stored in memory, thereby significantly increasing the memory requirements. The decision whether to use tonal concealment may be wrong and a frame with one or more harmonics may be classified as a frame without multiple harmonics. The last received MDCT frame is not directly used to improve the prediction of the lost MDCT spectrum, but just in the search for the tonal components. The number of MDCT coefficients to be concealed for a harmonic is fixed, however, depending on the noise level, it is desirable to have a variable number of MDCT coefficients that constitute one harmonic.

'455 Patent at 8:29-50; 9:10-9:27; 9:33-10:18.

218.     The claims of the '455 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

219.     Plaintiff holds all rights, title, and interest in and to the '455 Patent, including the right to bring this suit and recover all past, present and future damages for infringement of the '455 Patent.  Lenovo is not licensed to the '455 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '455 Patent whatsoever.   As such, Lenovo's infringement described below has injured, and continues to injure, Plaintiff.

220.     On information and belief, Lenovo has directly infringed and continues to directly infringe the '455 Patent by, for example, making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services that practice one or more claims of the '455 Patent, including without limitation Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard. These Lenovo devices include Lenovo's EVS Products.

221.     The EVS codec is a speech audio codec defined by the EVS Standard.

222. Each of Lenovo's EVS Products includes hardware and software that implements the EVS codec. For example, hardware and/or software components comprising Lenovo's EVS Products are publicly identified as supporting the EVS codec and/or Enhanced HD Voice, Ultra HD Voice, or HD Voice+ services.

223. The '455 Patent is essential to the EVS Standard.

224. Because Lenovo's EVS Products include hardware and/or software components supporting the EVS codec compliant with the EVS Standard, Lenovo necessarily infringes the '455 Patent.

225. On information and belief, Lenovo tests, or directs or controls others to test, Lenovo's EVS Products to ensure they include hardware and software compliant with the EVS Standard.

226. For example, Lenovo's EVS Products practice and/or are capable of practicing claim 28 of the '455 Patent, which is directed to an apparatus which performs a method for acquiring spectrum coefficients. The following paragraphs provide details regarding one example of Lenovo's infringement, and only as to a single patent claim. Plaintiff reserves its right to provide greater detail and scope via its Disclosure of Asserted Claims and Preliminary Infringement Contentions at the time required under the Local Patent Rules of Practice and Procedure adopted by this Court and any applicable scheduling order.

227. Claim 28 (which references the method of claim 1) of the '455 Patent states:

1. A method for acquiring spectrum coefficients for a replacement frame of an audio signal, the method comprising:

91

detecting a tonal component of a spectrum of an audio signal based on a peak that exists in the spectra of a last frame m−1 preceding a replacement frame m and a second to last frame m−2 preceding the replacement frame m;

for the tonal component of the spectrum, predicting spectrum coefficients for the peak and its surrounding in the spectrum of the replacement frame m; and

for the non-tonal component of the spectrum, using a non-predicted spectrum coefficient for the replacement frame m or a corresponding spectrum coefficient of a frame preceding the replacement frame m.

28. An apparatus for acquiring spectrum coefficients for a replacement frame m of an audio signal, the apparatus being configured to operate according to the method of claim 1.

'455 Patent at 22:7–22; 24:48-50.

228.    Lenovo's EVS Products embody at least Claim 28 of the '455 Patent.

229.    On information and belief, Lenovo's EVS Products conform to and implement technical specifications of the EVS Standard, including the portions of the specifications referenced below.

230.    As shown below, Lenovo's EVS Products constitute an apparatus for acquiring spectrum coefficients for a replacement frame m of an audio signal in accordance with the method of claim 1.

231.    Lenovo's EVS Products practice a method for acquiring spectrum coefficients for a replacement frame of an audio signal:

92

# 5.4 Concealment operation related to MDCT modes

## 5.4.1 PLC method selection

There is a multitude of PLC methods for MDCT coding modes available. Best possible codec performance in error-prone situations with frame losses is obtained through selecting the most suitable method for a given bit rate, coded audio bandwidth, used MDCT mode and signal class.

The main selector is the MDCT mode of the previous frame, i.e. TCX MDCT or HQ MDCT. Second level criteria are described in the following subclauses.

## 5.4.2 TCX MDCT

### 5.4.2.1 PLC method selection

In case the last good frame prior to a loss was coded with the MDCT based TCX, a range of different specifically optimized PLC methods are available that are selected based on second level criteria described in this subclause. The PLC methods are:

- TCX time domain concealment

- MDCT frame repetition with sign scrambling

- tonal MDCT concealment using phase prediction

- non-tonal concealment with waveform adjustment

3GPP TS 26.447 version 14.2.0 Release 14 at 38.

### 5.4.2.4 Tonal MDCT concealment using phase prediction

#### 5.4.2.4.1 Overview

The phase prediction described in subclause 5.4.2.4.3 is performed on the spectral coefficients belonging to tonal components found using the peak detection described in subclause 5.4.2. For the spectral coefficients not belonging to the tonal components, the sign scrambling is applied as described in subclause 5.4.2.3.

3GPP TS 26.447 version 14.2.0 Release 14 at 42.

#### 5.4.2.4.2 Peak detection of tonal components

Peak detection is performed if the current frame is lost but the previous frame has been received.

The peaks are first searched in the power spectrum of frame $m-1$, using predefined thresholds. Based on the location of the peaks in frame $m-1$, the thresholds for the search in the power spectrum of frame $m-1.5$ are adapted, whereas frame $m-1.5$ represents the second 10ms of frame $m-2$ and the first 10ms of frame $m-1$. Thus, peaks existing in both spectra ($m-1$ and $m-1.5$) are found. Their exact location is based on the power spectrum of frame $m-1.5$.

3GPP TS 26.447 version 14.2.0 Release 14 at 43.

Case 5:25-cv-00680-FL    Document 1    Filed 10/27/25    Page 93 of 118

232.     As shown below, the method comprises detecting a tonal component of a spectrum of an audio signal based on a peak that exists in the spectra of a last frame m−1 preceding a replacement frame m and a second to last frame m−2 preceding the replacement frame m:

---

### 5.4.2.4.2          Peak detection of tonal components

Peak detection is performed if the current frame is lost but the previous frame has been received.

The peaks are first searched in the power spectrum of frame $m-1$, using predefined thresholds. Based on the location of the peaks in frame $m-1$, the thresholds for the search in the power spectrum of frame $m-1.5$ are adapted, whereas frame $m-1.5$ represents the second 10ms of frame $m-2$ and the first 10ms of frame $m-1$. Thus, peaks existing in both spectra ($m-1$ and $m-1.5$) are found. Their exact location is based on the power spectrum of frame $m-1.5$.

---

3GPP TS 26.447 version 14.2.0 Release 14 at 43.

233.     As shown below, the method comprises for the tonal component of the spectrum, predicting spectrum coefficients for the peak and its surrounding in the spectrum of the replacement frame m:

---

### 5.4.2.4          Tonal MDCT concealment using phase prediction

#### 5.4.2.4.1          Overview

The phase prediction described in subclause 5.4.2.4.3 is performed on the spectral coefficients belonging to tonal components found using the peak detection described in subclause 5.4.2. For the spectral coefficients not belonging to the tonal components, the sign scrambling is applied as described in subclause 5.4.2.3.

---

3GPP TS 26.447 version 14.2.0 Release 14 at 42.

---

### 5.4.2.4.3          Phase prediction

For all found tonal components $I_{Tones}$, that include spectrum peaks and their surroundings, as described in subclause 5.4.2.4.2.2, the MDCT phase prediction is used. For all other spectrum coefficients sign scrambling described in subclause 5.4.2.3 is used.

The phases are derived for each bin of a tonal component as:

$$\varphi^{[m-1.5]}(k) = \arctan\left(\frac{S^{[m-1.5]}(k)}{C^{[m-1.5]}(k)}\right), \quad k \in I_{Tone}, I_{Tone} \in I_{Tones} \qquad (142)$$

---

3GPP TS 26.447 version 14.2.0 Release 14 at 45.

The fractional part $\Delta l$ is given by:

$$\Delta l = \arctan\left(a \cdot \frac{b}{2}\right) \qquad (143)$$

with $a$ given in Table 2, depending on the neighboring bins around a spectral peak $l = i_{\max}$.

**Table 9: Variable a from equation (143)**

| if | a |
|---|---|
| $P^{[m-2]}(l-1) > mr \cdot P^{[m-2]}(l+1)$ | $\tan\left(\dfrac{0 \cdot \pi}{b}\right)$ |
| $P^{[m-2]}(l+1) > mr \cdot P^{[m-2]}(l-1)$ | $\tan\left(\dfrac{2 \cdot \pi}{b}\right)$ |
| else | $\dfrac{\cos\left(\dfrac{\pi}{b}\right) - \left(\dfrac{P^{[m-2]}(l-1)}{P^{[m-2]}(l+1)}\right)^G \cdot \cos\left(\dfrac{3 \cdot \pi}{b}\right)}{\sin\left(\dfrac{\pi}{b}\right) + \left(\dfrac{P^{[m-2]}(l-1)}{P^{[m-2]}(l+1)}\right)^G \cdot \sin\left(\dfrac{3 \cdot \pi}{b}\right)}$ |

Where the bandwidth $b$ is 7, the maximum ratio $mr$ is 44.8 and the constant $G$ is $\dfrac{1}{2 \cdot 1.36}$.

The phase shift, being the same for every spectrum bin in $I_{Tone}$, is derived as follows

$$\Delta\varphi = \pi \cdot l\%4 + \Delta l , \qquad (144)$$

where $l = i_{\max}$ is the index of the bin closest to the peak and $\Delta l$ is the fractional part (i.e. distance of the peak from $i_{\max}$ given as the fractional number of bins).

The current phase $\varphi^{[m]}(k)$ is estimated for each $k \in I_{Tone}$ using:

$$\varphi^{[m]}(k) = \varphi^{[m-1.5]}(k) + n_{\mathrm{frmdist}} \cdot \Delta\varphi \qquad (145)$$

where $n_{\mathrm{frmdist}} = 1.5$ for the first concealed frame and $n_{\mathrm{frmdist}}$ is increased for 1 for every consecutive frame loss. The correspondingt MDCT bins are estimated as:

$$C^{[m]}(k) = \sqrt{P^{[m-1.5]}(k)} \cdot \cos\left(\varphi^{[m]}(k)\right). \qquad (146)$$

3GPP TS 26.447 version 14.2.0 Release 14 at 46.

234.    As shown below, the method comprises for the non-tonal component of the spectrum, using a non-predicted spectrum coefficient for the replacement frame m or a corresponding spectrum coefficient of a frame preceding the replacement frame m:

### 5.4.2.3  MDCT frame repetition with sign scrambling

The excitation of the concealed frame (input to FDNS) $\bar{C}_{exc}^{[m]}(k)$ is derived by sign scrambling of the last received excitation spectrum $C_{exc\_lastGood}(k)$:

$$\bar{C}_{exc}^{[m]}(k) = \frac{randomVector(k)}{|randomVector(k)|} \cdot C_{exc\_lastGood}(k), \text{ for } k = [0,...,igfStartLine] \qquad (122)$$

$igfStartLine$ is the IGF cross over frequency. The $randomVector$ is derived as

$$randomVector(k) = randomVector(k-1) \cdot 31821 + 13849, \text{ for } k = [1,...,igfStartLine] \qquad (123)$$

For any lost frame following a received frame, the initial value is reset:

$$randomVector(0) = 1977 \qquad (123a)$$

If the last 2 spectra are coded using TCX5, then the one with smaller energy is chosen.

The spectrum $\bar{C}^{[m]}(k)$ is faded towards noise as described in subclause 5.4.6.1.3.2.1.

3GPP TS 26.447 version 14.2.0 Release 14 at 42.

### 5.4.2.4.3  Phase prediction

For all found tonal components $I_{Tones}$, that include spectrum peaks and their surroundings, as described in subclause 5.4.2.4.2.2, the MDCT phase prediction is used. For all other spectrum coefficients sign scrambling described in subclause 5.4.2.3 is used.

The phases are derived for each bin of a tonal component as:

$$\varphi^{[m-1.5]}(k) = \arctan\left( \frac{S^{[m-1.5]}(k)}{C^{[m-1.5]}(k)} \right), \quad k \in I_{Tone}, I_{Tone} \in I_{Tones} \qquad (142)$$

3GPP TS 26.447 version 14.2.0 Release 14 at 45.

235.    Based on the above Lenovo directly infringes at least claim 28 of the '455 Patent.

236.    In addition to direct infringement by making, using, offering to sell, selling, and/or importing Lenovo's EVS Products, Lenovo indirectly infringes the '455 Patent claims.

237.    Lenovo has indirectly infringed and continues to indirectly infringe the '455 Patent by inducing third parties to directly infringe that patent.

238. Lenovo had actual knowledge of the '455 Patent at least as of its issuance but no later than its receipt of Plaintiff's FRAND package on October 13, 2023, and continues to import, make, use, sell, and/or offer for sale Lenovo's EVS Products. At the very latest, Lenovo had actual knowledge of the '455 Patent and of its infringement of that patent as of the date of this Complaint. Where acts constituting direct infringement of the '455 Patent are not performed by Lenovo, such acts constituting direct infringement of the '455 Patent are performed by Lenovo's customers or end-users who act at the direction and/or control of Lenovo, with Lenovo's knowledge.

239. Lenovo knows that the use of Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, to make a voice call using the EVS codec, constitutes infringement of the '455 Patent.

240. Lenovo advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provide instructions on and/or encourage infringing use.

241. Lenovo encourages and facilitates its customers to infringe the '455 Patent by instructing customers that purchase Lenovo's EVS Products that such devices have voice calling capability, and providing various indicators within those devices of the same.

242. For instance, Lenovo provides its customers with a user guide for each of the accused EVS Products. The user guide includes instructions on how to make a phone call as shown in the example below:[27]

---

[27] https://en-us.support.motorola.com/app/answers/detail/a_id/184284/~/user-guide-%28html%29---moto-g-power---2025 (last visited October 16, 2025).

97



243.    Using an accused device to make a phone call on an EVS-supported wireless carrier network, e.g., Verizon, results in infringement of the '455 Patent.

244.    Plaintiff is informed and believes, and on that basis alleges, that Lenovo indirectly infringes at least claim 28 of the '455 Patent by active inducement in violation of 35 U.S.C. § 271(b), by at least manufacturing, importing, supplying, distributing, selling, and/or offering for sale Lenovo's EVS Products to its customers with the knowledge and intent that use of those products would constitute direct infringement of the '455 Patent.  Lenovo has induced, and continues to induce, direct infringement of the '455 Patent by customers, importers, sellers, resellers, and/or end users of Lenovo's EVS Products.

245.    End users of Lenovo's EVS Products, pursuant to Lenovo's instructions, indicators, and advertisements, thus each directly infringe the '455 Patent.

246.    Lenovo also indirectly infringes by contributing to the infringement of, and continuing to contribute to the infringement of, one or more claims of the '455 Patent under 35

98

U.S.C. § 271(c) and/or 271(f) by selling, offering for sale, and/or importing into the United States, Lenovo's EVS Products. Lenovo knew at least as of its receipt of Plaintiff's FRAND package on October 13, 2023, that the accused products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '455 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

247.     The acts of infringement by Lenovo have caused damage to Plaintiff, and Plaintiff is entitled to recover from Lenovo damages sustained by Plaintiff as a result of Lenovo's wrongful acts in an amount subject to proof at trial. The infringement of the '455 Patent by Lenovo has damaged and will continue to damage Plaintiff.

248.     Lenovo had actual knowledge of, or was willfully blind to, the existence of the '455 Patent and Lenovo's infringement of the '455 Patent before the filing of this Complaint and at least as early as its issuance but no later than October 13, 2023, when it received the FRAND package from Fraunhofer.

249.     Despite this knowledge, Lenovo continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious that it should have been known to Lenovo. Thus, Lenovo's infringement has been, and continues to be, willful and deliberate.

## COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 10,249,317

250.     Plaintiff hereby incorporates by reference and re-alleges the foregoing paragraphs as if fully set forth herein.

251. On April 2, 2019, the USPTO duly and legally issued the '317 Patent, titled "Estimating Noise of an Audio Signal in a LOG2-Domain."

252. Pursuant to 35 U.S.C. § 282, the '317 Patent is presumed valid.

253. The '317 Patent is generally directed toward an improvement in the coding of audio signals. Specifically, it deals with noise estimation. Estimating noise in a signal typically involves computing the power spectrum, which means transforming the signal into the frequency domain and calculating the square of each frequency bin. The square function means that a 16-bit sample resolution requires 32 bits of dynamic range. Complicating this further, summing up several power spectrum bins into bands requires even more headroom, meaning that typically around 40-bits are needed for the estimation process. For mobile devices, which typically support data in a 16 or 32 bit fixed point format, this requires splitting the data into two: a mantissa and exponent (i.e., scientific notation). This adds even more complexity to the estimation process. By converting the energy levels into the log-2 domain, the invention reduces the complex overhead needed, simplifying the process.

254. The '317 Patent is not directed to conventional or well-known audio coding technology. Rather, the '317 Patent improves existing audio codecs. In this regard, the '317 Patent teaches:

> The present invention is based on the inventors' findings that, contrary to conventional approaches in which a noise estimation algorithm is run on linear energy data, for the purpose of estimating noise levels in audio/speech material, it is possible to run the algorithm also on the basis of logarithmic input data. For the noise estimation the demand on data precision is not very high, for example when using estimated values for comfort noise generation as described in PCT/EP2013/077525 or PCT/EP2013/077527, both being incorporated herein by reference, it has been found that it is sufficient to estimate a roughly correct noise level per band, i.e., whether the noise level is estimated to be, e.g., 0.1 dB higher or not will not be noticeable in the final signal. Thus, while 40 bits may be needed to cover the dynamic range of the data, the data precision for mid/high level signals, in conventional approaches, is much higher than actually necessitated. On

100

the basis of these findings, in accordance with embodiments, the key element of the invention is to convert the energy value per band into the logarithmic domain, advantageously the log 2-domain, and to carry out the noise estimation, for example on the basis of the minimum statistics algorithm or any other suitable algorithm, directly in a logarithmic domain which allows expressing the energy values in 16 bits which, in turn, allows for a more efficient processing, for example using a fixed point processor.

'317 Patent at 4:44–5:3.

255. The claims of the '317 Patent are novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination.

256. Plaintiff holds all rights, title, and interest in and to the '317 Patent, including the right to bring this suit and recover all past, present and future damages for infringement of the '317 Patent. Lenovo is not licensed to the '317 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '317 Patent whatsoever. As such, Lenovo's infringement described below has injured, and continues to injure, Plaintiff.

257. On information and belief, Lenovo has directly infringed and continues to directly infringe the '317 Patent by, for example, making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services that practice one or more claims of the '317 Patent, including without limitation Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard. These Lenovo devices include Lenovo's EVS Products.

258. The EVS codec is a speech audio codec defined by the EVS Standard.

259. Each of Lenovo's EVS Products includes hardware and software that implements the EVS codec. For example, hardware and/or software components comprising Lenovo's EVS

Products are publicly identified as supporting the EVS codec and/or Enhanced HD Voice, Ultra HD Voice, or HD Voice+ services.

260.     The '317 Patent is essential to the EVS Standard.

261.     Because Lenovo's EVS Products include hardware and/or software components supporting the EVS codec compliant with the EVS Standard, Lenovo necessarily infringes the '317 Patent.

262.     On information and belief, Lenovo tests, or directs or controls others to test, Lenovo's EVS Products to ensure they include hardware and software compliant with the EVS Standard.

263.     For example, Lenovo's EVS Products practice and/or are capable of practicing claim 9 of the '317 Patent, which is directed to a non-transitory digital storage medium having stored thereon a computer program for performing a method for estimating noise in an audio signal. The following paragraphs provide details regarding one example of Lenovo's infringement, and only as to a single patent claim. Plaintiff reserves its right to provide greater detail and scope via its Disclosure of Asserted Claims and Preliminary Infringement Contentions at the time required under the Local Patent Rules of Practice and Procedure adopted by this Court and any applicable scheduling order.

264.     Claim 9 of the '317 Patent states:

9. A non-transitory digital storage medium having stored thereon a computer program for performing a method for estimating noise in an audio signal, the method comprising:

determining an energy value for the audio signal;

converting the energy value into the log 2-domain, and

estimating a noise level for the audio signal based on the converted energy value

directly in the log 2-domain,

wherein the energy value is converted into the log 2-domain as follows:

$$E_{n\_log} = \frac{\lfloor (\log_2(1 + E_{n\_lin})) \cdot 2^N \rfloor}{2^N}$$

$\lfloor x \rfloor$ floor (x),

$E_{n\_log}$ energy value of band n in the log 2-domain,

$E_{n\_lin}$ energy value of band n in the linear domain,

N quantization resolution,

when said computer program is run by a computer.

'317 Patent at 15:5-24.

265.    Lenovo's EVS Products implement at least Claim 9 of the '317 Patent.

266.    On information and belief, Lenovo's EVS Products conform to and implement technical specifications of the EVS Standard, including the portions of the specifications referenced below.

267.    Lenovo's EVS Products include a non-transitory digital storage medium having stored thereon a computer program (i.e., the EVS codec) for performing the method shown below.

268.    As shown below, Lenovo's EVS Products practice a method for estimating noise in an audio signal:

## 4.1 Introduction

The present document is a detailed description of the signal processing algorithms of the Enhanced Voice Services coder. The detailed mapping from 20ms input blocks of audio samples in 16 bit uniform PCM format to encoded blocks of bits and from encoded blocks of bits to output blocks of reconstructed audio samples is explained. Four sampling rates are supported; 8 000, 16 000, 32 000 and 48 000 samples/s and the bit rates for the encoded bit stream of may be 5.9, 7.2, 8.0, 9.6, 13.2, 16.4, 24.4, 32.0, 48.0, 64.0, 96.0 or 128.0 kbit/s. An AMR-WB Interoperable mode is also provided which operates at bit rates for the encoded bit stream of 6.6, 8.85, 12.65, 14.25, 15.85, 18.25, 19.85, 23.05 or 23.85 kbit/s.

3GPP TS 26.445 version 14.2.0 Release 14 at 20.

## 5 Functional description of the encoder

The description of the encoder is as follows. First, common pre-processing is described, and then the different elements of the encoder are described one by one. The discontinuous transmission (DTX) operation and the AMR-WB interoperable option are then given in separate subclauses, again referencing the same processing as in the default option.

3GPP TS 26.445 version 14.2.0 Release 14 at 25.

## 5.6.1 Overview

This subclause describes the discontinuous transmission (DTX) scheme and the comfort noise generation (CNG) algorithm. The DTX/CNG operation, which is activated on a command line, is used to reduce the transmission rate by simulating background noise during inactive signal periods. The regular DTX/CNG modes are supported for bit rates up to 24.4 kbps. For higher bit rates, the EVS codec supports a less aggressive DTX/CNG scheme that only switches to CNG for low input signal power.

The reduction of the transmission rate during inactive periods is achieved by coding the parameters referred to as comfort noise (CN) parameters. These parameters are used at the decoder to regenerate the background noise as well as possible, by respecting the spectral and temporal content of the background noise at the encoder. In the EVS Codec, the CNG algorithm reproduces high quality comfort noise by choosing between a linear prediction-domain based coding mode (LP-CNG) and a frequency-domain based coding mode (FD-CNG), according to the input characteristics. Each of the two coding modes utilizes a different set of CN parameters. In the LP-CNG mode, four CN parameters are analyzed and encoded: the low-band excitation energy, the low-band signal spectrum, the low-band excitation envelope and the high-band energy, where the high-band energy is only encoded for SWB/FB input. In the FD-CNG mode, the CN parameters consisting of global gain and spectral energies grouped in critical bands. Those parameters are encoded by a vector quantizer for transmission.

3GPP TS 26.445 version 14.2.0 Release 14 at 423.

Case 5:25-cv-00680-FL    Document 1    Filed 10/27/25    Page 104 of 118

### 5.6.3 Encoding for FD-CNG

To be able to produce an artificial noise resembling the actual input background noise in terms of spectro-temporal characteristics, the FD-CNG makes use of a noise estimation algorithm to track the energy of the background noise present at the encoder input. The noise estimates are then transmitted as parameters in the form of SID frames to update the amplitude of the random sequences generated in each frequency band at the decoder side during inactive phases. Note, however, that the noise estimation is carried out continuously on every frame, i.e., regardless of the speech activity. Therefore, it can deliver some meaningful information about the noise spectrum at any time, in particular at the very beginning of a speech pause.

3GPP TS 26.445 version 14.2.0 Release 14 at 434.

### 5.6.3.2 FD-CNG noise estimation

The FD-CNG relies on a noise estimator to track the energy of the background noise present in the input spectrum. This is mostly based on the minimum statistics algorithm [R. Martin, Noise Power Spectral Density Estimation Based on Optimal Smoothing and Minimum Statistics, 2001].

3GPP TS 26.445 version 14.2.0 Release 14 at 436.

269. As shown below, the method comprises determining an energy value for the audio signal:

### 3 Definitions, abbreviations and mathematical expressions

### 3.1 Definitions

For the purposes of the present document, the terms and definitions given in TR 21.905 [1] and the following apply. A term defined in the present document takes precedence over the definition of the same term, if any, in TR 21.905 [1].

**frame:** an array of audio samples spanning 20ms time duration.

3GPP TS 26.445 version 14.2.0 Release 14 at 17.

105

## 5.1.5    Spectral analysis

Spectral analysis is used in the encoder for signal activity detection (SAD) and signal classification functions. The discrete Fourier transform (DFT) is used to perform the spectral analysis and spectral energy estimation.

### 5.1.5.1    Windowing and DFT

The frequency analysis is done twice per frame using 256-point fast Fourier transform (FFT) with a 50% overlap. The centre of the first window is placed 96 samples past the beginning of the current frame. The centre of the second window is placed 128 samples farther, i.e., in the middle of the second subframe of the current frame. A square root of a Hanning window (which is equivalent to a sine window) is used to weight the input signal for the frequency analysis. The square root Hanning window is given by

$$w_{FFT}(n) = \sqrt{0.5 - 0.5\cos\left(\frac{2\pi n}{L_{FFT}}\right)} = \sin\left(\frac{\pi n}{L_{FFT}}\right), \qquad n = 0,...,L_{FFT}-1 \qquad (21)$$

where $L_{FFT} = 256$ is the size of FFT analysis. Note that only half of the window is computed and stored since it is symmetric (from 0 to $L_{FFT}/2$).



**Figure 5: Relative positions of the spectral analysis windows**

3GPP TS 26.445 version 14.2.0 Release 14 at 30.

### 5.1.5.2    Energy calculations

The spectral analysis module also calculates several energy-related parameters. For example, an average energy per critical band is computed as

$$E_{CB}(i) = \frac{1}{(L_{FFT}/2)^2 M_{CB}(i)} \sum_{k=0}^{M_{CB}(i)-1} \left(X_R^2(k+j_i) + X_I^2(k+j_i)\right), \qquad i = 0,...,19 \qquad (24)$$

where $X_R(k)$ and $X_I(k)$ are, respectively, the real and the imaginary parts of the $k$-th frequency bin and $j_i$ is the index of the first bin in the $i$th critical band given by $j_i = \{1, 3, 5, 7, 9, 11, 13, 16, 19, 22, 26, 30, 35, 41, 47, 55, 64, 75, 89, 107\}$. Furthermore, energy per frequency bin, $E_{BIN}(k)$, is calculated as

$$E_{BIN}(k) = \frac{4}{L_{FFT}^2}\left(X_R^2(k) + X_I^2(k)\right), \qquad k = 0,...,127 \qquad (25)$$

3GPP TS 26.445 version 14.2.0 Release 14 at 31.

Case 5:25-cv-00680-FL    Document 1    Filed 10/27/25    Page 106 of 118

### 5.6.3.1    Spectral partition energies

The partition energies are computed separately for the FFT and CLDFB bands. The $L_{\text{part}}^{[\text{FFT}]}$ energies corresponding to the FFT partitions and the $L_{\text{part}}^{[\text{CLDFB}]}$ energies corresponding to the CLDFB partitions are then concatenated into a single array $E_{\text{FD-CNG}}$ of size $L_{\text{part}} = L_{\text{part}}^{[\text{FFT}]} + L_{\text{part}}^{[\text{CLDFB}]}$ which will serve as input to the noise estimator described in subclause 5.6.3.2.

### 5.6.3.1.1    Computation of the FFT partition energies

Partition energies for the frequencies covering the core bandwidth are obtained as

$$E_{\text{FD-CNG}}(i) = \frac{E_{\text{CB}}^{[0]}(i) + E_{\text{CB}}^{[1]}(i)}{2} H_{\text{de-emph}}(i) \qquad\qquad i = 0,...,L_{\text{part}}^{[\text{FFT}]} - 1 , \qquad (1356)$$

where $E_{\text{CB}}^{[0]}(i)$ and $E_{\text{CB}}^{[1]}(i)$ are the average energies in critical band $i$ for the first and second analysis windows, respectively, as explained in subclause 5.1.5.2. The number of FFT partitions $L_{\text{part}}^{[\text{FFT}]}$ depends on the sampling rate $sr_{\text{HP}}$ of the input signal, as show in Table 133. The de-emphasis spectral weights $H_{\text{de-emph}}(i)$ are used to compensate for the high-pass filter described in subclause 5.1.4 and are defined as

$$\left\{ H_{\text{de-emph}}(0),...,H_{\text{de-emph}}(L_{\text{part}}^{[\text{FFT}]}-1) \right\} = \{\ 9.7461, 9.5182, 9.0262, 8.3493, 7.5764, 6.7838, 5.8377,$$
$$4.8502, 4.0346, 3.2788, 2.6283, 2.0920, 1.6304, 1.2850, \qquad (1357)$$
$$1.0108, 0.7916, 0.6268, 0.5011, 0.4119, 0.3637\ \}.$$

3GPP TS 26.445 version 14.2.0 Release 14 at 435.

270.    As shown below, the method comprises converting the energy value into the log 2-domain:

### 3.3    Mathematical Expressions

For the purposes of the present document, the following conventions apply to mathematical expressions:

$\lfloor x \rfloor$   indicates the largest integer less than or equal to $x$: $\lfloor 1.1 \rfloor = 1$, $\lfloor 1.0 \rfloor = 1$ and $\lfloor -1.1 \rfloor = -2$ ;

3GPP TS 26.445 version 14.2.0 Release 14 at 19.

which is converted to the linear domain by

$$\hat{\hat{E}} = 2^{\hat{\hat{E}}_{\text{log}}} \qquad\qquad (1339)$$

3GPP TS 26.445 version 14.2.0 Release 14 at 431.

### 6.1.5.1.3.1    LSF de-quantizing

The first five LSFs $\hat{\rho}_k^{SHB}$, $k = 1,\dots,5$ are reconstructed directly from the received CB indices. The mirroring frequency and optimal grid are reconstructed from the received indics. The upper-half ot the coefficients $\hat{\rho}_k^{SHB}$, $k = 6,\dots,10$ are reconstructed by flipping the lower-half of the coefficients over the reconstructed mirroring frequency, rescaling and then smoothing with the reconstructed optimal grid, as described in subclause 5.2.4.1.3.1.

$$\hat{\rho}_{k+5}^{SHB} = (1 - \lambda_k)\tilde{\rho}_k^{SHB} + \lambda_k \tilde{g}_{i^{opt},k} \quad k = 1,\dots,5 \tag{1551}$$

Using the received VQ index parameter for the gain shape, the de-quantized gain shape vector that contains the gain shape parameter in the log domain is retrieved. The quantized gain shape parameters $gs_q(j)$ for $j = 1,\dots 4$ are then obtained from the log domain values by inverse logarithm operation.

The de-quantized frame gain parameter $GF_q$ is obtained by obtaining the log domain frame gain value from the table and by converting this back into linear domain by inverse logarithm operation.

For the bit rates of 24.4 kb/s and 32 kb/s, the de-quantized high band subframe residual energy $\hat{\vartheta}_{res_q}(j)$, the de-quantized high band target energy, $\vartheta_q$ and the mixing factor, $fac_q$ ,are obtained by table lookup using the respective received indices.

3GPP TS 26.445 version 14.2.0 Release 14 at 486.

### 5.6.3.1    Spectral partition energies

The partition energies are computed separately for the FFT and CLDFB bands. The $L_{part}^{[FFT]}$ energies corresponding to the FFT partitions and the $L_{part}^{[CLDFB]}$ energies corresponding to the CLDFB partitions are then concatenated into a single array $E_{FD-CNG}$ of size $L_{part} = L_{part}^{[FFT]} + L_{part}^{[CLDFB]}$ which will serve as input to the noise estimator described in subclause 5.6.3.2.

#### 5.6.3.1.1    Computation of the FFT partition energies

Partition energies for the frequencies covering the core bandwidth are obtained as

$$E_{FD-CNG}(i) = \frac{E_{CB}^{[0]}(i) + E_{CB}^{[1]}(i)}{2} H_{de-emph}(i) \qquad i = 0,\dots,L_{part}^{[FFT]}-1 , \tag{1356}$$

where $E_{CB}^{[0]}(i)$ and $E_{CB}^{[1]}(i)$ are the average energies in critical band $i$ for the first and second analysis windows, respectively, as explained in subclause 5.1.5.2. The number of FFT partitions $L_{part}^{[FFT]}$ depends on the sampling rate $sr_{HP}$ of the input signal, as show in Table 133. The de-emphasis spectral weights $H_{de-emph}(i)$ are used to compensate for the high-pass filter described in subclause 5.1.4 and are defined as

$$\begin{aligned}\{H_{de-emph}(0),\dots,H_{de-emph}(L_{part}^{[FFT]}-1)\} = \{\, &9.7461, 9.5182, 9.0262, 8.3493, 7.5764, 6.7838, 5.8377, \\ &4.8502, 4.0346, 3.2788, 2.6283, 2.0920, 1.6304, 1.2850, \\ &1.0108, 0.7916, 0.6268, 0.5011, 0.4119, 0.3637 \,\}.\end{aligned} \tag{1357}$$

108

### 5.6.3.2 FD-CNG noise estimation

The FD-CNG relies on a noise estimator to track the energy of the background noise present in the input spectrum. This is mostly based on the minimum statistics algorithm [R. Martin, Noise Power Spectral Density Estimation Based on Optimal Smoothing and Minimum Statistics, 2001].

However, to reduce the dynamic range of the input energies $\{E_{\text{FD-CNG}}(0),...,E_{\text{FD-CNG}}(L_{\text{part}}-1)\}$ and hence facilitate the fixed-point implementation of the noise estimation algorithm, a non-linear transform is applied before noise estimation (see subclause 5.6.3.2.1). The inverse transform is then used on the resulting noise estimates to recover the original dynamic range (see subclause 5.6.3.2.3). The resulting noise estimates are used in subclause 5.6.3.5 to encode the SID frames.

### 5.6.3.2.1 Dynamic range compression for the input energies

The input energies are processed by a non-linear function and quantized with 9-bit resolution as follows:

$$E_{\text{MS}}(i) = \frac{\left\lfloor \log_2\left(\left(1 + E_{\text{FD-CNG}}(i)\right)2^9\right)\right\rfloor}{2^9} \qquad i = 0,...,L_{\text{part}}-1 . \qquad (1361)$$

271. As shown below, the method comprises estimating a noise level for the audio signal based on the converted energy value directly in the log 2-domain:

### 5.6.3.2.2 Noise tracking

The input energy $E_{\text{MS}}(i)$ corresponds to an instantaneous power for the $i$-th partition, referred to as periodogram in the sequel. The minimum statistics algorithm relies on an optimally smoothed periodogram $P_{\text{MS}}(i)$ which can be considered as an estimate of the input power spectral density. The algorithm derives therefore an estimate of the noise power spectral density which we denote in the following as $N_{\text{MS}}(i)$. As described in the sequel, some additional smoothing of $N_{MS}(i)$ is applied, yielding the smoothed noise estimate $\overline{N}_{\text{MS}}(i)$ introduced in subclause 5.6.3.2.2.5.

#### 5.6.3.2.2.1 Initialization phase

To correctly initialize the noise estimation algorithm, an initialization phase is used as long as the input energy $E_{\text{MS}}(0)$ of the first partition grows. Note that the initialization phase is also triggered when a reset of the noise estimation algorithm is judged necessary, as described in subclause 5.6.3.4.

The following applies for each partition $i = 0,...,L_{\text{part}}-1$ during the initialization phase:

$$P_{\text{MS}}(i) = N_{\text{MS}}(i) = \overline{N}_{\text{MS}}(i) = E_{\text{MS}}(i) . \qquad (1362)$$

109

**5.6.3.2.2.2**     **Optimal smoothing of the input energies**

As mentioned earlier, the power spectral density estimate $P_{\text{MS}}(i)$ is computed iteratively as a smoothed version of the input energy $E_{\text{MS}}(i)$, i.e.,

$$P_{\text{MS}}(i) = \alpha_{\text{opt}}(i) P_{\text{MS}}(i) + \left(1 - \alpha_{\text{opt}}(i)\right) E_{\text{MS}}(i) \qquad i = 0,...,L_{\text{part}} - 1, \qquad (1365)$$

**5.6.3.2.2.3**     **Bias compensation**

The minimum statistics algorithm essentially consists in tracking the minima of $P_{\text{MS}}(i)$ for each partition $i$ over time. However, this method delivers some biased estimates and necessitates therefore the computation of a bias compensation factor which is dependent on the variance of $P_{\text{MS}}(i)$.

**5.6.3.2.2.4**     **Minimum tracking**

For the sake of simplicity, we provide a description of the minimum tracking algorithm for the FFT partitions only. The CLDFB partitions can be treated in the same way.

The noise estimate $N_{\text{MS}}(i)$ is updated to $P_{\text{min,out}}(i)$ after each frame, except for the first frame in each sub-window.

**5.6.3.2.2.5**     **Smoothing of the noise estimates**

The main outputs of the noise tracker are the noise estimates $N_{\text{MS}}(i), i = 0,...,L_{\text{part}} - 1$. To obtain smoother transitions in the comfort noise, a first-order recursive filter is applied, i.e.

$$\overline{N}_{\text{MS}}(i) = 0.95\,\overline{N}_{\text{MS}}(i) + 0.05\,N_{\text{MS}}(i). \qquad (1393)$$

Furthermore, the input energy $E_{\text{MS}}(i)$ is averaged over the last 5 frames. This is used to apply an upper limit on $\overline{N}_{\text{MS}}(i)$ in each spectral partition.

272.     As shown below, the energy value is converted into the log 2-domain as follows:

110

$$E_{n\_log} = \frac{\lfloor (\log_2(1 + E_{n\_lin})) \cdot 2^N \rfloor}{2^N}$$

$\lfloor x \rfloor$ floor (x),

$E_{n\_log}$ energy value of band n in the log 2-domain,

$E_{n\_lin}$ energy value of band n in the linear domain,

N quantization resolution:

## 3.3  Mathematical Expressions

For the purposes of the present document, the following conventions apply to mathematical expressions:

$\lfloor x \rfloor$  indicates the largest integer less than or equal to $x$: $\lfloor 1.1 \rfloor = 1$, $\lfloor 1.0 \rfloor = 1$ and $\lfloor -1.1 \rfloor = -2$;

3GPP TS 26.445 version 14.2.0 Release 14 at 19.

which is converted to the linear domain by

$$\hat{\hat{E}} = 2^{\hat{\hat{E}}_{\log}} \qquad (1339)$$

3GPP TS 26.445 version 14.2.0 Release 14 at 431.

#### 6.1.5.1.3.1 LSF de-quantizing

The first five LSFs $\hat{\rho}_k^{SHB}$, $k=1,\ldots,5$ are reconstructed directly from the received CB indices. The mirroring frequency and optimal grid are reconstructed from the received indics. The upper-half ot the coefficients $\hat{\rho}_k^{SHB}$, $k=6,\ldots,10$ are reconstructed by flipping the lower-half of the coefficients over the reconstructed mirroring frequency, rescaling and then smoothing with the reconstructed optimal grid, as described in subclause 5.2.4.1.3.1.

$$\hat{\rho}_{k+5}^{SHB} = (1-\lambda_k)\tilde{\rho}_k^{SHB} + \lambda_k \tilde{g}_{i^{opt},k} \quad k=1,\ldots,5 \tag{1551}$$

Using the received VQ index parameter for the gain shape, the de-quantized gain shape vector that contains the gain shape parameter in the log domain is retrieved. The quantized gain shape parameters $gs_q(j)$ for $j=1,\ldots4$ are then obtained from the log domain values by inverse logarithm operation.

The de-quantized frame gain parameter $GF_q$ is obtained by obtaining the log domain frame gain value from the table and by converting this back into linear domain by inverse logarithm operation.

For the bit rates of 24.4 kb/s and 32 kb/s, the de-quantized high band subframe residual energy $\hat{\vartheta}_{res_q}(j)$, the de-quantized high band target energy, $\vartheta_q$ and the mixing factor, $fac_q$ ,are obtained by table lookup using the respective received indices.

3GPP TS 26.445 version 14.2.0 Release 14 at 486.

### 5.6.3.1 Spectral partition energies

The partition energies are computed separately for the FFT and CLDFB bands. The $L_{\text{part}}^{[\text{FFT}]}$ energies corresponding to the FFT partitions and the $L_{\text{part}}^{[\text{CLDFB}]}$ energies corresponding to the CLDFB partitions are then concatenated into a single array $E_{\text{FD-CNG}}$ of size $L_{\text{part}} = L_{\text{part}}^{[\text{FFT}]} + L_{\text{part}}^{[\text{CLDFB}]}$ which will serve as input to the noise estimator described in subclause 5.6.3.2.

#### 5.6.3.1.1 Computation of the FFT partition energies

Partition energies for the frequencies covering the core bandwidth are obtained as

$$E_{\text{FD-CNG}}(i) = \frac{E_{\text{CB}}^{[0]}(i) + E_{\text{CB}}^{[1]}(i)}{2} H_{\text{de-emph}}(i) \qquad i=0,\ldots,L_{\text{part}}^{[\text{FFT}]}-1 \ , \tag{1356}$$

where $E_{\text{CB}}^{[0]}(i)$ and $E_{\text{CB}}^{[1]}(i)$ are the average energies in critical band $i$ for the first and second analysis windows, respectively, as explained in subclause 5.1.5.2. The number of FFT partitions $L_{\text{part}}^{[\text{FFT}]}$ depends on the sampling rate $sr_{\text{HP}}$ of the input signal, as show in Table 133. The de-emphasis spectral weights $H_{\text{de-emph}}(i)$ are used to compensate for the high-pass filter described in subclause 5.1.4 and are defined as

$$\left\{ H_{\text{de-emph}}(0),\ldots,H_{\text{de-emph}}(L_{\text{part}}^{[\text{FFT}]}-1) \right\} = \{ 9.7461, 9.5182, 9.0262, 8.3493, 7.5764, 6.7838, 5.8377,$$
$$4.8502, 4.0346, 3.2788, 2.6283, 2.0920, 1.6304, 1.2850, \tag{1357}$$
$$1.0108, 0.7916, 0.6268, 0.5011, 0.4119, 0.3637 \}.$$

112

3GPP TS 26.445 version 14.2.0 Release 14 at 435.

---

### 5.6.3.2     FD-CNG noise estimation

The FD-CNG relies on a noise estimator to track the energy of the background noise present in the input spectrum. This is mostly based on the minimum statistics algorithm [R. Martin, Noise Power Spectral Density Estimation Based on Optimal Smoothing and Minimum Statistics, 2001].

However, to reduce the dynamic range of the input energies $\{E_{\text{FD-CNG}}(0),....,E_{\text{FD-CNG}}(L_{\text{part}}-1)\}$ and hence facilitate the fixed-point implementation of the noise estimation algorithm, a non-linear transform is applied before noise estimation (see subclause 5.6.3.2.1). The inverse transform is then used on the resulting noise estimates to recover the original dynamic range (see subclause 5.6.3.2.3). The resulting noise estimates are used in subclause 5.6.3.5 to encode the SID frames.

---

3GPP TS 26.445 version 14.2.0 Release 14 at 436.

---

### 5.6.3.2.1     Dynamic range compression for the input energies

The input energies are processed by a non-linear function and quantized with 9-bit resolution as follows:

$$E_{\text{MS}}(i) = \frac{\left\lfloor \log_2\left(\left(1 + E_{\text{FD-CNG}}(i)\right)2^9\right) \right\rfloor}{2^9} \qquad i = 0,...,L_{\text{part}}-1. \qquad (1361)$$

Background of using log2 is that the (int)log2 can usually be calculated very quickly (in one cycle) on fixed-point processors using the "norm" function which determines the numbers of leading zeros in a fixed point number.

Background for adding a constant 1 inside the log2 function is to ensure that the converted energies $E_{\text{MS}}(i)$ remain positive. This is especially important as the noise estimator rely on a statistical model of the noise energy. Performing noise estimation on negative values would strongly violate the model and can result in unexpected behaviour.

---

3GPP TS 26.445 version 14.2.0 Release 14 at 436–37.

273.    The EVS codec is a computer program that is run by Lenovo's EVS Products which constitute a computer.

274.    Based on the above Lenovo directly infringes at least claim 9 of the '317 Patent.

275.    In addition to direct infringement by making, using, offering to sell,  selling, and/or importing Lenovo's EVS Products, Lenovo indirectly infringes the '317 Patent claims.

276.    Lenovo has indirectly infringed and continues to indirectly infringe the '317 Patent by inducing third parties to directly infringe that patent.

277. Lenovo had actual knowledge of the '317 Patent at least as of its receipt of Plaintiff's FRAND package on October 13, 2023, and continues to import, make, use, sell, and/or offer for sale Lenovo's EVS Products. At the very latest, Lenovo had actual knowledge of the '317 Patent and of its infringement of that patent as of the date of this Complaint. Where acts constituting direct infringement of the '317 Patent are not performed by Lenovo, such acts constituting direct infringement of the '317 Patent are performed by Lenovo's customers or end-users who act at the direction and/or control of Lenovo, with Lenovo's knowledge.

278. Lenovo knows that the use of Lenovo's mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, to make a voice call using the EVS codec, constitutes infringement of the '317 Patent.

279. Lenovo advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provide instructions on and/or encourage infringing use.

280. Lenovo encourages and facilitates its customers to infringe the '317 Patent by instructing customers that purchase Lenovo's EVS Products that such devices have voice calling capability, and providing various indicators within those devices of the same.

281. For instance, Lenovo provides its customers with a user guide for each of the accused EVS Products. The user guide includes instructions on how to make a phone call as shown in the example below:[28]

---

[28] https://en-us.support.motorola.com/app/answers/detail/a_id/184284/~/user-guide-%28html%29---moto-g-power---2025 (last visited October 16, 2025).



282.     Using an accused device to make a phone call on an EVS-supported wireless carrier network, e.g., Verizon, results in infringement of the '317 Patent.

283.     Plaintiff is informed and believes, and on that basis alleges, that Lenovo indirectly infringes at least claim 9 of the '317 Patent by active inducement in violation of 35 U.S.C. § 271(b), by at least manufacturing, importing, supplying, distributing, selling, and/or offering for sale Lenovo's EVS Products to its customers with the knowledge and intent that use of those products would constitute direct infringement of the '317 Patent.  Lenovo has induced, and continues to induce, direct infringement of the '317 Patent by customers, importers, sellers, resellers, and/or end users of Lenovo's EVS Products.

284.     End users of Lenovo's EVS Products, pursuant to Lenovo's instructions, indicators, and advertisements, thus each directly infringe the '317 Patent.

285.     Lenovo also indirectly infringes by contributing to the infringement of, and continuing to contribute to the infringement of, one or more claims of the '317 Patent under 35

115

U.S.C. § 271(c) and/or 271(f) by selling, offering for sale, and/or importing into the United States, Lenovo's EVS Products. Lenovo knew at least as of its receipt of Plaintiff's FRAND package on October 13, 2023, that the accused products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '317 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

286.    The acts of infringement by Lenovo have caused damage to Plaintiff, and Plaintiff is entitled to recover from Lenovo damages sustained by Plaintiff as a result of Lenovo's wrongful acts in an amount subject to proof at trial. The infringement of the '317 Patent by Lenovo has damaged and will continue to damage Plaintiff.

287.    Lenovo had actual knowledge of, or was willfully blind to, the existence of the '317 Patent and Lenovo's infringement of the '317 Patent before the filing of this Complaint and at least as early as October 13, 2023, when it received the FRAND package from Fraunhofer.

288.    Despite this knowledge, Lenovo continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or obvious that it should have been known to Lenovo. Thus, Lenovo's infringement has been, and continues to be, willful and deliberate.

## JURY DEMAND

289.    Plaintiff hereby demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests entry of judgment in its favor and against Lenovo as follows:

116

a) A declaration that Lenovo has infringed and is infringing one or more claims of the '631 Patent, either literally or under the doctrine of equivalents;

b) A declaration that Lenovo has infringed and is infringing one or more claims of the '263 Patent, either literally or under the doctrine of equivalents;

c) A declaration that Lenovo has infringed and is infringing one or more claims of the '624 Patent, either literally or under the doctrine of equivalents;

d) A declaration that Lenovo has infringed and is infringing one or more claims of the '993 Patent, either literally or under the doctrine of equivalents;

e) A declaration that Lenovo has infringed and is infringing one or more claims of the '455 Patent, either literally or under the doctrine of equivalents;

f) A declaration that Lenovo has infringed and is infringing one or more claims of the '317 Patent, either literally or under the doctrine of equivalents;

g) An award of damages pursuant to 35 U.S.C. §§ 284, 285, 286, and 287 adequate to compensate Plaintiff for Lenovo's infringement of the Asserted Patents in an amount according to proof at trial (together with prejudgment and post-judgment interest), but no less than a reasonable royalty, including but not limited to a post-judgment running royalty in lieu of a permanent injunction;

h) A declaration that Lenovo's infringement is willful since at least as early as its receipt of the FRAND package on October 13, 2023, and enhancing damages pursuant to 35 U.S.C. § 284;

i) An award of costs and expenses pursuant to 35 U.S.C. § 284 or as otherwise permitted by law;

j)   An award of attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

k)   Such other and further relief, whether legal, equitable, or otherwise, to which Plaintiff may be entitled or which this Court may order.

Dated:  October 27, 2025

Respectfully submitted,

*/s/* Amir H. Alavi
Amir H. Alavi
Texas Bar No. 00793239
Demetrios Anaipakos
Texas Bar No. 00793258
Scott W. Clark
Texas Bar No. 24007003
Masood Anjom
Texas Bar No. 24055107
manjom@aatriallaw.com
ALAVI & ANAIPAKOS PLLC
609 Main Street, Suite 3200
Houston, Texas 77002
Telephone: (713) 751-2362
Facsimile: (713) 751-2341
Email: aalavi@aatriallaw.com
Email: danaipakos@aatriallaw.com
Email: sclark@aatriallaw.com
Email: manjom@aatriallaw.com

*Counsel for Plaintiff*

*/s/* Robert J. Morris
Robert J. Morris
N.C. State Bar No. 15981
SMITH ANDERSON BLOUNT DORSETT
MITCHELL & JERNIGAN, LLP
150 Fayetteville Street
Suite 2300
Raleigh, North Carolina 27601
Telephone: (919) 821-1220
Facsimile: (919) 821-6800
Email: jmorris@smithlaw.com

*Local Rule 83.1 Counsel for Plaintiff*

118